**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Miami Division**

Case No. 10-60017-CIV-ASG
L.T. Nos. 08-10928-JKO & 08-01435-JKO

In re:
TOUSA, INC., *et al.*,

                 Debtors.

---

3V CAPITAL MASTER FUND LTD., *et al.*,

                 Appellants,

         vs.

OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF TOUSA, INC., *et al.,*

                 Appellees,

        and

TOUSA, INC., *et al.*,

                 Appellees.

**APPEAL BRIEF OF THE TRANSEASTERN LENDERS**

## TABLE OF CONTENTS

Page(s)

INTRODUCTION ................................................................................................. 1

STATEMENT OF APPELLATE JURISDICTION ............................................ 4

STATEMENT OF ISSUES ................................................................................. 5

STANDARD OF REVIEW ................................................................................. 6

STATEMENT OF THE CASE............................................................................ 7

    A.    Nature of the Case................................................................................ 7

    B.    Course of Proceedings ......................................................................... 7

    C.    Factual Background ............................................................................. 9

ARGUMENT ...................................................................................................... 13

I.    THE BANKRUPTCY COURT'S THEORIES OF THE TRANSEASTERN
LENDERS' LIABILITY ARE CONTRARY TO SETTLED BANKRUPTCY
LAW ......................................................................................................... 13

    A.    The Court's "Direct Transferee" Theory Of The Transeastern Lenders'
Liability Is Incorrect ........................................................................ 13

        1.    The Conveying Subsidiaries Did Not Have A Property Interest In
The Loan Proceeds Within The Meaning Of Section 548 ....................... 14

        2.    The Bankruptcy Court Erred In Finding No Reasonably Equivalent
Value For Any Direct Transfer Of A Conveying Subsidiary
Interest In The New Loan Proceeds To The Transeastern Lenders.......... 19

            a.    The Bankruptcy Court Misapplied The Reasonably
Equivalent Value Test.................................................................. 19

            b.    The Bankruptcy Court Improperly Disregarded Indirect
Benefits To The Conveying Subsidiaries ..................................... 21

            c.    The Bankruptcy Court Erroneously Excluded Admissible
Testimony On Benefits Received ................................................. 22

    B.    The Transeastern Lenders Cannot Be Compelled To Disgorge The Value
Of The Liens As The Parties "For Whose Benefit" the New Loans Were
Made ................................................................................................. 24

II.    THE REMEDIES ORDERED BY THE BANKRUPTCY COURT ARE
LEGALLY IMPERMISSIBLE................................................................. 31

    A.    The Bankruptcy Court Awarded An Impermissible Remedy And Double
Recovery In Ordering The Transeastern Lenders To Pay Diminution
Damages............................................................................................. 31

    B.    The Bankruptcy Court Erred In Ordering The Transeastern Lenders To
Disgorge Funds That Will Be Distributed To The New Lenders ......... 36

i

1.  The Bankruptcy Court Did Not Have Jurisdiction To Redistribute Funds From The Transeastern Lenders To The New Lenders ................ 36

2.  The Bankruptcy Court Did Not Have The Equitable Power To Redistribute Property ............................................................... 37

3.  Public Policy Disfavors The Risk-Shifting Imposed By The Bankruptcy Court .................................................................. 39

4.  The Bankruptcy Court's Findings Do Not Support the Equitable Redistribution Ordered ............................................................ 40

C.  The Bankruptcy Court's Award of Attorneys' Fees Is Impermissible ................ 43

D.  The Bankruptcy Court's Award Of Prejudgment Interest Is Impermissibly Punitive .................................................................. 46

III.  IF THE BANKRUPTCY COURT'S LIABILITY HOLDING STANDS, THE TRANSEASTERN LENDERS' PROPERTY AND CONTRACTUAL RIGHTS AGAINST THE TOUSA ESTATE MUST BE ENFORCED ......................................... 49

A.  The Transeastern Lenders Are Entitled To Their Liens Against The Transeastern Assets Held By TOUSA Homes Florida, L.P. ................ 49

B.  The Transeastern Lenders' Recoupment Rights Are Cognizable ........................ 50

IV.  IT WOULD BE JUST UNDER THE CIRCUMSTANCES TO REASSIGN THIS CASE IF REMAND IS WARRANTED ....................................... 53

CONCLUSION .................................................................. 55

# <u>TABLE OF AUTHORITIES</u>

## CASES

*A.N. Deringer, Inc. v. United States*,
  287 F. Supp. 1016 (Cust. Ct. 1968) ............................................................... 23

*Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*,
  421 U.S. 240 (1975)......................................................................................... 44

*Amdura Nat'l Distrib. Co. v. Amdura Corp. (In re Amdura Corp.)*,
  75 F.3d 1447 (10th Cir. 1996) ........................................................................ 44

*American Bank of Martin County v. Leasing Serv. Corp. (In re Air Conditioning, Inc. of Stuart)*,
  845 F.2d 293 (11th Cir. 1988) ......................................................... 27, 28, 29

*Anzalone v. Dulgerian (In re Dulgerian)*,
  388 B.R. 142 (Bankr. E.D. Pa. 2008) ............................................................ 18

*AT & T v. City of N.Y.*,
  83 F.3d 549 (2d Cir. 1996)............................................................................... 41

*Bakst v. Presley (In re Presley Corp.)*,
  44 B.R. 781 (Bankr. S.D. Fla. 1984)............................................................... 47

*Bakst v. Sawran (In re Sawran)*,
  359 B.R. 348 (Bankr. S.D. Fla. 2007) ............................................................ 32

*Bakst v. Wetzel (In re Kingsley)*,
  518 F.3d 874 (11th Cir. 2008) ................................................................. 32, 44

*BankBoston, N.A. v. Sokolowski (In re Sokolowski)*,
  205 F.3d 532 (2d Cir. 2000)............................................................................. 45

*Bash v. Sun Trust Banks, Inc. (In re Ohio Business Machines, Inc.)*,
  No. 06-8005, 2007 Bankr. LEXIS 133 (B.A.P. 6th Cir. Jan. 25, 2007) ............... 18

*Bonded Fin. Servs. Inc. v. European Am. Bank (In re Bonded Fin. Servs.)*,
  838 F.2d 890 (7th Cir. 1988) ................................................................... 25, 26

*Brown v. Phillips (In re Phillips)*,
  379 B.R. 765 (Bankr. N.D. Ill. 2007) ............................................................. 45

*CCEC Asset Mgmt. Corp. v. Chemical Bank (In re Consol. Capital Equities Corp.)*,
  175 B.R. 629 (Bankr. N.D. Tex. 1994).......................................................... 26

*Christ v. Beneficial Corp.*,
  547 F.3d 1292 (11th Cir. 2008) ...................................................................... 44

*Chudasama v. Mazda Motor Corp.*,
  123 F.3d 1353 (11th Cir. 1997) ................................................................. 6, 53

*City of Milwaukee v. Cement Div., Nat'l Gypsum Co.*,
    515 U.S. 189 (1995) .................................................................................. 46

*Colnaghi, U.S.A., Ltd. v. Jewelers Prot. Servs., Ltd.*,
    611 N.E.2d 282 (N.Y. 1993) ..................................................................... 41

*Colony Square Co. v. Prudential Ins. Co. of Am. (In re Colony Square Co.)*,
    819 F.2d 272 (11th Cir. 1987) ..................................................................... 6

*Contemporary Indus. Corp. v. Frost (In re Contemporary Indus. Corp.)*,
    No. BR 98-80382, Adv. 99-8135, 2001 WL 34630639 (Bankr. D. Neb. Feb.
    14, 2001) ................................................................................................... 25

*Crafts Plus+, Inc. v. Foothill Capital Corp. (In re Crafts Plus+, Inc.)*,
    220 B.R. 331 (Bankr. W.D. Tex. 1998) ..................................................... 29

*Development Specialists, Inc. v. Hamilton Bank, N.A. (In re Model Imperial, Inc.)*,
    250 B.R. 776 (Bankr. S.D. Fla. 2000) ....................................................... 47

*Dow Chem. Can. Inc. v. HRD Corp.*,
    656 F. Supp. 2d 427 (D. Del. 2009) ........................................................... 52

*Dzikowski v. NASD Regulation, Inc.*,
    247 B.R. 867 (S.D. Fla. 2000) ................................................................... 15

*Enron Corp. v. Port of Houston Auth. (In re Enron Corp.)*,
    Nos. 01-160334 (AJG), 03-92511, 2006 WL 2385194 (Bankr. S.D.N.Y. June
    2, 2006) ..................................................................................................... 44

*Estate of Shafer v. Commissioner of Internal Revenue*,
    749 F.2d 1216 (6th Cir. 1984) ................................................................... 23

*Feltman v. City Nat'l Bank of Fla. (In re Sophisticated Commc'ns, Inc.)*,
    No. 02-1526-BKC-RAM-A, 2007 Bankr. LEXIS 3744 (Bankr. S.D. Fla. Oct.
    24, 2007) ................................................................................................... 48

*Feltman v. Warmus (In re American Way Serv. Corp.)*,
    229 B.R. 496 (Bankr. S.D. Fla. 1999) ....................................................... 35

*Friedman v. Ginsburg (In re David Jones Builder, Inc.)*,
    129 B.R. 682 (Bankr. S.D. Fla. 1991) ....................................................... 47

*Furr v. Reynolds (In re Reynolds)*,
    151 B.R. 974 (Bankr. S.D. Fla. 1993) ....................................................... 21

*General Elec. Credit Corp. v. Murphy (In re Rodriguez)*,
    895 F.2d 725 (11th Cir. 1990) ................................................................... 22

*Georgian Villa, Inc. v. United States (In re Georgian Villa, Inc.)*,
    55 F.3d 1561 (11th Cir. 1995) ................................................................... 38

*Geremia v. Dwyer (In re Dwyer)*,
    250 B.R. 472 (Bankr. D.R.I. 2000) ............................................................ 21

*Geron v. Palladin Overseas Fund, Ltd. (In re AppliedTheory Corp.)*,
    330 B.R. 362 (S.D.N.Y. 2005) ................................................................... 21

*Ghazal v. RJM Acquisitions Funding, LLC,*
  No 06-22699-Civ., 2008 WL 2439508 (S.D. Fla. June 16, 2008) ....................... 51

*Glanz v. RJF Int'l Corp. (In re Glanz),*
  205 B.R. 750 (Bankr. D. Md. 1997) ..................................................... 33

*Gold v. Interstate Fin. Corp. (In re Schmiel),*
  319 B.R. 520 (Bankr. E.D. Mich. 2005) ................................................. 33

*Gouveia v. Cahillane (In re Cahillane),*
  408 B.R. 175 (Bankr. N.D. Ind. 2009) .................................................. 45

*Goveart v. Capital Bank (In re Miami Gen. Hosp., Inc.),*
  124 B.R. 383 (Bankr. S.D. Fla. 1991) .............................................. 19, 40

*Harbour Oaks Dev. Corp. v. Southtrust Bank, N.A. (In re Harbour Oaks Dev.
  Corp.),*
   224 B.R. 228 (Bankr. M.D. Fla. 1998) ................................................ 37

*Harker v. Wells Fargo Bank, NA (In re Krause),*
  414 B.R. 243 (Bankr. S.D. Ohio 2009) ................................................. 38

*Hearn v. Leary,*
  211 N.Y.S. 668 (Sup. Ct. 1925) ....................................................... 30

*Henderson v. National Bank of Commerce (In re Al-Ben, Inc.),*
  156 B.R. 72 (Bankr. N.D. Ala. 1991) .................................................. 14

*In re Ace Fruit & Produce Co.,*
  49 F. Supp. 986, 990 (S.D.N.Y. 1943) ................................................. 45

*In re Best Prods. Co.,*
  168 B.R. 35 (Bankr. S.D.N.Y. 1994) ................................................... 49

*In re Bill Heard Enters., Inc.,*
  400 B.R. 813 (Bankr. N.D. Ala. 2009) ................................................. 51

*In re Dillon,*
  194 B.R. 533 (Bankr. S.D. Fla. 1996) ................................................. 38

*In re Smith,*
  966 F.2d 1527 (7th Cir. 1992) ........................................................ 18

*In re Tinker,*
  355 B.R. 380 (Bankr. D. Mass. 2006) .................................................. 49

*In re Win-Sum Sports, Inc.,*
  14 B.R. 389 (Bankr. D. Conn. 1981) ................................................... 30

*Industrial Risk Insurers v. M.A.N. Gutehoffnungshutte GmbH,*
  141 F.3d 1434 (11th Cir. 1998) ....................................................... 46

*Jensen v. Gillman (In re Gillman),*
  120 B.R. 219 (Bankr. M.D. Fla. 1990) ................................................. 21

*Kansas v. Colorado,*
  129 S. Ct. 1294 (2009) ............................................................... 44

*Kapila v. Espirito Santo Bank (In re Bankest Capital Corp.)*,
    374 B.R. 333 (Bankr. S.D. Fla. 2007) ........................................................................ 14, 15

*Kapila v. Moodie (In re Moodie)*,
    362 B.R. 554 (Bankr. S.D. Fla. 2007) .............................................................................. 21

*Kelley v. Chevy Chase Bank (In re Smith)*,
    236 B.R. 91 (Bankr. M.D. Ga. 1999) ............................................................................... 33

*Kelley v. GMAC (In re Farmer)*,
    209 B.R. 1022 (Bankr. M.D. Ga. 1997) ........................................................................... 33

*Kellogg v. Blue Quail Energy, Inc. (In re Compton Corp.)*,
    831 F.2d 586 (5th Cir. 1987) ........................................................................................... 28

*Kendall v. Carbaat (In re Carbaat)*,
    357 B.R. 553 (Bankr. N.D. Cal. 2006) ............................................................................ 20

*Kerusa Co. v. W10Z/515 Real Estate, L.P.*,
    810 N.Y.S.2d 861 (Sup. Ct. 2005) ................................................................................... 42

*Kittay v. Peter D. Leibowits Co. (In re Duke & Benedict, Inc.)*,
    265 B.R. 524 (Bankr. S.D.N.Y. 2001) ............................................................................ 20

*Krol v. Unglaub (In re Unglaub)*,
    332 B.R. 303 (Bankr. N.D. Ill. 2005) .............................................................................. 45

*Laird v. Bartz (In re Newman Cos.)*,
    140 B.R. 495 (Bankr. E.D. Wis. 1992) ........................................................................... 26

*Largen v. United States*,
    No. 93-333-Civ-Orl-3 ABF (22), 1995 U.S. Dist. LEXIS 10507 (M.D. Fla.
    July 14, 1995) .................................................................................................................... 41

*Levine v. Custom Carpet Shop, Inc. (In re Flooring Am., Inc.)*,
    302 B.R. 394 (Bankr. N.D. Ga. 2003) ............................................................................. 15

*Levit v. Ingersoll Rand Fin. Corp.*,
    874 F.2d 1186 (7th Cir. 1989) ......................................................................................... 28

*Lindquist v. Household Indus. Fin. Co. (In re Vondall)*,
    352 B.R. 193 (Bankr. D. Minn. 2006) ............................................................................ 34

*Manchester v. First Bank & Trust Co. (In re Moses)*,
    256 B.R. 641 (B.A.P. 10th Cir. 2000) ............................................................................. 18

*Merrill v. Abbott (In re Independent Clearing House Co.)*,
    41 B.R. 985 (Bankr. D. Utah 1984) ................................................................................. 48

*Merrill v. Dietz (In re Universal Clearing House Co.)*,
    62 B.R. 118 (D. Utah 1986) ............................................................................................. 26

*Miller v. Kemira, Inc. (In re Lemco Gypsum, Inc.)*,
    910 F.2d 784 (11th Cir. 1990) ......................................................................................... 37

*Moser v. Toyota Motor Credit Corp. (In re Davis)*,
    Adv. No. 08-4042, 2009 WL 1033194 (Bankr. E.D. Tex. Mar. 24, 2009) ...................... 33

*Murchison v. Grand Cyprus Hotel Corp.*,
   13 F.3d 1483 (11th Cir. 1994) ........................................................................ 40

*National Fire Ins. Co. of Hartford v. Fortune Constr. Co.*,
   No. 06-14614, 2007 WL 1047070 (11th Cir. Apr. 9, 2007) .................................. 46

*New Eng. Dairies, Inc. v. Dairy Mart Convenience Stores, Inc. (In re Dairy Mart
   Convenience Stores, Inc.)*,
   351 F.3d 86 (2d Cir. 2003) .............................................................................. 38

*New York Assets Realization Co. v. McKinnon*,
   209 F. 791 (2d. Cir. 1913) .............................................................................. 30

*Nordberg v. Sanchez (In re Chase & Sanborn Corp.)*,
   813 F.2d 1177 (11th Cir. 1987) ...................................................................... 14

*Nordberg v. Societe Generale (In re Chase & Sanborn Corp.)*
   848 F.2d 1196 (11th Cir. 1988) ................................................................ 14, 15

*Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*,
   458 U.S. 50 (1982) ........................................................................................ 37

*Official Comm. of Unsecured Creditors of M. Fabrikant & Sons, Inc. v. J.P.
   Morgan Chase Bank, N.A. (In re M. Fabrikant & Sons, Inc.)*,
   394 B.R. 721 (Bankr. S.D.N.Y. 2008) ............................................................... 22

*Official Unsecured Creditors' Comm. v. Stern (In re SPM Mfg. Corp.)*,
   984 F.2d 1305 (1st Cir. 1993) ........................................................................ 38

*Olson v. Parker (In re Parker)*,
   395 B.R. 12 (Bankr. W.D. Mich. 2008) ............................................................. 33

*Osterneck v. E.T. Barwick Indus.*,
   825 F.2d 1521 (11th Cir. 1987) ...................................................................... 46

*Pembroke Dev. Corp. v. Commonwealth Sav. & Loan Ass'n (In re Pembroke Dev.
   Corp.)*,
    124 B.R. 398 (Bankr. S.D. Fla. 1991) .............................................................. 19

*Peralta v. Figueroa*,
   No. 28093/06, 2007 WL 4104122 (N.Y. Sup. Ct. Nov. 14, 2007) ....................... 41

*Pereira v. Aetna Cas. & Sur. Co. (In re Payroll Express Corp.)*,
   216 B.R. 344 (S.D.N.Y. 1997) .................................................................... 23, 24

*Peterson v. Berg (In re Berg)*,
   387 B.R. 524 (Bankr. N.D. Ill. 2008) ............................................................... 33

*Peterson v. Hofmann (In re Delta Phones, Inc.)*,
   Adv. No. 05 A 1205, 2005 WL 3542667 (Bankr. N.D. Ill. Dec. 23, 2005) ........... 27

*Precision Instrument Mfg. Co. v. Automotive Maint. Mach. Co.*,
   324 U.S. 806 (1945) ...................................................................................... 41

*Ragsdale v. Bank S., N.A. (In re Whiteacre Sunbelt, Inc.)*,
   206 B.R. 1010 (Bankr. N.D. Ga. 1997) ............................................................ 25

*Roberts v. City of Troy,*
    773 F.2d 720 (6th Cir. 1985) ................................................................ 23

*Rodriguez v. DaimlerChrysler Fin. Servs. Ams. LLC (In re Bremer),*
    408 B.R. 355 (B.A.P. 10th Cir. 2009) ............................................... 32, 36

*Rodriguez v. Drive Fin. Servs. LP (In re Trout),*
    392 B.R. 869 (Bankr. D. Colo. 2008) ................................................ 32, 33

*Roost v. Associates Home Equity Serv. (In re Williams),*
    234 B.R. 801 (Bankr. D. Or. 1999) ......................................................... 33

*Savage & Assocs., P.C. v. Mandl (In re Teligent Inc.),*
    380 B.R. 324 (Bankr. S.D.N.Y. 2008) ..................................................... 48

*Schnittjer v. Linn Area Credit Union (In re Sickels),*
    392 B.R. 423 (Bankr. N.D. Iowa 2008) ......................................... 32, 33, 34

*Securities Investor Prot. Corp. v. Stratton Oakmont, Inc.,*
    234 B.R. 293 (Bankr. S.D.N.Y. 1999) ..................................................... 25

*Shimer v. Fugazy (In re Fugazy Express, Inc.),*
    159 B.R. 432 (Bankr. S.D.N.Y. 1993) ..................................................... 45

*Slone v. Lassiter (In re Grove-Merritt),*
    406 B.R. 778 (Bankr. S.D. Ohio 2009) ................................................... 20

*Smith v. American Fin. Sys., Inc. (In re Smith),*
    737 F.2d 1549 (11th Cir. 1984) .............................................................. 51

*Southmark Corp. v. Grosz (In re Southmark Corp.),*
    49 F.3d 1111 (5th Cir. 1995) .................................................................. 44

*Southwest Marine Inc. v. Danzig,*
    217 F.3d 1128 (9th Cir. 2000) ................................................................ 51

*St. Paul Fire & Marine Ins. Co. v. Lago Canyon, Inc.,*
    561 F.3d 1181 (11th Cir. 2009) .............................................................. 46

*Stalnaker v. DLC, Ltd. (In re DLC, Ltd.),*
    295 B.R. 593 (B.A.P. 8th Cir. 2003), *aff'd,* 376 F.3d 819 (8th Cir. 2004) .......................... 33

*Suhar v. Burns (In re Burns),*
    322 F.3d 421 (6th Cir. 2003) .................................................................. 32

*T. B. Westex Foods, Inc. v. Federal Deposit Ins. Corp. (In re T.B. Westex Foods, Inc.),*
    950 F.2d 1187 (5th Cir. 1992) ................................................................ 29

*Tavormina v. Capital Factors, Inc. (In re Jarax Int'l, Inc.),*
    164 B.R. 180 (Bankr. S.D. Fla. 1993) ..................................................... 15

*Tavormina v. Merchants Bank of Miami (In re Gillett),*
    55 B.R. 675 (Bankr. S.D. Fla. 1985) ....................................................... 47

*TeleFest, Inc. v. VU-TV, Inc.,*
    591 F. Supp. 1368 (D.N.J. 1984) ...................................................... 21, 40

*Tolz v. Lauderdale Dev., Ltd. (In re Empresa Naviera Santa USA, Inc.)*,
   235 B.R. 130 (Bankr. S.D. Fla. 1999) ............................................................... 45

*Tolz v. Miller (In re Todd)*,
   391 B.R. 504 (Bankr. S.D. Fla. 2008) ............................................................... 21

*Turner v. Phoenix Fin., L.L.C. (In re Imageset, Inc.)*,
   299 B.R. 709 (Bankr. D. Me. 2003) .................................................................. 25

*United States v. Craft*,
   535 U.S. 274 (2002) ......................................................................................... 18

*United States v. Kapila*,
   402 B.R. 56 (S.D. Fla. 2008) ........................................................................... 14

*United States v. Sanford (In re Sanford)*,
   979 F.2d 1511 (11th Cir. 1992) ........................................................................ 38

*United States v. Security Indus. Bank*,
   459 U.S. 70 (1982) ........................................................................................... 50

*United States v. Spiwak (In re Spiwak)*,
   285 B.R. 744 (S.D. Fla. 2002) ........................................................................... 6

*USAA Fed. Sav. Bank v. Thacker (In re Taylor)*,
   390 B.R. 654 (B.A.P. 9th Cir. 2008), *rev'd*, 599 F.3d 880 (9th Cir. 2010) ........................ 34

*Vazquez Laboy v. Doral Mortgage Corp. (In re Vazquez Laboy)*,
   397 B.R. 627 (Bankr. D.P.R. 2008) .................................................................. 34

*Wisconsin Dep't of Indus., Labor & Human Relations v. Marine Bank Monroe (In re Kubly)*,
   818 F.2d 643 (7th Cir. 1987) ............................................................................ 37

*Yoppolo v. Liberty Mortgage (In re Morgan)*,
   276 B.R. 785 (Bankr. N.D. Ohio 2001) ...................................................... 31, 32

## STATUTES

28 U.S.C. § 158 .................................................................................................... 4

28 U.S.C. § 2106 ................................................................................................ 53

Bankr. Code, 11 U.S.C. § 105 ...................................................................... 37, 38

Bankr. Code, 11 U.S.C. § 547 .................................................................... passim

Bankr. Code, 11 U.S.C. § 548 .................................................................... passim

Bankr. Code, 11 U.S.C. § 550(a) ............................................................... passim

Bankr. Code, 11 U.S.C. § 550(b) ................................................................. 24, 26

Bankr. Code, 11 U.S.C. § 550(d) ...................................................................... 34

## RULES

Fed. R. Bankr. P. 8001(a) ................................................................................. 4

Fed. R. Evid. 801(d)(2) ................................................................................... 22

## TREATISES

4 L. King, *Collier on Bankruptcy*, ¶ 550.02 (15th ed. 1990) ...................................... 45

4 L. King, *Collier on Bankruptcy*, ¶ 550.02 (15th ed. 1992) ...................................... 45

4 Norton Bankr. L. & Prac. 3d § 70:3 ................................................................... 32

5 Collier on Bankruptcy ¶ 550-02(a)[1][b] (16th ed. 2010) ........................................ 45

## OTHER AUTHORITIES

Brian E. Greer & Joel S. Moss, *Guaranties in Bankruptcy: A Primer*,
16 J. Bankr. L. & Prac. 3 Art. 2 (2007) ............................................................. 40

George G. Triantis, *A Tussle with TOUSA: Savings Clauses in Intercorporate
Guaranties*
(Harvard Public Law Working Paper, No. 09-68, 2009), *available at*
http://ssrn.com/abstract=1507754 ................................................................. 35

Jack F. Williams, *The Fallacies of Contemporary Fraudulent Transfer Models as
Applied to Intercorporate Guarantees*,
15 Cardozo L. Rev. 1403 (1994) ............................................................. 19, 40

Kenneth J. Carl, *Fraudulent Transfer Attacks on Guaranties in Bankruptcy*,
60 Am. Bankr. L.J. 109 (1986) ..................................................................... 40

Michael F. Maglio, *The Promise, Part II: Corporations, Obligations and
Fraudulent Conveyances*,
14 Bus. L. Today 25 (2005) ......................................................................... 40

## <u>INTRODUCTION</u>

Appellants are a collection of financial entities (the "<u>Transeastern Lenders</u>")[1] that loaned approximately $421 million in 2005 to a homebuilding joint venture involving TOUSA, Inc. ("<u>TOUSA</u>") and TOUSA Homes, L.P. ("<u>TOUSA Homes</u>").  The bankruptcy court in this case ordered the Transeastern Lenders to disgorge over $403 million received in repayment of their valid antecedent debt, and to pay prejudgment interest for a total disgorgement of more than $480 million.  The Transeastern Lenders appeal from that judgment.

TOUSA's repayment to the Transeastern Lenders was made in one of a series of multi-party transactions that took place on July 31, 2007.  Those transactions involved essentially three distinct asset transfers:

(1)     TOUSA caused certain of its subsidiaries (the Conveying Subsidiaries[2]) to convey liens on their real property assets (the "<u>Liens</u>") and become obligated to a collection of financial entities (the "<u>New Lenders</u>");

(2)     in exchange for the Liens and the obligations, the New Lenders loaned funds and provided other credit facilities (collectively, the "<u>New Loans</u>") to TOUSA; and

(3)     TOUSA used the funds from the New Lenders in part to satisfy its $421 million debt to the Transeastern Lenders.

Six months later, TOUSA filed for bankruptcy protection.  Moving on behalf of the Conveying Subsidiaries only, the Official Committee of Unsecured Creditors of TOUSA, Inc. (the "<u>Committee</u>") filed an adversary proceeding in the bankruptcy court, seeking to unwind

---

[1]     The Transeastern Lenders are defined in Appendix A.  The Transeastern Lenders were referred to as the "Senior Transeastern Lenders" prior to this appeal and are so referenced in decisions of the bankruptcy court.

[2]     As defined in the Third Amended Adversary Complaint (D.E. 243) ¶ 9.

each of these transactions.  Adopting the Plaintiff's Proposed Findings of Fact and Conclusions of Law (D.E. 690)[3] (the "Plaintiff's Proposed Opinion") nearly verbatim, the bankruptcy court ordered the Transeastern Lenders to disgorge $403 million of the $421 million repayment of the debt they were owed, in addition to avoiding the Liens.  The order was based on the theory that two of the transfers on July 31, 2007—the Conveying Subsidiaries' transfer of the Liens to the New Lenders (the "Lien Transfer") and TOUSA's transfer of the New Loan proceeds to the Transeastern Lenders (the "Transeastern Settlement")—were "fraudulent transfers" under Section 548 of the Bankruptcy Code (11 U.S.C. §§ 101, et seq.).

The bankruptcy court was wrong.  There is no valid principle of bankruptcy law under which the Transeastern Lenders can be required to disgorge the $403 million of debt satisfaction.  Nobody contends that the debt was not genuine, due, and owing.  Outside of the 90-day preference period, during which payments favoring one creditor over another are voidable under Section 547 of the Bankruptcy Code, a party is generally free to pay debts as it sees fit.  A transaction that takes place more than 90 days before the bankruptcy filing—as here—can be avoided only if it is deemed a "fraudulent transfer" under Section 548 of the Bankruptcy Code.  The bankruptcy court adopted two distinct fraudulent transfer theories, but neither supplies a legally valid basis for requiring the Transeastern Lenders to disgorge the debt repayment.

First, the court held that the Conveying Subsidiaries had their own property interest in the New Loan proceeds received by TOUSA, and that the Conveying Subsidiaries did not receive "reasonably equivalent value" in exchange for that interest when TOUSA transferred the funds to the Transeastern Lenders.  The bankruptcy court avoided the transfer under Section 548.  But the court's premise is unambiguously wrong:  under Section 548, a party has a

---

[3]     Unless otherwise indicated, docket entries refer to the docket for the adversary proceeding, Case No. 08-01435-JKO.

transferrable property interest in funds *only* if that party has the authority to control the funds transferred.  Here, the Conveying Subsidiaries had no authority to control the distribution of proceeds of the New Loans.  Because the Conveying Subsidiaries did not and could not control the proceeds of the New Loans, it was not their property to transfer.

Second, the court found that the Conveying Subsidiaries did not receive reasonably equivalent value in exchange for their transfer of Liens to the New Lenders.  Even if that finding were correct—which is the subject of the New Lenders' separate appeals—as a matter of bankruptcy law that finding has nothing to do with the Transeastern Lenders' liability to the TOUSA estate.  The bankruptcy court erroneously relied on Bankruptcy Code Section 550(a), which provides that a party "for whose benefit" a fraudulent transfer was made can be compelled to disgorge the benefit, to conclude that the Transeastern Lenders could be held responsible for the fraudulent transfer of the Liens to the New Lenders.  Under settled law, however, the Transeastern Lenders were *not* parties "for whose benefit" the Liens were transferred within the meaning of Section 550(a), because they did not receive an immediate benefit from the Lien Transfer itself.  They benefitted only from the subsequent *use* of the Liens by the New Lenders to make the New Loans to TOUSA and then by the use of the New Loans by TOUSA to repay its debt to the Transeastern Lenders.  There is, in short, no legal basis for requiring the Transeastern Lenders to participate in any remedy for the allegedly fraudulent transfer of the Liens to the New Lenders.  Even if the Transeastern Lenders could be considered entities for whose benefit the Liens were transferred, the appropriate and complete remedy for that transfer is the invalidation of the Liens, which the bankruptcy court ordered.  No further remedy is permissible or proper.

The bankruptcy court's theories of liability against the Transeastern Lenders not only contravene settled bankruptcy rules, they would create unprecedented risks for creditors of potentially troubled companies. Before accepting payment in satisfaction of a valid, enforceable debt, creditors would be required to conduct full-blown due diligence of the debtor, including investigating the debtor's method of financing the repayment. Otherwise, as here, the creditor could not only be required to return the payment months or years down the road, but also could be exposed to new liabilities. The bankruptcy court's theories would create significant obstacles for businesses in financial trouble and their creditors trying to voluntarily work out defaults without forcing foreclosure and bankruptcy.

The bankruptcy court's errors of law and policy extended well beyond those outlined above. Other errors are elaborated on below. But the flaws in the court's basic disgorgement liability theories are the most glaring and the most fundamental. Correcting them is dispositive of the Transeastern Lenders' liability. Under settled bankruptcy law principles, the Transeastern Lenders owe the Conveying Subsidiaries nothing. The bankruptcy court's order to the contrary must be reversed and the Transeastern Lenders must be dismissed.

## STATEMENT OF APPELLATE JURISDICTION

The Transeastern Lenders appeal from the Amended Findings of Fact and Conclusions of Law (D.E. 722) (the "Opinion") and the Amended Final Judgment (D.E. 721) (the "Judgment") entered on October 30, 2009 by the Honorable John K. Olson, U.S. Bankruptcy Judge for the Southern District of Florida. The Transeastern Lenders filed a timely Amended Notice of Appeal on November 9, 2009 (D.E. 747). This Court has jurisdiction pursuant to 28 U.S.C. § 158 and Federal Rule of Bankruptcy Procedure 8001(a).[4]

---

[4]     The Transeastern Lenders appealed two earlier orders of the bankruptcy court on July 10, 2009 and July 20, 2009. The district court dismissed the appeals as interlocutory, *see*

## STATEMENT OF ISSUES

1.      Whether the Transeastern Lenders can be compelled to disgorge to the Conveying Subsidiaries funds paid by TOUSA to satisfy a legitimate, uncontested debt, where the Conveying Subsidiaries did not control the transferred funds.

2.      Whether the Transeastern Lenders are liable for disgorgement as the entities "for whose benefit" the Conveying Subsidiaries transferred the Liens to the New Lenders, where the Transeastern Lenders received no direct and immediate benefit from the Lien Transfer.

3.      Whether the Transeastern Lenders are liable to pay the Conveying Subsidiaries damages for the diminution in value of the assets subject to the Liens when the avoidance of the Liens ordered is a complete and sufficient remedy.

4.      Whether the bankruptcy court exceeded its authority in ordering the Transeastern Lenders to disgorge funds payable to the New Lenders, even though the New Lenders expressly agreed to accept the risk that the transfers that took place on July 31, 2007 were fraudulent transfers.

5.      Whether the award of attorneys' fees was impermissible where such an award is permissible in a fraudulent transfer action only if authorized by an applicable contract or statute and no such authority existed here.

6.      Whether the prejudgment interest award was impermissibly punitive.

7.      Whether the Transeastern Lenders' property and recoupment rights must be recognized.

---

*Senior Transeastern Lenders v. TOUSA, Inc., et al.,* No. 09-61308 (D.E. 22) and *Senior Transeastern Lenders v. Official Committee of Unsecured Creditors*, No. 09-61437 (D.E. 11), and the Transeastern Lenders address the subject orders in this brief.  (*See* D.E. 772 (Second Amended Notice of Appeal of the July 2 and July 8 orders).)

## STANDARD OF REVIEW

This Court reviews the bankruptcy court's conclusions of law *de novo*; its factual findings for clear error; and its equitable determinations for abuse of discretion.  *United States v. Spiwak (In re Spiwak)*, 285 B.R. 744, 747 (S.D. Fla. 2002).  The Opinion of the bankruptcy court warrants especially careful review because it adopts the Plaintiff's Proposed Opinion nearly verbatim.  The bankruptcy court did not address or even cite a *single case* relied on by the Transeastern Lenders in their simultaneously-submitted post-trial pleadings other than those coincidentally cited in the Plaintiff's Proposed Opinion.  The Eleventh Circuit has "consistently frowned upon the practice of delegating the task of drafting important opinions to litigants," which "harms the quality of the [lower] court's deliberative process, impedes [the reviewing court's] ability to review the [lower] court's decisions, and creates the potential for overreaching and exaggeration on the part of attorneys."  *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1373 n.46 (11th Cir. 1997) (citations and internal quotation omitted).  "The dangers inherent in litigants ghostwriting opinions are readily apparent. . . .  The quality of judicial decisionmaking suffers when a judge delegates the drafting of orders to a party; the writing process requires a judge to wrestle with the difficult issues before him and thereby leads to stronger, sounder judicial rulings."  *Colony Square Co. v. Prudential Ins. Co. of Am. (In re Colony Square Co.)*, 819 F.2d 272, 275-76 (11th Cir. 1987).  As demonstrated more fully below, the bankruptcy court's Opinion manifests every danger inherent in ghostwritten opinions.

## STATEMENT OF THE CASE

### A. Nature of the Case

This is an appeal from a bankruptcy court order requiring the Transeastern Lenders to disgorge $403 million, representing almost 95% of a payment of a valid and enforceable $421 million debt owed to the Transeastern Lenders by TOUSA, plus more than $80 million in prejudgment interest from July 31, 2007 through October 13, 2009.

### B. Course of Proceedings

On January 29, 2008, TOUSA and the Conveying Subsidiaries filed voluntary petitions for bankruptcy seeking reorganization pursuant to Chapter 11 in the United States Bankruptcy Court for the Southern District of Florida. (Tr. Ex.[5] 5032 at 2.) Because the Committee's members' claims were subordinate to the New Loans, the Committee brought an adversary proceeding on behalf of the Conveying Subsidiaries asserting, *inter alia*, claims for fraudulent conveyance against the New Lenders and seeking to avoid the Liens granted and obligations incurred by the Conveying Subsidiaries in connection with the New Loans. The Committee also set its sights on the Transeastern Lenders. Advancing an assortment of unprecedented legal theories, the Committee contended that TOUSA's repayment of its $421 million debt to the Transeastern Lenders amounted to a fraudulent conveyance of Conveying Subsidiary property, and sought disgorgement of the payment from the Transeastern Lenders. (Third Am. Compl. (D.E. 243) ¶¶ 86, 87, 95, 96, 104, 105, 113, 114, 122, 123, 131, 132.)

---

[5] "Tr. Ex." refers to exhibits as designated for the trial in the bankruptcy court, which are part of the record on appeal. (*See* Senior Transeastern Lenders' Amended Designation of Record and Statement of Issues on Appeal (D.E. 773).) The Transeastern Lenders will submit courtesy copies of all materials from the record referenced in their briefs on September 7, 2010, consistent with this Court's direction in *Wells Fargo Bank, N.A., et al. v. Official Committee of Unsecured Creditors of TOUSA, Inc., et al. and TOUSA Inc., et al.* (*See* Order Setting Oral Argument on Bankruptcy Appeal; Requiring Submission, No. 10-cv-60018-ASG (D.E. 63).)

The bankruptcy court denied the Transeastern Lenders' motions to dismiss (D.E. 210), and tried the Committee's claims from July 13 to 28 and August 28, 2009. On October 30, 2009, the court issued the Opinion and Judgment in favor of the Committee.[6]

The bankruptcy court first held that the conveyance of Liens from the Conveying Subsidiaries to the New Lenders (along with the incurrence of obligations by the Conveying Subsidiaries) was a fraudulent transfer to the New Lenders within the meaning of Section 548(a)(1)(B). (Op. at 129-50.) The Opinion found that the Conveying Subsidiaries were insolvent at the time of the Lien Transfer,[7] and that they did not receive reasonably equivalent value in exchange for the obligations and the Liens. According to the bankruptcy court, the Conveying Subsidiaries received no direct benefits from the New Lenders' loans to TOUSA, but instead received "at most, minimal indirect benefits" from the loans. (*Id.* at 129-50, 104-15.)

The bankruptcy court then held the Transeastern Lenders liable for disgorgement of the payment they received from TOUSA in satisfaction of its debt to them. The bankruptcy court found the Transeastern Lenders liable on two distinct theories. One theory was that the Conveying Subsidiaries had acquired a "minimal" property interest in the New Loans, and that the Conveying Subsidiaries did not receive sufficient value from the Transeastern Lenders in exchange for conveying that "minimal" interest to them. (Op. at 105, 155-160.) The other was that the Transeastern Lenders were the "entities for whose benefit" the Conveying Subsidiaries transferred Liens to the New Lenders, thereby requiring disgorgement under Section 550. (Op. at 151-52.)

---

[6]     The Amended Findings of Fact and Conclusions of Law (D.E. 722) and the Amended Final Judgment (D.E. 721) replaced the Findings of Fact and Conclusions of Law (D.E. 658) and the Final Judgment (D.E. 659) entered on October 13, 2009.

[7]     The bankruptcy court added a footnote to Plaintiff's Proposed Opinion observing that the Committee only "just" proved insolvency. (Op. at 29 n.8.)

Turning to remedy, the bankruptcy court first avoided the Liens and the Conveying Subsidiaries' obligations under the New Loans, restoring them to their pre-transaction position.  The court then also ordered the Transeastern Lenders to disgorge $403 million of the Transeastern Settlement proceeds (plus prejudgment interest of approximately $80 million) to a "Disgorgement Account."  (Op. at 177-78, 181.)  The New Lenders were separately ordered to disgorge more than $154 million in previously paid interest, fees, and principal payments into the Disgorgement Account.  (Op. at 180.)  Funds in the Disgorgement Account are to be distributed to the Conveying Subsidiaries to pay costs purportedly incurred "as a direct result of the transfers," including attorneys' fees, transaction and other costs, as well as the diminution in value of the property subject to the Liens since 2007 ("Diminution Damages").  (Op. at 171-75; 178-79.)  Amounts remaining in the Disgorgement Account after distribution of the fees, costs and Diminution Damages to the Conveying Subsidiaries are to be paid to the New Lenders.  (Op. at 181.)  The court reinstated only the Transeastern Lenders' unsecured claims against TOUSA, and not the secured claims that the Transeastern Lenders released as part of the Transeastern Settlement.  (Op. at 177.)

## C.    Factual Background

In June 2005, national homebuilder TOUSA formed a joint venture with Falcone/Ritchie LLC, a Florida-based land banker, to acquire the homebuilding assets of Transeastern Properties, Inc. (the "Joint Venture" or "Transeastern").  (Op. at 5; Jt. Stip. (D.E. 542) ¶ 18; Trial Tr. (Berkowitz) 1593:6-18; Tr. Ex. 533 at TOUSA-BR-00003569.)  TOUSA financed the Joint Venture largely with $450 million in secured loans from the Transeastern Lenders—a $115 million revolving credit agreement, and a $335 million term loan (together, the "Transeastern Loans").  (Op. at 5; Tr. Ex. 533 at TOUSA-BR-00003571; Tr. Ex. 5127 at TOUSA-BR-00000709; Tr. Ex. 2007 at Lehman 020309.)

9

As a condition of the financing, the Transeastern Lenders were granted first priority liens on substantially all of the Transeastern assets and received a number of guaranties from TOUSA and its subsidiary TOUSA Homes.  (Op. at 5; Jt. Stip. (D.E. 542) ¶ 21.a.)  TOUSA agreed, *inter alia*, to indemnify the lenders for losses resulting from fraud or the like by Transeastern; to repay the Transeastern Loans in full if Transeastern filed for bankruptcy; and to complete the build-out of certain Transeastern properties if Transeastern did not.  (Op. at 5; Jt. Stip. (D.E. 542) ¶ 24.)

In late 2006, Transeastern defaulted on the Transeastern Loans.  Litigation promptly ensued.  (Op. at 6-7; Jt. Stip. (D.E. 542) ¶ 25.)  TOUSA filed a declaratory action against the Transeastern Lenders' administrative agent in November 2006, disclaiming liability for the loans; the agent countersued in December 2006, contending that TOUSA's indemnification obligations had been triggered.  (Op. at 7; Burns Aff. (Tr. Ex. 5404) ¶ 8; Tr. Ex. 533 at TOUSA-BR-00003592-607.)

The Transeastern Lenders did not exercise their right to foreclose on the Transeastern collateral.  Instead, the lenders commenced good-faith negotiations with TOUSA, thereby allowing Transeastern to continue its operations.  (Burns Aff. (Tr. Ex. 5404) ¶ 14.)

The negotiations culminated in the Transeastern Settlement.  (*Id.* ¶ 16.)  In May 2007, TOUSA agreed to repay $421 million, the amount outstanding under the Transeastern Loans, in exchange for the lenders' release of their claims and liens against Transeastern.  (*Id.*; Jt. Stip. (D.E. 542) ¶ 42.)  TOUSA later reached settlement terms with Falcone and other Transeastern creditors as well.  (Jt. Stip. (D.E. 542) ¶¶ 35-38.)  Settlement payments were made by TOUSA on July 31, 2007.  (*Id.* ¶ 45.)

The Transeastern situation posed a serious risk to the survival of TOUSA and its affiliates.  A bankruptcy filing by Transeastern or an adverse judgment against TOUSA in the Transeastern litigation would have obligated TOUSA to repay immediately the $625 million in Transeastern Loans, cut off TOUSA's access to its revolver financing, and created a cross-default on over $1 billion of bond debt.  (Trial Tr. (Burns) 3894:5-13; 3899:7-21; Trial Tr. (Berkowitz) 1678:3-1679:21.)  This chain of events would have plunged TOUSA and its subsidiaries into a free-fall bankruptcy.  (Trial Tr. (Burns) 3899:7-21.)  Significantly, the Conveying Subsidiaries were co-borrowers with TOUSA on an $800 million revolver facility, which held as collateral a secured claim on all of the Conveying Subsidiaries' assets, and were also guarantors on the more than $1 billion of TOUSA bond debt.  (Trial Tr. (Berkowitz) 1724:8-13; 1678:3-1679:21.)  Therefore, resolution of the Transeastern litigation allowed TOUSA and the Conveying Subsidiaries to have continued access to their financing facilities and eliminated the impending risk of default and bankruptcy.

TOUSA funded the Transeastern Settlement with the New Loans, $500 million in loans underwritten and syndicated by Citicorp North America, Inc. ("Citibank").  (Op. at 7; Trial Tr. (Berkowitz) 1640:22-1641:17; Tr. Ex. 3266 at 2.)  Citibank undertook months of diligence before committing to the New Loans and concluded that TOUSA was comfortably solvent and would remain so after the transaction.  (Trial Tr. (McManus) 3609:9-3611:11, 3682:20-3683:5; Tr. Ex. 254.)  In June and July 2007, Citibank successfully syndicated the New Loans.  (Trial Tr. (McManus) 3663:25-3664:6; Nikov Dep. 190:7-12.)  To secure the New Loans, TOUSA caused the Conveying Subsidiaries to pledge liens on their assets.  The New Loans consisted of a $200 million loan facility with a "first lien" on those assets and a $300 million facility with a "second

lien" on them.  (Op. at 5, 7, 8.)  The Conveying Subsidiaries were also made co-borrowers on the New Loans.  (*Id*. at 129-30.)

The loan agreements were executed on July 31, 2007.  (Exs. 360, 361.)  Pursuant to the agreements' terms, Citibank transferred the proceeds of the New Loans directly to a TOUSA-controlled account at its subsidiary Universal Land Title, Inc. (not a Conveying Subsidiary).  (Jt. Stip. (D.E. 542) ¶ 43; Trial Tr. (Berkowitz) 1709:18-1710:9.)  TOUSA then transferred the loan proceeds to CIT, as the administrative agent for the Transeastern Lenders.[8] (Op. at 7-8; Jt. Stip. (D.E. 542) ¶¶ 43-44.)  CIT distributed $421 million—the undisputed principal, interest, and fees owed on the Transeastern Loans—to the Transeastern Lenders.  (Op. at 8 n.3; Jt. Stip. (D.E. 542) ¶ 45.)

The Transeastern Settlement resolved TOUSA's debt to the Transeastern Lenders, but TOUSA nonetheless thereafter proved unable to weather the severe downturn in the housing market.  On January 29, 2008, TOUSA and the Conveying Subsidiaries filed voluntary petitions for bankruptcy protection under Chapter 11.  (*Supra* at 7.)  These proceedings followed.

---

[8]     $79 million in loan proceeds were used to satisfy other claims and to pay insurance and loan fees and were not transferred to CIT.  (Op. at 8 n.3.)

<u>**ARGUMENT**</u>

I.    **THE BANKRUPTCY COURT'S THEORIES OF THE TRANSEASTERN LENDERS' LIABILITY ARE CONTRARY TO SETTLED BANKRUPTCY LAW**

The Transeastern Lenders were paid an outstanding debt by the party that owed it. Because TOUSA entered bankruptcy more than 90 days after that payment, the payment is not an "avoidable preference" under Section 547(b)(4)(A) of the Bankruptcy Code. No other principle of bankruptcy law can compel the Transeastern Lenders to return the payment. The bankruptcy court's two contrary theories are meritless.

A.    **The Court's "Direct Transferee" Theory Of The Transeastern Lenders' Liability Is Incorrect**

Section 548 authorizes avoidance of "fraudulent transfers," defined to include—as relevant here—the transfer "of an interest of the debtor in property," if the debtor "received less than a reasonably equivalent value in exchange for such transfer," and "was insolvent on the date that such transfer was made." Bankr. Code § 548(a)(1). The bankruptcy court found that the Conveying Subsidiaries had a property interest in the New Loan proceeds that TOUSA transferred to the Transeastern Lenders, received only minimal value in exchange for relinquishing that property, and were insolvent. (Op. at 105, 159-60.) Accordingly, the bankruptcy court voided the entire transfer and ordered the Transeastern Lenders to disgorge the funds received in satisfaction of the undisputed debt they were owed. (*Id.* at 180-81.)

The court erred in at least two respects: (1) the Conveying Subsidiaries did not have a property interest in the New Lenders' loan proceeds because they had no control over those proceeds, and (2) even if they did have a minimal interest—as the court concluded—the

13

benefits they received from the debt repayment were reasonably equivalent in value to that minimal interest.[9]

### 1. The Conveying Subsidiaries Did Not Have A Property Interest In The Loan Proceeds Within The Meaning Of Section 548

As noted, Section 548 applies only to a transfer "of an interest of the debtor in property." Bankr. Code § 548(a)(1). Thus the "threshold inquiry" under this provision "is whether each transfer was in fact property of the debtor." *Henderson v. National Bank of Commerce (In re Al-Ben, Inc.)*, 156 B.R. 72, 76 (Bankr. N.D. Ala. 1991); *see also United States v. Kapila*, 402 B.R. 56, 60 (S.D. Fla. 2008) (Section 548 requires the trustee to show a transfer of an interest *of the debtor* in property).

To determine whether the debtor had an interest in property for purposes of Section 548, the dispositive question under Eleventh Circuit precedent is "whether the Debtor had *control* over the subject funds." *Kapila v. Espirito Santo Bank (In re Bankest Capital Corp.)*, 374 B.R. 333, 338-39 (Bankr. S.D. Fla. 2007) (citing *Nordberg v. Sanchez (In re Chase & Sanborn Corp.)*, 813 F.2d 1177, 1181-1182 (11th Cir. 1987) ("*Chase I*")). In *Chase I*, the Eleventh Circuit held that a transfer is avoidable under Section 548 *only* if the debtor exercised *actual control* over the property transferred. 813 F.2d at 1181-82.[10] Without the requisite

---

[9]     The bankruptcy court also erred in finding that the Conveying Subsidiaries were insolvent, an issue we expect to be addressed in the New Lenders' appeals, docket numbers 10-cv-60018-ASG and 10-cv-60019-AJ. If the New Lenders prevail on appeal, the Transeastern Lenders cannot be liable to the Conveying Subsidiaries because insolvency is a necessary element under either theory of liability against the Transeastern Lenders. The Transeastern Lenders therefore incorporate by reference any arguments regarding errors in determining the solvency of the Conveying Subsidiaries advanced by the New Lenders in their appeals, and do not intend to argue independently those issues herein.

[10]     One year later, in another appeal in the *Chase & Sanborn* litigation, *Nordberg v. Societe Generale (In re Chase & Sanborn Corp.)*, 848 F.2d 1196 (11th Cir. 1988) ("*Chase II*"), the Eleventh Circuit explained: "We feel that the general approach outlined in [*Chase I*]

control, the subject property could not have been used by the debtor to pay another creditor, and the transfer thus did not decrease the value of the debtor's estate.  Since *Chase I*, the actual control test has been consistently applied in the Eleventh Circuit "to determine whether a debtor had possession of property allegedly recoverable under section 548."  *Chase II*, 848 F.2d at 1199; *see*, *e.g.*, *Tavormina v. Capital Factors, Inc. (In re Jarax Int'l, Inc.)*, 164 B.R. 180, 186 (Bankr. S.D. Fla. 1993) (finding a transfer not avoidable under Section 548 where "there has been no transfer of an interest of the Debtor in property because the Debtor lacked the requisite control over the funds to satisfy the Eleventh Circuit's control test"); *Levine v. Custom Carpet Shop, Inc. (In re Flooring Am., Inc.)*, 302 B.R. 394, 399 (Bankr. N.D. Ga. 2003) (finding that the debtor had a property interest in funds because there were no restrictions on its use of the funds and it had the ability to control and direct them).

The Eleventh Circuit's control test encompasses two key elements:  "the power to designate which party will receive the funds," and "the power to actually disburse the funds at issue to that party."  *Dzikowski v. NASD Regulation, Inc.*, 247 B.R. 867, 869-70 (S.D. Fla. 2000).  Courts have also "complemented the control analysis by asking whose interests are primarily served by the challenged transaction"—if not the debtor's, "courts are more likely to find that there was no fraudulent transfer of property of the debtor."  *In re Bankest Capital Corp.*, 374 B.R. at 338-39.

The bankruptcy court did not and could not find that the Conveying Subsidiaries exercised *any* control over the proceeds of the New Loans, much less the degree of control required to satisfy the Eleventh Circuit's test.  The Conveying Subsidiaries had no power to

---

applies regardless of whether a court is attempting to determine whether a debtor controlled the transferred funds it transferred to a defendant *or* a defendant gained control over the funds transferred to it."  848 F.2d at 1199.

designate who would receive the loan proceeds and no power to actually disburse them.  That power lay exclusively with TOUSA, as the First and Second Lien Term Loan Agreements expressly provided,[11] and as the undisputed trial record established.[12]  Indeed, the bankruptcy court acknowledged the Conveying Subsidiaries' complete lack of control over the funds, observing that they were "forced" *by TOUSA* "to enter into a contractual commitment that the borrowed funds would be paid to others."  (Op. at 159.)  The bankruptcy court also did not believe the Conveying Subsidiaries' interests were primarily served by the transfer.  (Op. at 105 ("It is undisputed that the Conveying Subsidiaries did not obtain the satisfaction of their own debts in the July 31 Transaction; rather, they satisfied an obligation of TOUSA, Inc. and Homes, LP.").)  The record, in short, unambiguously foreclosed any conclusion that the Conveying Subsidiaries had the control over the New Loan proceeds required to establish a property interest in those proceeds.

Rather than apply the Eleventh Circuit's control test, the bankruptcy court dismissed it, expressly rejecting as "clearly wrong" the proposition "that 'control' is an essential

---

[11]     Both the First and Second Lien Term Loan Agreements direct that the proceeds of the New Loans be used to satisfy the Transeastern Settlement.  Section 4.12 requires the proceeds of the loans to be used to fund the "Acquisition," defined as "the contribution by the Administrative Borrower to the Transeastern JV Entities of an amount necessary to discharge all amounts of outstanding Indebtedness of the Transeastern JV Entities."  (Tr. Ex. 360 at TOUSA-BR-00074659-60, TOUSA-BR-00074724; Tr. Ex. 361 at TOUSA-BR-0075346-47, TOUSA-BR-00075410.)  TOUSA is the sole "Administrative Borrower".  (Tr. Ex. 360 at TOUSA-BR-00074659; Tr. Ex. 361 at TOUSA-BR-00075346.)

[12]     Witness testimony confirmed that the Conveying Subsidiaries could not use the loan proceeds in a manner inconsistent with the loan documents and that the Conveying Subsidiaries had no independent control or authority over the loan proceeds (Trial Tr. (Wagman) 562:2-6; Trial Tr. (Berkowitz) 1712:3-7).  The lack of control was most plainly stated by a Citibank witness who testified that Citibank viewed the transaction as a loan only to TOUSA and would not have honored any request by the Conveying Subsidiaries (as co-borrowers) to use the funds.  (Trial Tr. (McManus) 3695:19-3696:9, 3696:23-3697:1.)

element of any property interest" under Section 548.  (Op. at 157.)  In the court's view, a control

test "would negate the paradigmatic example of a fraudulent transfer, in which the owner of an

insolvent corporation transfers corporate funds to a personal account for his personal use,"

because the owner's *de facto* control over the funds cannot vitiate the corporation's control over,

and property interest in, the funds.  (Op. at 158.)  This analysis misses the point:  the fact that

property may be involuntarily disbursed by a third party says nothing about whether the debtor

had the authority to designate who would receive the funds or to actually disburse them, as the

Eleventh Circuit's control test requires.  It simply means that despite the debtor's control over

the property, someone else was also able to distribute the property without the debtor's consent.

Where, as here, the debtor lacked *any* authority either to determine who will receive the funds or

to actually distribute them—no matter what rights any other party may have—the debtor cannot

claim the control necessary to establish an interest in transferred property.  (*See supra* at 15-16.)

       For the same reasons, the court erred in relying on the Bankruptcy Code's

definition of "transfer" and fraudulent transfers as including "involuntary" and "indirect"

transfers.  (Op. at 158 (citing 11 U.S.C. §§ 101(54)(D), 548(a)(1)).)  According to the court,

"[t]hese definitions leave no doubt that a debtor may own property even if the debtor has no

power to prevent some other party from transferring the property."  (*Id.*)  This again misses the

point:  the Eleventh Circuit's fraudulent transfer test asks not whether the debtor could prevent

another party from transferring the property, but whether the debtor had *any power of its own* to

direct or manage distribution of the property.  Here, the Conveying Subsidiaries had no such

power, and they have never argued otherwise.

       The bankruptcy court also erred in concluding that the Conveying Subsidiaries

had a property interest because they were co-borrowers on the New Loans.  (*Id.* at 156.)  When

funds are loaned to co-borrowers, the court reasoned, "each of the co-borrowers has a property interest in the funds," because if that were not true, then the "'property would belong to no one.'" (*Id.* (quoting *United States v. Craft*, 535 U.S. 274, 285 (2002)).)  But of course that theoretical possibility is irrelevant where, as here, the property involved *does* belong to someone, *i.e.*, TOUSA, the primary borrower and the only party with authority under the loan documents to control the loan proceeds' distribution.  *Craft* involves an entirely different question, *viz.*, whether tenants by the entirety each possess property within the meaning of federal tax law. 535 U.S. at 285.  *Craft* does not address—much less implicitly overrule—the Eleventh Circuit's settled requirement that a property interest for purpose of the Bankruptcy Code's fraudulent transfer provisions is established only when the debtor has authority to compel the transfer. Because the Conveying Subsidiaries had no such authority, they had no property interest in the loan proceeds, and thus transferred no interest to the Transeastern Lenders.[13]

The idea that subsidiaries acquire a property interest by virtue of being co-borrowers or guarantors, or by pledging liens, would dramatically upset settled expectations in countless commercial transactions.  If the bankruptcy court were correct, then, for example, a co-

---

[13]    The court cited several other, out-of-circuit cases, but none is germane, not least because if they stood for what the court says, they would be contrary to Eleventh Circuit law. *Anzalone v. Dulgerian (In re Dulgerian)*, 388 B.R. 142 (Bankr. E.D. Pa. 2008), assumed in *dicta* that co-borrowers "jointly own[]" loan proceeds, but did not analyze the question.  *Id.* at 151.  In *Bash v. Sun Trust Banks, Inc. (In re Ohio Business Machines, Inc.)*, No. 06-8005, 2007 Bankr. LEXIS 133 (B.A.P. 6th Cir. Jan. 25, 2007), the loan documents expressly recognized an interest of the co-borrower in the proceeds, providing that any unused portion would go toward its working capital.  *Id.* at *15-18.  And *Manchester v. First Bank & Trust Co. (In re Moses)*, 256 B.R. 641 (B.A.P. 10th Cir. 2000), and *In re Smith*, 966 F.2d 1527 (7th Cir. 1992), did not involve co-borrowers at all, but simply addressed—consistent with the Eleventh Circuit's control test—when a borrower exercises sufficient control over loan proceeds to have an interest in them (albeit for purposes of § 547, not § 548).  256 B.R. at 650; 966 F.2d at 1533.

signer on a loan would have a claim to the loan proceeds—which would create additional *liability* for the lenders, not additional security.  So-called "upstream guaranties," such as the Liens granted by the Conveying Subsidiaries, are "routine in commercial transactions," Jack F. Williams, *The Fallacies of Contemporary Fraudulent Transfer Models as Applied to Intercorporate Guarantees*, 15 Cardozo L. Rev. 1403, 1418 (1994), and numerous cases have considered whether the conveyance of such liens constitutes a fraudulent transfer.  In such cases, however, courts do not ask whether the subsidiary had a property interest in the loan proceeds and whether a subsequent transfer of those loan proceeds is avoidable; they instead focus on whether the subsidiary can avoid the transfer of the liens and the incurrence of the obligations. *See, e.g.*, *Pembroke Dev. Corp. v. Commonwealth Sav. & Loan Ass'n (In re Pembroke Dev. Corp.)*, 124 B.R. 398, 400 (Bankr. S.D. Fla. 1991); *Goveart v. Capital Bank (In re Miami Gen. Hosp., Inc.)*, 124 B.R. 383, 394 (Bankr. S.D. Fla. 1991); Williams, *supra*, at 1404-05.  In short, the claims against the New Lenders are commonplace, while the claims against the Transeastern Lenders are unprecedented—and legally wrong, as demonstrated above.

      **2.**     **The Bankruptcy Court Erred In Finding No Reasonably Equivalent Value For Any Direct Transfer Of A Conveying Subsidiary Interest In The New Loan Proceeds To The Transeastern Lenders**

            **a.**     **The Bankruptcy Court Misapplied The Reasonably Equivalent Value Test**

Even assuming the bankruptcy court's finding that the Conveying Subsidiaries had an interest in the New Loan proceeds could be sustained, its conclusion that they received no reasonably equivalent value in exchange for the transfer of that interest could not.  With respect to the supposed property interest that the Conveying Subsidiaries transferred to the Transeastern Lenders, the bankruptcy court concluded that "the value of that property interest to the Conveying Subsidiaries was ***minimal*.*"  (Op. at 159 (emphasis added).)  Yet in considering

19

whether reasonably equivalent value was exchanged, the bankruptcy court erroneously compared the *total value* of the loan proceeds—rather than the Conveying Subsidiaries' "minimal" interest therein—to the benefits received by the Conveying Subsidiaries.

The relevant inquiry for analyzing reasonably equivalent value is not "the value of the property that was conveyed, but the value of the *debtor's interest* in the property conveyed." *Kittay v. Peter D. Leibowits Co. (In re Duke & Benedict, Inc.)*, 265 B.R. 524, 531 (Bankr. S.D.N.Y. 2001); *see Kendall v. Carbaat (In re Carbaat)*, 357 B.R. 553, 560 (Bankr. N.D. Cal. 2006) ("To determine whether the transfers sought to be avoided . . . were constructively fraudulent, the Court must determine the value of what the Debtor transferred and the value of what he received."); *Slone v. Lassiter (In re Grove-Merritt)*, 406 B.R. 778, 811 (Bankr. S.D. Ohio 2009) (trustee entitled to recover value of debtor's equity in real property transferred).  The bankruptcy court recognized as much, noting that a fraudulent transfer claim requires the plaintiff to show that "a debtor did not receive direct benefits reasonably equivalent to the value which *it* gave up."  (Op. at 144 (emphasis added).)

The bankruptcy court decided that reasonably equivalent value was not exchanged in the transfer to the Transeastern Lenders because "[t]o the extent [the Conveying Subsidiaries] received any value at all, it was *minimal* and did not come anywhere near the $403 million of obligations they incurred collectively."  (Op. at 105 (emphasis added).)  But the $403 million of obligations was incurred in a separate transaction, namely, the avoided transfer to the New Lenders.  Nowhere did the court reconcile its conclusion that the Conveying Subsidiaries had, at best, only a "minimal" interest in the proceeds of the New Loans used to repay the Transeastern debt with its conclusion that they received minimal value in exchange for the transfer of those proceeds.  A proper comparison of the purported minimal interest in the New Loan proceeds to

20

the ostensibly minimal value received necessitates the conclusion that reasonably equivalent value was exchanged.[14]

> ### b.  The Bankruptcy Court Improperly Disregarded Indirect Benefits To The Conveying Subsidiaries

Not only did the court wrongly conclude that the Conveying Subsidiaries transferred a property interest to the Transeastern Lenders, it also applied the wrong legal standard in assessing the value they received for that transfer.  The bankruptcy court decided that any benefit that did not come within Webster's dictionary definition of "property," *i.e.*, something "in which or to which a person has a right protected by law," was not legally cognizable.  (Op. at 147-48, 148 n.55.)  On that basis, it refused to consider the many indirect benefits the Conveying Subsidiaries received from the Lien Transfer and Transeastern Settlement, including avoidance of the risk of a TOUSA bankruptcy and of their own bankruptcy, and freeing their business operations of the pall cast by the Transeastern litigation. (*Id.* at 148; *see supra* at 11.)  But many precedents recognize exactly these kinds of indirect benefits in determining whether reasonably equivalent value was exchanged.  *See, e.g.*, *TeleFest, Inc. v. VU-TV, Inc.*, 591 F. Supp. 1368, 1380-81 (D.N.J. 1984) (indirect benefits can result "from the general relationship between the parent corporation and its subsidiaries"); *Geron v. Palladin Overseas Fund, Ltd.* (*In re AppliedTheory Corp.*), 330 B.R. 362, 364 (S.D.N.Y. 2005) (avoiding bankruptcy, even if "ultimately proved to be short-lived," provides reasonably equivalent value);

---

[14]    In an analogous context, courts routinely conclude as a matter of law that even when a party holds "bare legal title" to property (which is more than the Conveying Subsidiaries had), the transfer of that interest for free provides reasonably equivalent value.  *See Kapila v. Moodie (In re Moodie)*, 362 B.R. 554, 562 (Bankr. S.D. Fla. 2007) ("the transfer of bare legal title for free is not less then [sic] reasonably equivalent value"); *accord Tolz v. Miller (In re Todd)*, 391 B.R. 504, 509 (Bankr. S.D. Fla. 2008); *Furr v. Reynolds (In re Reynolds)*, 151 B.R. 974, 977 (Bankr. S.D. Fla. 1993); *Geremia v. Dwyer (In re Dwyer)*, 250 B.R. 472, 474-75 (Bankr. D.R.I. 2000); *Jensen v. Gillman (In re Gillman)*, 120 B.R. 219, 220 (Bankr. M.D. Fla. 1990).

*Official Comm. of Unsecured Creditors of M. Fabrikant & Sons, Inc. v. J.P. Morgan Chase Bank, N.A. (In re M. Fabrikant & Sons, Inc.)*, 394 B.R. 721, 738 (Bankr. S.D.N.Y. 2008) ("Indirect benefits may include synergy, increased access to capital, safeguarding a source of supply and protecting customer relationships."); *see also General Elec. Credit Corp. v. Murphy (In re Rodriguez)*, 895 F.2d 725, 727 (11th Cir. 1990) (holding Bankruptcy Code "does not authorize voiding a transfer which 'confers an economic benefit upon the debtor,' either directly or indirectly").  Had the court properly recognized these interests, it would have been compelled to hold that the Conveying Subsidiaries' "minimal" interest in the New Loan proceeds was not just matched, but vastly *outweighed*, by the benefits, including legally cognizable indirect benefits, they received from the transfer of the proceeds to the Transeastern Lenders.

**c.      The Bankruptcy Court Erroneously Excluded
Admissible Testimony On Benefits Received**

The bankruptcy court's legal error in disregarding indirect benefits when evaluating reasonably equivalent value was compounded by its ruling that statements by the Conveying Subsidiaries' employees about the benefits their companies received were inadmissible hearsay.

Federal Rule of Evidence 801(d)(2) provides that statements by a party's agent or employee offered against that party are not hearsay.  Fed. R. Evid. 801(d)(2)(D).  The Conveying Subsidiaries are each "a party" to this litigation.  Consistent with the authority granted to it by the bankruptcy court, the Committee acted "*on behalf of and as the representative of the bankruptcy estates of the Debtors,*" in prosecuting the avoidance action.  (Third Am. Compl. (D.E. 243) at 4 (emphasis added); No. 08-10928-JKO, D.E. 1092 at 3 (granting the Committee authority to bring a fraudulent conveyance claim "in the stead of, the Debtors").)  And it is well-established that "admissions by the beneficial party or real party in interest . . . are admissible in

22

evidence against the nominal plaintiff representing his interests." *Roberts v. City of Troy*, 773 F.2d 720, 726 (6th Cir. 1985) (citing *A.N. Deringer, Inc. v. United States*, 287 F. Supp. 1016, 1023 n.6 (Cust. Ct. 1968) (collecting cases)).  Thus, in keeping with the purpose of Rule 801(d)(2) to "increase the admissibility of representative admissions," *Estate of Shafer v. Commissioner of Internal Revenue,* 749 F.2d 1216, 1219 (6th Cir. 1984), admissions by a debtor are admissible as non-hearsay against a trustee bringing suit on behalf of the debtor.  *See Pereira v. Aetna Cas. & Sur. Co. (In re Payroll Express Corp.)*, 216 B.R. 344, 357 n.8 (S.D.N.Y. 1997) (finding that property loss notices prepared on behalf of the debtor were admissions of the debtor, and admissible against the plaintiff trustee as admissions by a party-opponent).  The Committee is therefore subject to the admission of statements by employees of the parties on whose behalf it is acting.

> At trial, however, the bankruptcy court repeatedly sustained the Committee's hearsay objection to testimony elicited by the Defendants from Paul Berkowitz, executive vice president and chief of staff of TOUSA, and an officer of many of the Conveying Subsidiaries, regarding the negative effects of the Transeastern Litigation on the Conveying Subsidiaries and the benefits received by the Conveying Subsidiaries in the Transeastern Settlement.  (Trial Tr. (Berkowitz) 1588:19-22; 1590:23-1591:10; 1633:24-1637:11.)  That testimony would have strongly supported the Transeastern Lenders' contention that the Conveying Subsidiaries did, in fact, receive substantial indirect benefits from TOUSA's payment of the New Loan proceeds to the Transeastern Lenders.  But although the court and the Committee recognized that the excluded statements would have been admissible against the Debtors under Rule 801(d)(2) if the Debtors were the plaintiffs, the court ruled that the Committee was not bound by such statements.  (Trial Tr. (Berkowitz) 1633:24-1637:11.)  That ruling was wrong.  As shown above,

the rules of evidence apply to the Committee, as a nominal plaintiff standing in the shoes of the

Debtors, exactly as they would to the Debtors, and statements admissible against the Conveying

Subsidiaries must be admissible against the Committee.  *See In re Payroll Express Corp.*, 216

B.R. at 357 n.8.

      **B.**     **The Transeastern Lenders Cannot Be Compelled To Disgorge The Value Of The Liens As The Parties "For Whose Benefit" the New Loans Were Made**

      The bankruptcy court's second, independent theory of the Transeastern Lenders'

liability for a fraudulent transfer rested on Section 550(a) of the Bankruptcy Code, which

authorizes the court to compel a party "for whose benefit" an avoidable preference or fraudulent

transfer was made to disgorge the benefits the party received.  The bankruptcy court held that the

Transeastern Lenders were the parties for whose benefit the Conveying Subsidiaries transferred

the Liens to the New Lenders.  (Op. at 151-52.)  That holding is contrary to settled law

governing "for whose benefit" liability under Section 550(a).

      Section 550(a) provides in relevant part:

> [T]o the extent that a transfer is avoided under section [547 or 548] of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—
>
>   (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
>
>   (2) any immediate or mediate transferee of such initial transferee.

Bankr. Code § 550(a).  Section 550(b), in turn, addresses recovery from subsequent transferees,

prohibiting recovery from such transferees if they took the property in good faith.  *Id.* § 550(b).

      Because Section 550(a) explicitly links the initial transferee with the entity "for

whose benefit" the initial transfer was made, courts have held that "only a person who receives a

benefit *from the initial transfer*" can be an entity "for whose benefit" the initial transfer was

made.  *Bonded Fin. Servs. Inc. v. European Am. Bank (In re Bonded Fin. Servs.)*, 838 F.2d 890,

896 (7th Cir. 1988) (emphasis added); *see Ragsdale v. Bank S., N.A. (In re Whiteacre Sunbelt, Inc.)*, 206 B.R. 1010, 1024 (Bankr. N.D. Ga. 1997) ("the benefit referred to in § 550(a)(1) must be determined by reference to the initial transfer").  The paradigmatic example of a "for whose benefit" entity is a loan guarantor whose obligation is relieved by the debtor's payment to the creditor:

> Section 550(a)(1) recognizes that debtors often pay money to A for the benefit of B; that B may indeed have arranged for the payment (likely so if B is an insider of the payor); that but for the payment B may have had to make good on the guarantee or pay off his own debt; and accordingly that B should be treated the same way initial recipients are treated.

*Bonded*, 838 F.2d at 896.  In that circumstance, the guarantor immediately benefits from the initial transfer, and can be compelled to disgorge any benefits it received.  By contrast, the "for whose benefit" language does *not* apply where the "benefit" is not the immediate and necessary consequence of the initial transfer, but flows from the manner in which the initial transfer is *used* by its recipient:  the "benefit must derive directly from the [initial] transfer, not from the use to which it is put by the transferee."  *Turner v. Phoenix Fin., L.L.C. (In re Imageset, Inc.)*, 299 B.R. 709, 718 (Bankr. D. Me. 2003); *see Contemporary Indus. Corp. v. Frost (In re Contemporary Indus. Corp.)*, No. BR 98-80382, Adv. 99-8135, 2001 WL 34630639, at *10 (Bankr. D. Neb. Feb. 14, 2001) ("The phrase 'or the entity for whose benefit such transfer was made' refers to those who received a benefit as a result of the initial transfer from the debtor.  It does not refer to those who receive a benefit as a result of a subsequent transfer."); *Securities Investor Prot. Corp. v. Stratton Oakmont, Inc.*, 234 B.R. 293, 314 (Bankr. S.D.N.Y. 1999) (entity for whose benefit

transfer was made must receive benefit from initial transfer, "not . . . from the subsequent transfer of the initially transferred money or property").[15]

The Transeastern Lenders received no benefit from the initial transfer of Liens from the Conveying Subsidiaries to the New Lenders. Instead, that initial transfer allowed the New Lenders to transfer the New Loan proceeds to TOUSA, which in turn made payments to the Transeastern Lenders, through their agent. The Conveying Subsidiaries' transfer to the New Lenders provided no benefit, in itself, to the Transeastern Lenders.[16] To be sure, the transfer of Liens initiated a chain of transactions that ultimately benefitted the Transeastern Lenders by enabling TOUSA to satisfy its debt to them, but the statute forecloses the possibility of holding such indirect beneficiaries liable under Section 550(a). Section 550(b) expressly provides that subsequent transferees cannot be deemed liable except where funds were not received in good faith. As the Seventh Circuit held in *Bonded*, that subsequent transferee provision underscores that the "for whose benefit" language is limited to those entities who benefit immediately for the initial transfer itself and does not extend to all those who, at some point down the line, may be said to have benefited from the transaction. *See* 838 F.2d at 896 (holding that bank that obtained dominion over funds as a result of subsequent transfer could not be "entity for whose benefit [the initial] transfer was made").

---

[15] *See also CCEC Asset Mgmt. Corp. v. Chemical Bank (In re Consol. Capital Equities Corp.)*, 175 B.R. 629, 636 (Bankr. N.D. Tex. 1994); *Merrill v. Dietz (In re Universal Clearing House Co.)*, 62 B.R. 118 (D. Utah 1986); *Laird v. Bartz (In re Newman Cos.)*, 140 B.R. 495, 498 (Bankr. E.D. Wis. 1992).

[16] By seeking to avoid separately in the Complaint both the Lien Transfer and the transfer of the New Loan proceeds to the Transeastern Lenders, the Conveying Subsidiaries acknowledge that these are distinct transfers and not simply aspects of a single transaction.

The decision in *Peterson v. Hofmann (In re Delta Phones, Inc.)*, Adv. No. 05 A 1205, 2005 WL 3542667, at *5 (Bankr. N.D. Ill. Dec. 23, 2005), underscores the fallacy of the bankruptcy court's reasoning.  There, the defendant guarantied a loan (from First Capital to Hofcom) that was used, in turn, to fund a loan (from Hofcom) to the debtor (Delta Phones).  *Id.* at *1-2.  When the debtor paid off its loan from Hofcom, the proceeds were used by Hofcom to pay off the First Capital loan guaranteed by the defendant.  *Id.*  The plaintiff argued that the defendant was a "for whose benefit" entity of the transfer to Hofcom.  "Not so," the court explained:

> [T]he initial transfers were the payments Delta Phones made to Hofcom, not the subsequent payments Hofcom made to First Capital.  Although [the defendant] had guaranteed the First Capital loan and benefitted when Hofcom used Delta Phones' payments to repay First Capital, that benefit is irrelevant.  For purposes of section 550(a)(1), the benefit must derive directly from the initial transfer, not from the use to which it is put by the transferee.

*Id.* at *5 (quotation and alterations omitted).  Because the provision does not target those who benefit from subsequent transfers—even those who are not themselves subsequent transferees—the *Hofmann* defendant did not come within its reach.

The bankruptcy court did not and could not find that the Transeastern Lenders were liable as subsequent transferees—the lien interests that were initially transferred by the Conveying Subsidiaries to the New Lenders were never subsequently transferred; they remained at all times with the New Lenders.  The court's theory is simply that the Transeastern Lenders received a benefit *flowing from the use to which the initial lien transfer was put* by the New Lenders.  The theory is foreclosed by the statute, as shown above.  (*See supra* at 25-26.)

In holding otherwise, the bankruptcy court erroneously relied on the Eleventh Circuit's decision in *American Bank of Martin County v. Leasing Service Corp. (In re Air Conditioning, Inc. of Stuart)*, 845 F.2d 293, 296-97 (11th Cir. 1988).  *Air Conditioning* does not

support the court's application of Section 550 to the Transeastern Lenders.  In fact, *Air Conditioning* does not even address the meaning of Section 550(a)—it instead construes Section 547, the avoidable preference provision, which has no relevance here.  As the Seventh Circuit has observed of *Air Conditioning*, the "*holding* of [the] case was that a recoverable preference had taken place," and the Court did "not consider the relation between §§ 547 and 550 of the Code."  *Levit v. Ingersoll Rand Fin. Corp.*, 874 F.2d 1186, 1196 n.6 (7th Cir. 1989).

In *Air Conditioning*, the debtor provided security to an undersecured creditor through a bank letter of credit, which the debtor in turn secured through a certificate of deposit at the bank.  845 F.2d at 295.  One month later, the debtor filed for bankruptcy.  The court held that the transfer of the collateral to the bank was an avoidable preference under Section 547(b) recoverable from the creditor.  To fall within the reach of Section 547(b), the transfer had to be "to or for the benefit of a creditor . . . for or on account of an antecedent debt owed by the debtor before such transfer was made."  *Id*. at 295-96 (quoting § 547(b)).  The court reasoned that although the transfer was nominally to the bank, it was "for the benefit" of the creditor because it "secured payment of an undersecured antecedent debt owed by [the debtor]."  *Id.* at 296.  The net result was that a "secured creditor was substituted for an unsecured creditor to the detriment of the other unsecured creditors."  *Id.* at 297 n.3 (quoting *Kellogg v. Blue Quail Energy, Inc. (In re Compton Corp.)*, 831 F.2d 586, 594-95 (5th Cir. 1987)).  Because the point of Section 547 is to avoid transfers that prefer certain creditors over others, the court deemed the transaction a preferential transfer under Section 547, and permitted the trustee to recover the proceeds of the letter of credit from the creditor.  *In re Compton Corp.*, 831 F.2d at 594.  In addition to Section 547's particular concern with avoiding pre-bankruptcy preferences between creditors, the court also emphasized the significance of commercial transactions involving letters of

credit—given "the sanctity of letters of credit as vital instruments of commerce," it was appropriate to treat the transaction as a preferential transfer to the creditor, and allow recovery from the creditor under Section 550(a). *In re Air Conditioning, Inc.*, 845 F.2d at 299.

None of the factors that drove the decision in *Air Conditioning* is present here. There is certainly no letter of credit requiring special treatment. More important, *Air Conditioning* permitted recovery from the creditor under Section 550 only because the transfer was deemed "for the benefit" of the creditor under the *substantive liability rule* of Section 547(b). That rule is inapplicable here: the Transeastern Lenders were paid on a genuine debt owed to them outside the Bankruptcy Code's 90-day preference period, so there is no question of preference under Section 547(b). The applicable substantive rule is Section 548, and that provision's "for the benefit of" liability applies *only* to transfers "for the benefit of an insider under an employment contract." Bankr. Code § 548(a)(1). Accordingly, the bankruptcy court did not and could not find that the fraudulent transfer of the Liens from the Conveying Subsidiaries to the New Lenders was "for the benefit of" the Transeastern Lenders under Section 548's substantive provisions. Instead it leaped to Section 550(a)'s "for whose benefit" *recovery* provision. As *Air Conditioning* indicates, however, that provision is not self-executing—it applies only to permit recovery from an entity that qualifies as a "for the benefit of" entity under the controlling *liability* provision at issue.[17] *In re Air Conditioning, Inc.*, 845 F.2d 299. Because the Transeastern Lenders could not be "for the benefit of" entities under

---

[17]   It bears noting that the *Air Conditioning* court's approach to construing § 547 has itself been criticized and never expanded beyond its limited reach, and that the Fifth Circuit has retreated from its use of the approach in *Compton. See, e.g., Crafts Plus+, Inc. v. Foothill Capital Corp. (In re Crafts Plus+, Inc.)*, 220 B.R. 331, 337 (Bankr. W.D. Tex. 1998) (noting the various critiques of the *Compton* court's reasoning); *T. B. Westex Foods, Inc. v. Federal Deposit Ins. Corp. (In re T.B. Westex Foods, Inc.)*, 950 F.2d 1187 (5th Cir. 1992) (declining to apply the *Compton* approach). The decision's flaws are, in any case, irrelevant because the decision is inapplicable.

Section 548 itself, there is no basis under Section 550(a) for obtaining "for whose benefit" recovery against them.

Finally, it bears emphasis that imposing disgorgement liability on the Transeastern Lenders, whether as a direct transferee or "for whose benefit" entity, would severely upset expectations underlying the basic debtor-creditor relationship. A fundamental tenet governing that relationship is that a creditor cannot refuse to accept tendered payment of a valid debt pursuant to the loan's terms. *See*, *e.g.*, *New York Assets Realization Co. v. McKinnon*, 209 F. 791, 793 (2d. Cir. 1913) ("It would be an exceeding great hardship on the debtor if the creditor had the right to refuse to accept payment of the debt after it was due, and at the same time retain the debtor's property or a lien upon it for the debt."); *In re Win-Sum Sports, Inc.*, 14 B.R. 389, 394 (Bankr. D. Conn. 1981) ("The brief filed on behalf of the petitioning creditors states that they refused to accept further paydown on their debts . . . because it 'would have been an obvious preference'. . . there is certainly nothing improper or illegal in creditors accepting payments on their debts."); *Hearn v. Leary*, 211 N.Y.S. 668, 670 (Sup. Ct. 1925) ("[i]t is well settled that a tender of the amount due discharges the lien"). Under the bankruptcy court's approach, however, a creditor is subject to disgorgement and additional damages liability for accepting a tendered debt repayment if the creditor does not first investigate the debtor's internal re-financing structure and ensure that the debtor's subsidiaries receive fair value as part of the repayment. But nothing in state law authorizes a creditor to refuse a debt repayment subject to the creditor's satisfaction that the debtor's arrangements are fair to the debtor's own affiliates and business partners. Creditors thus would be exposed to disgorgement and damages liability *either way*—under the Bankruptcy Code (for accepting debt payments), on the one hand, and under the UCC or state law (for refusing them), on the other. Even worse, creditors could invoke

30

the prospect of Section 550 damages liability to refuse full principal repayment from distressed

debtors when interest payments provide a more favorable return, undermining the ability of

debtors to escape debts and encouraging the proliferation of wasteful debt-resolution litigation.

These adverse policy consequences only confirm what the law already makes

clear:  the Transeastern Lenders cannot be required to disgorge a debt repayment that was not an

avoidable preference, and was proper and owing when tendered to them.

## II.   THE REMEDIES ORDERED BY THE BANKRUPTCY COURT ARE LEGALLY IMPERMISSIBLE

The bankruptcy court directed a panoply of impermissible remedies.  If this Court

affirms the bankruptcy court's liability findings, it should confine the Conveying Subsidiaries'

remedy to avoidance of the Liens and obligations conveyed to the New Lenders.

### A.   The Bankruptcy Court Awarded An Impermissible Remedy And Double Recovery In Ordering The Transeastern Lenders To Pay Diminution Damages

If the Conveying Subsidiaries participated in a fraudulent transfer by incurring

obligations and pledging the Liens to the New Lenders, the only remedy available is avoidance

of those obligations and liens—precisely the relief ordered by the bankruptcy court against the

New Lenders.  The bankruptcy court erred as a matter of law in going beyond that remedy and

ordering the Transeastern Lenders to disgorge the New Loan proceeds for the payment of

Diminution Damages.

The Bankruptcy Code grants debtors two distinct powers in responding to

fraudulent transfers:  (1) the power to avoid the transfers under Sections 544 (which incorporates

state law) and 548 (the substantive federal law); and (2) the power to recover property from

certain transferees under Section 550.  *See Yoppolo v. Liberty Mortgage (In re Morgan)*, 276

B.R. 785, 790 (Bankr. N.D. Ohio 2001) (noting that the two powers are "distinct concepts

completely separate and independent from one another").  The purpose of Section 550 is to restore the debtor to the position it would have occupied had the fraudulent transfer not occurred. *See, e.g.*, *Bakst v. Wetzel (In re Kingsley)*, 518 F.3d 874, 877 (11th Cir. 2008).  Thus, "when the avoidance alone is a sufficient remedy, there is no need for the trustee to seek recovery" under Section 550.  *Suhar v. Burns (In re Burns)*, 322 F.3d 421, 427 (6th Cir. 2003); *see Schnittjer v. Linn Area Credit Union (In re Sickels)*, 392 B.R. 423, 426 (Bankr. N.D. Iowa 2008) ("recovery is only necessary when . . . avoidance is inadequate"); *Bakst v. Sawran (In re Sawran)*, 359 B.R. 348, 351-52 (Bankr. S.D. Fla. 2007).

Avoidance is universally understood to be a complete remedy when the fraudulent transfer involved a nonpossessory interest in property, such as a lien.  *See, e.g.*, *In re Morgan*, 276 B.R. at 792 (avoiding mortgage lien but disallowing Section 550 recovery, holding that "in the case of nonpossessory transfers, no recovery is possible under [Section] 550"); 4 Norton Bankr. L. & Prac. 3d § 70:3 ("An example of the avoidance alone being satisfaction is when the trustee successfully avoids a lien.").  If a debtor owns its property free and clear of any lien, but then transfers a lien on that property, it continues to hold the property, albeit subject to that lien. Avoidance of the liens is then "sufficient to place the estate in exactly the same position it would have been in, but for the granting of the lien."  *Rodriguez v. Drive Fin. Servs. LP (In re Trout)*, 392 B.R. 869, 871 (Bankr. D. Colo. 2008), *aff'd sub nom. Rodriguez v. DaimlerChrysler Fin. Servs. Ams. LLC (In re Bremer)*, 408 B.R. 355 (B.A.P. 10th Cir. 2009) ("avoiding and preserving the [] liens for the benefit of the estates placed these estates in their pre-transfer position"); *see In re Morgan*, 276 B.R. at 792 ("[W]hen a nonpossessory interest in property is avoided, there is nothing left to recover.").  In that circumstance, application of Section 550(a)'s allowance of recovery of the "property transferred, or . . . the value of such property" makes no sense—the

property has already been "recovered" in every relevant respect.  Bankr. Code § 550(a); *see In re*

*Trout*, 392 B.R. at 871 ("After a transfer is avoided, the reference in § 550(a) to allowing the

trustee to 'recover . . . the property transferred, or . . . the value of such property . . .' simply does

not fit in circumstances where the avoidance in question is of a lien.").[18]

---

[18]    *See also Stalnaker v. DLC, Ltd. (In re DLC, Ltd.)*, 295 B.R. 593, 602 n.7 (B.A.P. 8th Cir. 2003) (avoiding grant of a security interest is sufficient to recover the transferred property), *aff'd*, 376 F.3d 819 (8th Cir. 2004); *Moser v. Toyota Motor Credit Corp. (In re Davis)*, Adv. No. 08-4042, 2009 WL 1033194, at *7 (Bankr. E.D. Tex. Mar. 24, 2009) (where trustee avoids transfer of nonpossessory lien, trustee cannot "recover" any property or its value); *Sickels*, 392 B.R. at 427 ("Avoidance of the lien constitutes a complete recovery for the bankruptcy estate.  No further recovery is allowed or necessary to remedy the avoidable transfer or put the estate back into the financial condition Debtors enjoyed prior to the transfer."); *Olson v. Parker (In re Parker)*, 395 B.R. 12, 23-24 (Bankr. W.D. Mich. 2008) (no remedy beyond avoiding transferred quitclaim deed necessary); *Gold v. Interstate Fin. Corp. (In re Schmiel)*, 319 B.R. 520, 530 (Bankr. E.D. Mich. 2005) (because only mortgage on property was transferred, and not property itself, avoidance of preferential transfer was the only remedy available); *Kelley v. Chevy Chase Bank (In re Smith)*, 236 B.R. 91, 100 (Bankr. M.D. Ga. 1999) (remedy for the preferential transfer of a lien on a vehicle is the avoidance of that lien, not the recovery of the value of the vehicle at the time of the lien transfer); *Roost v. Associates Home Equity Servs., Inc. (In re Williams)*, 234 B.R. 801, 805 (Bankr. D. Or. 1999) (where trustee avoids lien, and property subject to lien was not transferred to creditor, trustee had no need for "recovery" under Section 550); *Kelley v. GMAC (In re Farmer)*, 209 B.R. 1022, 1024-25 (Bankr. M.D. Ga. 1997) (same); *Glanz v. RJF Int'l Corp. (In re Glanz)*, 205 B.R. 750, 758 (Bankr. D. Md. 1997) (avoidance of lien left "simply nothing to 'recover' under § 550(a)"); *Peterson v. Berg (In re Berg)*, 387 B.R. 524, 569 (Bankr. N.D. Ill. 2008) ("remedy of avoidance is adequate for a non-possessory mortgage interest").

In addition to being demonstrably unnecessary and unprecedented,[19] the disgorgement order also violates Section 550(d), which provides that the trustee "is entitled to only a single satisfaction" under Section 550(a). The Judgment violates the "single satisfaction" rule because it effectively allows the Conveying Subsidiaries to collect *twice* on the transferred lien interests, once getting the Liens back and a second time getting their value, resulting in a windfall to the debtors and a double penalty for the Defendants. *See Sickels*, 392 B.R. at 427 ("If the Court also awarded Trustee a judgment in the amount of the loan, Trustee would be allowed to collect twice on the avoided mortgage lien. Such a result is precluded by § 550(d)."); *Lindquist v. Household Indus. Fin. Co. (In re Vondall)*, 352 B.R. 193, 200 (Bankr. D. Minn. 2006) (holding that ordering lienholder to pay trustee the value of its secured claim after avoidance would permit double recovery and "penalize [the lienholder] double the value of its secured interest"); *Vazquez Laboy v. Doral Mortgage Corp. (In re Vazquez Laboy)*, 397 B.R. 627, 633 (Bankr. D.P.R. 2008).

The bankruptcy court's Opinion did not address this argument or any of the cases the Transeastern Lenders cited in its support. Rather, the Opinion reproduced near-verbatim the Plaintiff's Proposed Opinion, which volunteered a fundamental confusion between transfers of *possessory* interests and transfers of *nonpossessory* interests. In awarding the double recovery,

---

[19]   To counsel's knowledge, in only one case has a lower court allowed recovery of the value of a lien from the lender instead of avoiding the lien—but even in that case, the court still did not allow *both* avoidance and recovery and did not permit recovery against a non-lender third party. *See USAA Fed. Sav. Bank v. Thacker (In re Taylor)*, 390 B.R. 654, 662 (B.A.P. 9th Cir. 2008) (preserving the lender's "security interest on the car along with its contract rights against the debtors"), *rev'd*, 599 F.3d 880 (9th Cir. 2010). The Ninth Circuit recently reversed the decision of the Bankruptcy Appellate Panel, finding that it was error to award the value of the lien rather than the transferred property (the lien) itself. *In re Taylor*, 599 F.3d at 884-85. The court remanded the case with an instruction to declare the lien void. *Id*.

the court reasoned that fully compensating the Conveying Subsidiaries required accounting for the diminution in value of the Liens, quoting a case stating that "if the court limits the Trustees to recovery of the property itself, . . . the estate will have lost the opportunity to dispose of the property prior to its depreciation."  (Op. at 175) (quoting *Feltman v. Warmus (In re American Way Serv. Corp.)*, 229 B.R. 496, 532 (Bankr. S.D. Fla. 1999)).  That logic, by its own terms, applies only where the debtor *lost possession* of the property in question—in *Warmus* the debtor transferred legal title and physical control of the subject property, leaving it unable to control the risk of diminution in value and unable to enjoy use of the property following the transfer.  229 B.R. at 530-31.  Here, by contrast, the Conveying Subsidiaries at all times had full possession and control of the assets pledged as collateral for the Liens, including the ability to dispose of them before they diminished in value.[20]  The court's decision shifts the risk of asset depreciation to the Transeastern Lenders, effectively making them insurers of the value of the Conveying Subsidiaries' assets (through a loan transaction to which the Transeastern Lenders were not even a party).  Rather than restore the Conveying Subsidiaries to their pre-transfer positions, the Judgment undoes the effects of both the Lien Transfer and an extraordinary housing downturn, putting the Conveying Subsidiaries in a far better position than they would have occupied had the transaction not happened.  *See* George G. Triantis, *A Tussle with TOUSA: Savings Clauses in Intercorporate Guaranties* (Harvard Public Law Working Paper, No. 09-68, 2009), *available at* http://ssrn.com/abstract=1507754 (observing that the Defendants here "were compelled to insure the borrower against market declines in the value of their assets" and that "the court's remedy

---

[20]     The importance of permitting damages in addition to avoidance is obvious when depreciating property—such as a car or boat—is physically transferred.  In such cases, only the transferee has use and enjoyment of the property while it depreciates in value.  When a non-possessory interest is transferred, the transferor can dispose of the property before it depreciates, and also benefits from the use and enjoyment of the property while it is depreciating.

was punitive in that it left the debtor better off than if the avoidable transaction had not

occurred").  The Bankruptcy Code provides no such guarantee.  *In re Bremer*, 408 B.R. at 361

(denying recovery for decline in value of the property subject to avoided liens).  The recovery

remedy ordered by the bankruptcy court is unprecedented and wrong as a matter of law.[21]

### B.   The Bankruptcy Court Erred In Ordering The Transeastern Lenders To Disgorge Funds That Will Be Distributed To The New Lenders

The bankruptcy court ordered the Transeastern Lenders to disgorge $403 million

plus prejudgment interest to a common fund that will be used to pay the Conveying Subsidiaries'

damages.  (Op. at 181.)  But the monies in the fund—more than $630 million at last count—are

certain to substantially exceed those damages, and so the court provided for the disposal of any

remainder.  Remarkably, the bankruptcy court directed that the remainder go not to the

Transeastern Lenders but to the *New Lenders*—who are the Transeastern Lenders' co-

Defendants in this proceeding, have asserted no claims against the Transeastern Lenders, and are

not debtors capable of bringing claims before the bankruptcy court for adjudication.  This

extraordinary award exceeded the bankruptcy court's jurisdiction and erroneously shifted risk

*away* from the parties that understood the risk to be their own.

### 1.   The Bankruptcy Court Did Not Have Jurisdiction To Redistribute Funds From The Transeastern Lenders To The New Lenders

Bankruptcy courts are creatures of Article I of the Constitution and, accordingly,

are courts of limited jurisdiction.  *See Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*,

---

[21]   In the unlikely event that the Committee's direct-transferee theory fails against the New Lenders but is viable against the Transeastern Lenders, the Committee would be limited in its recovery to the value of the property transferred by the Conveying Subsidiaries to the Transeastern Lenders, *see* Section 550(a)—that is, their "minimal" and apparently valueless interest, as found by the bankruptcy court, in the New Loan proceeds, *see supra* at 19-20.

458 U.S. 50, 76 (1982); *Miller v. Kemira, Inc. (In re Lemco Gypsum, Inc.)*, 910 F.2d 784, 787 (11th Cir. 1990).  Bankruptcy courts lack jurisdiction over disputes between non-debtors "where the dispute does not involve property of the estate, does not affect the administration of the estate and the resolution of the inter-creditor dispute will not affect the recovery of creditors under a confirmed plan."  *Harbour Oaks Dev. Corp. v. Southtrust Bank, N.A. (In re Harbour Oaks Dev. Corp.)*, 224 B.R. 228, 230 (Bankr. M.D. Fla. 1998); *see Wisconsin Dep't of Indus., Labor & Human Relations v. Marine Bank Monroe (In re Kubly)*, 818 F.2d 643, 645 (7th Cir. 1987) ("[D]isputes among creditors of a bankrupt come within the federal bankruptcy jurisdiction only if they involve property of the estate or if resolving two creditors' intramural squabble will affect the recovery of some other creditor.").

Because the Conveying Subsidiaries' obligations to the New Lenders are avoided under the Opinion—which displaces the New Lenders as creditors of the Conveying Subsidiaries—the payment of the Transeastern Lenders' funds to the New Lenders will have no bearing on the property of the Conveying Subsidiaries' estates or the sums available to their creditors.  Indeed, the very scope of the order presupposes that only non-estate property will go to the New Lenders.  (Op. at 180-81.)  It was accordingly well beyond the bankruptcy court's jurisdiction to order the distribution of funds paid by the Transeastern Lenders to the New Lenders.

### 2.    The Bankruptcy Court Did Not Have The Equitable Power To Redistribute Property

The bankruptcy court purported to rely on its general equitable powers in ordering the award, believing that equity called for both sets of defendants to "share" the costs of returning the Conveying Subsidiaries to their pre-transfer position.  (Op. at 176.)  But the court's equitable powers under 11 U.S.C. § 105(a) are not an *exception* to its limited jurisdiction; they

are strictly confined to carrying out actions specifically provided for in the Bankruptcy Code. *See, e.g.*, *In re Dillon*, 194 B.R. 533, 536 (Bankr. S.D. Fla. 1996) ("The 11th Circuit has been careful to confine 11 U.S.C. § 105 to issues of enforcement of provisions of the Bankruptcy Code, and not to allow bankruptcy courts to overuse their equitable authority." (citing *United States v. Sanford (In re Sanford)*, 979 F.2d 1511 (11th Cir. 1992))).[22]  Section 105(a) does not empower bankruptcy courts to "create substantive rights that are otherwise unavailable under applicable law."  *In re Dairy Mart*, 351 F.3d at 92; *see Official Unsecured Creditors' Comm. v. Stern* (*In re SPM Mfg. Corp.*), 984 F.2d 1305, 1311, 1315 (1st Cir. 1993) (bankruptcy court lacked equitable authority to compel secured creditor, which had contracted with unsecured creditors to split monies realized under security interest, to pay unsecured creditors' portion of proceeds to estate for distribution).

   The court cited no provision of the Bankruptcy Code permitting the redistribution of funds in a fraudulent transfer case from one defendant to another, nor does one exist.  Its order was instead an impermissible exercise of "free-floating discretion to redistribute rights in accordance with [the court's] personal views of justice and fairness."  *In re Dillon*, 194 B.R. at 536.

   And the court did not even get the equities right.  The Judgment does not effect a "sharing" of the loss between the Defendants, but rather shifts the loss entirely to the

---

[22] *See also, e.g.*, *Georgian Villa, Inc. v. United States (In re Georgian Villa, Inc.)*, 55 F.3d 1561, 1563 (11th Cir. 1995) (the equitable power of the bankruptcy court is limited by the remedial provisions of the Bankruptcy Code); *New Eng. Dairies, Inc. v. Dairy Mart Convenience Stores, Inc. (In re Dairy Mart Convenience Stores, Inc.)*, 351 F.3d 86, 92 (2d Cir. 2003) ("[T]he bankruptcy court's equitable powers [] must and can only be exercised within the confines of the Bankruptcy Code." (quotation omitted)); *Harker v. Wells Fargo Bank, NA (In re Krause)*, 414 B.R. 243, 264 (Bankr. S.D. Ohio 2009) (Section 105(a) is not an "independent basis for relief"; when exercised, Section 105(a) power is "tethered to another Code provision and serves merely as a vehicle to carry out such provision").

Transeastern Lenders.  Although the New Lenders lose the Liens against the Conveying Subsidiaries, they stand to gain as much as $480 million from the Transeastern Lenders and they retain their secured claims against TOUSA.  The Transeastern Lenders, by contrast, have almost no prospect of recovery, because having lost their security interests in the Transeastern assets they are left only with unsecured claims against TOUSA that sit behind the fully secured amount of the New Loans.  That result is punitive, not equitable.

The court's personal view of the equities between the Transeastern Lenders and the New Lenders also contradicts the express assignment of risk by the parties to the New Loans. The New Loan documents included "savings clauses" by which the New Lenders agreed to limit the Liens and obligations against the Conveying Subsidiaries to the maximum amount permitted by law if the transfer of the full value of the Liens and obligations were to constitute a fraudulent transfer.  (Op. at 139.)  Those savings clauses demonstrate the parties' recognition of the risk that the Liens and liabilities might not be enforceable, and their express agreement that the New Lenders would bear that risk and carry the loss entirely if the Liens and liabilities were invalidated.  By shifting the risk of loss from the New Lenders to the Transeastern Lenders, the bankruptcy court inexplicably reversed the parties' contractually-expressed risk expectations.

### 3.    Public Policy Disfavors The Risk-Shifting Imposed By The Bankruptcy Court

The bankruptcy court's risk-shifting award to the New Lenders also upends settled law.  In upstream guarantee cases, where a parent borrows funds by causing its subsidiaries to grant liens or guaranties to lenders, the lenders—rather than the ultimate recipients of the borrowed funds—typically bear the risk that the guaranties and liens are avoidable fraudulent transfers.  *See* Kenneth J. Carl, *Fraudulent Transfer Attacks on Guaranties in Bankruptcy*, 60 Am. Bankr. L.J. 109, 139 (1986) (noting ways the parties to a guaranty

transaction can mitigate the risk of avoidance); Brian E. Greer & Joel S. Moss, *Guaranties in Bankruptcy: A Primer*, 16 J. Bankr. L. & Prac. 3 Art. 2, at IX.b.2.g. (2007) (same).  *See generally* Michael F. Maglio, *The Promise, Part II: Corporations, Obligations and Fraudulent Conveyances*, 14 Bus. L. Today 25 (2005); Williams, *supra* at 19.  As the New Loans' savings clauses bear out, that is the premise of countless commercial transactions.  The bankruptcy court's analysis would unsettle that law and shift the risk of upstream guaranties from the lenders (who could simply choose not to lend money) to the parties in the worst position to police that risk—the ultimate recipients of the borrowed funds.  That would force creditors with a due and payable debt to refuse repayment of undisputed indebtedness and instead foreclose on their collateral.  That outcome would undermine the voluntary settlement of loan disputes, since payments in respect of any settlement could be challenged as fraudulent.  This would both accelerate bankruptcies and inhibit the credit markets, *cf. Goveart v. Capital Bank (In re Miami General Hospital, Inc.)*, 124 B.R. 383, 393 (Bankr. S.D. Fla. 1991) (cautioning against holdings that are "inhibitory of contemporary financing practices") (quoting *TeleFest, Inc. v. VU-TV, Inc.*, 591 F. Supp. 1368, 1379 (D.N.J. 1984)), and would contravene the well-settled judicial policy of encouraging settlements in lieu of litigation, *see Murchison v. Grand Cyprus Hotel Corp.*, 13 F.3d 1483, 1486 (11th Cir. 1994) ("We favor and encourage settlements in order to conserve judicial resources.").

### 4.    The Bankruptcy Court's Findings Do Not Support the Equitable Redistribution Ordered

Even if authorized by the Bankruptcy Code, any equitable redistribution of property required the bankruptcy court to conclude that the Transeastern Lenders acted in bad faith and that the New Lenders did not.  Because the bankruptcy court expressly found that the New Lenders did not act in good faith, its redistribution is void at the outset.  (Op. at 116, 124,

149-50.)  "[O]ne who has unclean hands is not entitled to relief in equity," *Largen v. United States*, No. 93-333-Civ-Orl-3 ABF (22), 1995 U.S. Dist. LEXIS 10507, at *24 (M.D. Fla. July 14, 1995), and thus the Court's bad faith finding as to the New Lenders precludes an equitable remedy in their favor.  *Id.* ("The principle of unclean hands forecloses the possibility of equitable relief to a party who has done wrong in the context of the dispute, regardless of the impropriety of the other party's behavior.") (citing *Precision Instrument Mfg. Co. v. Automotive Maint. Mach. Co.*, 324 U.S. 806, 814 (1945)).  Although the Transeastern Lenders disagree on the merits with the bankruptcy court's conclusion that the New Lenders did not act in good faith, having reached that conclusion the bankruptcy court was obligated to apply that finding as the law requires.

The bankruptcy court also found that "the Senior Transeastern Lenders[] Did Not Act In Good Faith And Were Grossly Negligent."  (Op. at 116.)  Although that conclusion was irrelevant to any issue determined in the Opinion, it cannot be permitted to stand, because it rests on a conception of a lender's legal duty to a borrower that is, again, contrary to the basic legal premises of the creditor-debtor relationship.

Under New York law, which applies to the claims against the Transeastern Lenders, (*see* Tr. Ex. 2007 at Lehman 020416; Tr. Ex. 5076 at EY-TOUSA-001201), gross negligence is "conduct that evinces a reckless disregard for the rights of others or 'smacks' of intentional wrongdoing."  *AT & T v. City of N.Y.*, 83 F.3d 549, 556 (2d Cir. 1996) (citing *Colnaghi, U.S.A., Ltd. v. Jewelers Prot. Servs., Ltd.*, 611 N.E.2d 282, 284 (N.Y. 1993)).  A claim for gross negligence requires proof of a duty owed by the defendant to the plaintiff, *see Peralta v. Figueroa*, No. 28093/06, 2007 WL 4104122, at *5 (N.Y. Sup. Ct. Nov. 14, 2007) (dismissing gross negligence claim where record revealed no relationship between plaintiff and defendant

sufficient to give rise to a duty); *Kerusa Co. v. W10Z/515 Real Estate, L.P.*, 810 N.Y.S.2d 861, 866 (Sup. Ct. 2005) (same), but the Transeastern Lenders are not alleged to have owed (or breached) a duty of care to the Conveying Subsidiaries.  The 182-page Opinion contains no analysis or discussion of such a duty, and the record evinces no such duty.  The gross negligence finding against the Transeastern Lenders had no basis in law and should be reversed.

The bankruptcy court's conclusion that the Transeastern Lenders did not act in good faith is similarly flawed.  In considering the good faith of the Transeastern Lenders, the court should have asked on what information a reasonable creditor would have relied.  Instead, the court drew unreasonable inferences from the information available to the Transeastern Lenders, finding that the Transeastern Lenders acted in bad faith because:  (1) TOUSA was experiencing general financial problems in 2006 and 2007 (Op. at 117-18); (2) *Debtwire*, Moody's, and Standard & Poor's reported negative information about TOUSA and other homebuilders (*Id*. at 117-19); and (3) TOUSA disclosed that it received a letter from a group of bondholders that asserted, based on publicly available information, that TOUSA was "in the zone of insolvency" (*Id*. at 118).  None of these facts, either separately or together, support a finding of bad faith.  First, knowledge that TOUSA was experiencing a downturn, concurrent with the rest of the homebuilding industry, cannot mean the Transeastern Lenders should have deemed TOUSA insolvent.  Companies often experience substantial declines while remaining viable.  Second, there is no reason the Transeastern Lenders should have credited assertions in a letter from bondholders based solely on public information, rather than rely on TOUSA's internal financial projections and analyses based on confidential information prepared by TOUSA's financial advisors, including a solvency opinion.  Inexplicably, the court gave no weight to the fact that $500 million in almost entirely new money was being lent to TOUSA by

major financial institutions that the Transeastern Lenders believed conducted extensive independent due diligence.  (Trial Tr. (Burns) 3905:24-3906:21, 3908:19-3909:21; Trial Tr. (Morgan) 4087:6-14; Burns Aff. (Tr. Ex. 5404 ¶¶ 25-28, 30-33, 39); Hinckley Aff. (Tr. Ex. 5406) ¶¶ 13-14.)

The net result of the court's finding is to impose extraordinary duties of due diligence on the part of creditors accepting repayment—duties that equal or exceed those imposed on lenders extending credit in the first instance.  The court recognized that "Citi had, if anything, even more notice of TOUSA's precarious position [than the Transeastern Lenders] and greater opportunity to conduct due diligence" (Op. at 124), but the court failed to appreciate why that would be, or why it mattered:  the Transeastern Lenders, as *recipients* of a debt payment, had no reason or legal duty to conduct due diligence with respect to the provenance of the funds with which they were being repaid.  As discussed above, the ordinary allocation of the risk of avoidance requires that it remain with the New Lenders because of their greater ability to manage, mitigate, and avoid that risk.

### C.    The Bankruptcy Court's Award of Attorneys' Fees Is Impermissible

The bankruptcy court held the Defendants liable for the Committee's and Debtors' costs of prosecuting this suit, purportedly on the authority of Section 550, including "fees and expense paid to [] counsel, financial advisors, and experts."  (Op. at 172, 174, 179.) That holding is wrong.  Nothing in the Bankruptcy Code generally, or in Section 550 specifically, authorizes the award of attorneys' fees to the plaintiff in a fraudulent transfer action, and courts in bankruptcy cases have hewed to the American Rule that each party bears its own fees unless expressly provided for by contract or statute.[23]

---

[23]    The phrase "attorneys' fees" is used herein to refer to fees and expenses paid to professionals including attorneys, advisors, and experts.  The Supreme Court has made

The bankruptcy court reasoned that Section 550 is "designed to restore the estate to the financial condition that would have existed had the transfer never occurred," (*Id.* at 171) (quotation omitted), which is certainly true insofar as the remedies used to restore the estate to that position are tied to Section 550 itself, *see In re Kingsley*, 518 F.3d at 877.  It is decidedly *not* true, however, that Section 550 authorizes remedies outside the scope of its terms—otherwise, its express provision that in a fraudulent transfer action the trustee may recover "the property transferred, or . . . the value of such property" would be meaningless.  Bankr. Code § 550; *see Christ v. Beneficial Corp.*, 547 F.3d 1292, 1298 (11th Cir. 2008) (noting that "[w]here Congress has provided a comprehensive statutory scheme of remedies . . . the interpretive canon of *expressio unius est exclusio alterius* applies," and accordingly refusing to construe statute to authorize unspecified remedies).[24]  Thus, courts both within the Eleventh Circuit and beyond

---

clear that the American Rule applies to attorneys' fees as well as expert expenses.  *See Kansas v. Colorado*, 129 S. Ct. 1294, 1298 (2009) (citing *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240 (1975)) (the American Rule applies not only to attorney's fees but also other costs of litigation, including expert witness fees).

[24]   The award to the Conveying Subsidiaries of approximately $20 million in transaction costs paid by TOUSA out of its centralized cash management account fails for the same reason.  Those payments were not made with the New Loan proceeds and any reimbursement of those costs to the Conveying Subsidiaries impermissibly uses Section 550 to give the Conveying Subsidiaries more than the value of the Liens they transferred.  Moreover, the transaction costs were paid out of a TOUSA account over which TOUSA had full control, (*see* Tr. Ex. 136 at TOUSA-BR-00249964 (indicating that the transaction costs were paid from the 9121 account); Mot. for Cont'd Use of Cash Mgmt. Sys., No. 08-10928-JKO (Bankr. S.D. Fla. Jan. 29, 2008) (D.E. 8) at Ex. C); the payment thus did not involve the transfer of Conveying Subsidiary property.  (*See supra* at 15-16.)  *See also Southmark Corp. v. Grosz (In re Southmark Corp.)*, 49 F.3d 1111 (5th Cir. 1995) (commingled funds in centralized cash management account were property of the entity with legal title and control); *Amdura Nat'l Distrib. Co. v. Amdura Corp. (In re Amdura Corp.)*, 75 F.3d 1447 (10th Cir. 1996) (deposits in a centralized cash management account presumptively belong to the entity in whose name the account is established); *Enron Corp. v. Port of Houston Auth. (In re Enron Corp.)*, Nos. 01-160334 (AJG), 03-92511, 2006 WL 2385194 (Bankr. S.D.N.Y. June 2, 2006) ("for purposes of Section 548(a) of the Bankruptcy Code, it is the transferor's control of the funds in the

have consistently held that the authority for an award of attorneys' fees in a fraudulent transfer

action must derive from a specific source other than Section 550, and that if no such authority

exists—as the bankruptcy court recognized was true here, (*see* Op. 172-74)—attorneys' fees are

not allowable.  *See, e.g.*, *Tolz v. Lauderdale Dev., Ltd. (In re Empresa Naviera Santa USA, Inc.)*,

235 B.R. 130, 133 (Bankr. S.D. Fla. 1999).[25]

The bankruptcy court acknowledged one case from the stream of authority

disallowing attorneys' fees (Op. at 172), but rather than follow or endeavor to distinguish that

caselaw, the court relied on a single contrary case stating, in *dicta*, that *Collier on Bankruptcy*

"suggests that § 550 of the Code provides the basis for an award of attorneys' fees and costs."

*Shimer v. Fugazy (In re Fugazy Express, Inc.)*, 159 B.R. 432, 437 (Bankr. S.D.N.Y. 1993) (citing

4 L. King, *Collier on Bankruptcy*, ¶ 550.02 at 550-9 (15th ed. 1990)).[26]  But the only authority

cited by *Collier* for this proposition is *Fugazy* itself, *see* 5 Collier on Bankruptcy ¶ 550-

02(a)[1][b] n.32 (16th ed. 2010), and the edition of *Collier's* cited in *Fugazy* indicates that the

statement was nothing more than erroneous *ipse dixit*.  *See* 4 L. King, *Collier on Bankruptcy*, ¶

550.02 at 550-9 (15th ed. 1992).  Indeed, the *Fugazy* court's own governing circuit has

subsequently rejected the *Fugazy*/*Collier* view, confirming that "there is no general right to

attorney's fees in bankruptcy actions."  *BankBoston, N.A. v. Sokolowski (In re Sokolowski)*, 205

F.3d 532, 535 (2d Cir. 2000).

---

[cash management] account and not the actual ownership that is dispositive") (citations omitted).  The Committee made no contrary showing.

[25]  *See also Gouveia v. Cahillane (In re Cahillane)*, 408 B.R. 175, 214 (Bankr. N.D. Ind. 2009); *Brown v. Phillips (In re Phillips)*, 379 B.R. 765, 789 (Bankr. N.D. Ill. 2007); *Krol v. Unglaub (In re Unglaub)*, 332 B.R. 303, 323 (Bankr. N.D. Ill. 2005).

[26]  The only other case cited by the court, *In re Ace Fruit & Produce Co.*, 49 F. Supp. 986, 990 (S.D.N.Y. 1943), stated simply that it was not error for the referee in bankruptcy to have awarded "costs and disbursements."  The court there did not address attorneys' fees.

Recovery of the Committee's prosecution costs is unauthorized as a matter of law, and the bankruptcy court's holding to the contrary must be reversed.

### D.   The Bankruptcy Court's Award Of Prejudgment Interest Is Impermissibly Punitive

The bankruptcy court ordered the Transeastern Lenders to pay prejudgment interest on the sums it disgorged from July 31, 2007, the date of the Transeastern Settlement, through the date of the Judgment, October 13, 2010.  (Op. at 181.)  Although a bankruptcy court has discretion to determine whether and on what terms to award prejudgment interest, *see Industrial Risk Insurers v. M.A.N. Gutehoffnungshutte GmbH*, 141 F.3d 1434, 1446-47 (11th Cir. 1998), where, as here, the award is based on the construction of state law, it is reviewed *de novo*. *See National Fire Ins. Co. of Hartford v. Fortune Constr. Co.*, No. 06-14614, 2007 WL 1047070, at *2 (11th Cir. Apr. 9, 2007).   The prejudgment interest award—which compounds the Transeastern Lenders' liability by roughly $80 million—is wholly divorced from the evidence and from any compensatory purpose.  It is a clear abuse of discretion.

The "essential rationale for awarding prejudgment interest is to ensure that an injured party is fully compensated" by accounting for its lost use of money.  *City of Milwaukee v. Cement Div., Nat'l Gypsum Co.*, 515 U.S. 189, 195 (1995); *see St. Paul Fire & Marine Ins. Co. v. Lago Canyon, Inc.*, 561 F.3d 1181, 1191-92 (11th Cir. 2009) (prejudgment interest is "compensation to the plaintiff for the use of funds that were rightfully his").  Thus, the Eleventh Circuit has stressed that "in awarding prejudgment interest, the district court must insure that the award is not punitive in nature."  *Osterneck v. E.T. Barwick Indus.*, 825 F.2d 1521, 1536 (11th Cir. 1987).  The bankruptcy court's prejudgment interest award violates this principle in three important respects.

First, the bankruptcy court impermissibly ordered prejudgment interest on the *full amount* of the disgorgement without regard to the amount or timing of the monetary damages actually suffered by the Conveying Subsidiaries.  The primary element of monetary damages payable to the Conveying Subsidiaries is the diminution in value of their collateral over time.  As the subsequent filings by the debtors and the Committee demonstrate, the total diminution in value of the Conveying Subsidiaries' assets was approximately $100 million, a fraction of the $403 million on which the Transeastern Lenders were ordered to pay prejudgment interest.[27] (D.E. 939 (Clancy Decl.) at Ex. G; *see also* TOUSA, Inc. and Subsidiaries Remaining Value Analysis (D.E. 757).)  Moreover, those damages clearly had not accrued by July 31, 2007, when the court ordered prejudgment interest to begin accruing.  Similarly, the second element of the monetary award—the Committee's costs of prosecution—could not have even begun to accrue before the filing of the bankruptcy petition.

An appropriate prejudgment interest award would compensate the plaintiff for specific sums from the date on which the plaintiff lost the use of those sums.  Even if such damages were incurred prior to the filing of the complaint, prejudgment interest should have been awarded not from the date of the transfer but "from the date of demand or, in the absence of demand, from the commencement of the action."  *Tavormina v. Merchants Bank of Miami (In re Gillett)*, 55 B.R. 675, 680 (Bankr. S.D. Fla. 1985).[28]  Indeed, courts have noted that "[a]bsent

---

[27]   Highlighting the absurdity of this award, the amount of prejudgment interest to be paid by the Transeastern Lenders is almost equal to the full amount of diminution damages suffered by the Conveying Subsidiaries.

[28]   *See also Development Specialists, Inc. v. Hamilton Bank, N.A. (In re Model Imperial, Inc.)*, 250 B.R. 776, 805 (Bankr. S.D. Fla. 2000) (allowing prejudgment interest in § 548 case from date of commencement of adversary proceeding); *Friedman v. Ginsburg (In re David Jones Builder, Inc.)*, 129 B.R. 682, 699 (Bankr. S.D. Fla. 1991) (same, in § 547 case); *Bakst v. Presley (In re Presley Corp.)*, 44 B.R. 781, 784 (Bankr. S.D. Fla. 1984) (same, in fraudulent transfer case).

special circumstances, it would be inequitable to impose prejudgment interest from the date of

transfer because the estate's funds are not wrongfully held as of the transfer date.  At that time

the transfer is simply payment of a debt." *Feltman v. City Nat'l Bank of Fla. (In re Sophisticated*

*Commc'ns, Inc.)*, No. 02-1526-BKC-RAM-A, 2007 Bankr. LEXIS 3744, at *9 (Bankr. S.D. Fla.

Oct. 24, 2007) (citing *Merrill v. Abbott (In re Independent Clearing House Co.)*, 41 B.R. 985,

1015 (Bankr. D. Utah 1984).  The award of prejudgment interest here is untethered from the

evidence and from the doctrine's compensatory purpose.  *Cf. Savage & Assocs., P.C. v. Mandl*

(*In re Teligent Inc.*), 380 B.R. 324, 338 (Bankr. S.D.N.Y. 2008) (denying prejudgment interest

where the court found no basis for computing the appropriate amount).

Second, the bankruptcy court ordered prejudgment interest on the nearly $300

million of funds to be paid from the Disgorgement Fund to the *New Lenders*.  The New Lenders

plainly did not suffer the loss of funds in the Transeastern Lenders' possession from July 31,

2007 or otherwise, and are not plaintiffs in any event.  The award of prejudgment interest to the

New Lenders is nonsensical, and operates only to punish the Transeastern Lenders.

Finally, the prejudgment interest award gives the Committee an impermissible

double recovery.  Even assuming that prejudgment interest is properly granted on the full $403

million disgorged by the Transeastern Lenders, the interest the Conveying Subsidiaries would

have earned on that sum was owable to the New Lenders and thus did not constitute a loss to

them.  Moreover, further assuming the interest rightly belonged to the Conveying Subsidiaries,

the New Lenders have been ordered to disgorge such interest as part of the judgment against

---

The difference is not inconsequential—the Committee filed this adversary case in July
2008, one year after the transfer, which accounts for nearly $35 million in prejudgment
interest.

them.  (Op. at 180.)  The Conveying Subsidiaries are thus being paid twice for the loss of the use

of money that did not even belong to them.

**III.    IF THE BANKRUPTCY COURT'S LIABILITY HOLDING STANDS, THE TRANSEASTERN LENDERS' PROPERTY AND CONTRACTUAL RIGHTS AGAINST THE TOUSA ESTATE MUST BE ENFORCED**

**A.    The Transeastern Lenders Are Entitled To Their Liens Against The Transeastern Assets Held By TOUSA Homes Florida, L.P.**

A corollary to the bankruptcy court's remedial overreaching was its refusal to

restore the Transeastern Lenders to the position they occupied before TOUSA's repayment of its

Transeastern debt.  Avoidance of a fraudulent transfer must "restore" the parties "to their

previous positions," meaning that when "the grantee has to surrender security or refund a

payment, he is left where he began, with a debt."  *In re Best Prods. Co.*, 168 B.R. 35, 57 (Bankr.

S.D.N.Y. 1994) (quotation omitted).  Contrary to this basic legal principle, the bankruptcy court

restored only a fraction of the Transeastern Lenders' pre-transfer position because it failed to

reinstate their liens on the Transeastern assets, acquired through merger by TOUSA Homes

Florida, L.P.

Under the terms of the Transeastern credit documents, the Transeastern Lenders

held first priority liens on substantially all the assets of Transeastern, including its real estate,

cash, subsidiary equity interests, and option contracts.  (Burns Aff. (Tr. Ex. 5404) ¶ 6; Tr. Ex.

209; Tr. Ex. 533 at TOUSA-BR-00003571; Tr. Ex. 3062 at CNAIT-00750049-050; Tr. Ex. 3093

at TOUSA-BR-00006653.)  The Transeastern Lenders released those liens, and claims relating to

them, as part of the Transeastern Settlement.  The Transeastern Lenders' interest in those liens is

constitutionally protected.  *See In re Tinker,* 355 B.R. 380, 387 n.9 (Bankr. D. Mass. 2006)

("Lien creditors hold constitutionally cognizable property rights in assets against which their

liens lie."); *United States v. Security Indus. Bank*, 459 U.S. 70, 77-78 (1982) (destruction of liens implicates the Takings Clause of the Fifth Amendment).

The bankruptcy court purported to "unwind[] the July 31[, 2007] Transaction" (Op. at 176), but doing so requires reinstating the Transeastern Lenders' position as secured lenders to Transeastern. By giving the Transeastern Lenders only (virtually worthless) unsecured claims against the TOUSA estate behind the full secured claims of the New Lenders, the court extinguished the Transeastern Lenders' constitutionally-protected lien interests in the Transeastern assets in violation of the Takings Clause and well-settled bankruptcy law.

### B. The Transeastern Lenders' Recoupment Rights Are Cognizable

The Transeastern credit agreements provided that the Transeastern Lenders would be indemnified for any liabilities arising out of that agreement, and the Transeastern Settlement Agreement preserved that indemnification right.[29] Among the TOUSA entities obligated to indemnify the Transeastern Lenders is TOUSA Homes Florida, L.P., a Conveying Subsidiary, which is the successor (by merger) to several parties to the Transeastern credit agreements and the Transeastern Settlement Agreements.[30] The bankruptcy court's judgment triggered TOUSA Homes Florida, L.P.'s indemnification obligation, and thus the Transeastern Lenders' right to

---

[29] Section 9.14 of the Transeastern Senior Credit Agreement states that EHT, TOUSA Senior, and TOUSA agree to hold the Transeastern Lenders harmless against, among other things, liabilities and damages relating to or arising out of the Senior Credit Agreement. (Tr. Ex. 3071 at TOUSA-BR-00000127-128.) Section 3 of the Mutual Release and Consent Agreement governing the Transeastern Settlement states that the releases provided by the Transeastern Lenders do not apply to claims arising under Section 9.14 of the Senior Credit Agreement, which are identified therein as the "Surviving Obligations." (Tr. Ex. 5076 at EY-TOUSA-001198-1199.)

[30] As part of the Transeastern Settlement, TOUSA Homes Florida, L.P. merged with the Transeastern entities that were parties to the Transeastern credit agreement, including EHT, thereby becoming obligated under the Mutual Release and Consent Agreement upon the unwinding of the Transeastern Settlement. (Tr. Ex. 5069; Trial Tr. (Berkowitz) 1708:2-1709:17; 1715:16-1716:9; Berkowitz Dep. 154:2-157:11; Tr. Ex. 5076.)

recoupment—"the right of a defendant, in the same action, to cut down the plaintiff's demand . . . because the plaintiff has not complied with some cross obligation of the contract on which he sues." *Smith v. American Fin. Sys., Inc. (In re Smith)*, 737 F.2d 1549, 1553 n.7 (11th Cir. 1984).

The bankruptcy court rejected the Transeastern Lenders' recoupment claim for two reasons, neither of which has merit. First, the court held that the Transeastern Lenders had not satisfied the requirement that "the debtor's claim and the creditor's claim ar[i]se from the same transaction" (Op. at 153 (quoting *In re Bill Heard Enters., Inc.*, 400 B.R. 813, 821 (Bankr. N.D. Ala. 2009)), because at the time of the Transeastern Settlement payment TOUSA Homes Florida, L.P. had not yet merged with the indemnification obligors. (*Id.* at 153-54.) Because TOUSA Homes Florida, L.P.'s claim against the Transeastern Lenders existed irrespective of its successor status, the court reasoned, the recoupment claim "does not seek justice by viewing 'one transaction as a whole.'" (*Id.*)

That holding results in a $10 million windfall to TOUSA Homes Florida, L.P.,[31] contrary to the purpose of the recoupment doctrine. The entities with which the Transeastern Lenders negotiated the TOUSA credit agreements did not disappear into the ether—their rights *and obligations* continued to their successor. The bankruptcy court cited no support for the proposition that successor entities are not bound by recoupment principles. The law is, in fact, to the contrary. *See, e.g.*, *Southwest Marine Inc. v. Danzig*, 217 F.3d 1128, 1140 (9th Cir. 2000) (allowing recoupment against successor entities); *see also Ghazal v. RJM Acquisitions Funding, LLC*, No 06-22699-Civ., 2008 WL 2439508, at *2 (S.D. Fla. June 16, 2008) (the same-transaction requirement is "construed liberally," and "[o]nly a logical relationship between the two claims is required"). There is no question that the Transeastern Lenders have an actionable

---

[31]     *See* Op. at 104-05 (ascribing $10 million of the $403 million in payments to be disgorged to TOUSA Homes Florida, L.P.).

claim against TOUSA Homes Florida, L.P. pursuant to their indemnification obligations as successors. Failure to recognize that claim is contrary to law.

The court's second basis for rejecting the Transeastern Lenders' recoupment right was equally misguided. The court noted that the indemnification provision does not extend to liabilities resulting from the "gross negligence" of the indemnified party, and held that the Transeastern Lenders were grossly negligent in proceeding with the Transeastern Settlement because TOUSA was clearly in a precarious position at the time and the Conveying Subsidiaries clearly were incurring obligations on another's debt. But "gross negligence" is a term of art that must be construed according to its accepted legal meaning. *See, e.g.*, *Dow Chem. Can. Inc. v. HRD Corp.*, 656 F. Supp. 2d 427, 440 (D. Del. 2009) ("legal terms of art . . . should be interpreted in accord with their specialized or accepted usage"). As set forth above in Section II.B.4, an essential element of a claim for gross negligence is a duty. The bankruptcy court did not find that the Transeastern Lenders violated the applicable legal standard, nor could it. A creditor is not obligated to investigate the source and circumstances of the payment of a debt. To hold otherwise would work a sea-change in the law, and would cripple the debt market, not to mention millions of ordinary business transactions. Moreover, the gross negligence finding is wholly unrelated to any finding of liability against the Transeastern Lenders.

Because the court erred in its analysis, the Transeastern Lenders' right of recoupment requires that the Committee's damages be reduced by any amounts owing to TOUSA Homes Florida, L.P. The bankruptcy court's holding to the contrary should be reversed.

**IV.    IT WOULD BE JUST UNDER THE CIRCUMSTANCES TO REASSIGN THIS CASE IF REMAND IS WARRANTED**

Should this Court conclude that further proceedings in this matter are appropriate, the Court should direct that the case be reassigned to a different bankruptcy judge on remand. The bankruptcy court's conduct of the proceedings in this case raises serious doubts about its ability to approach the Defendants' evidence and arguments fairly.  Reassignment accordingly would be "just under the circumstances."  28 U.S.C. § 2106.

In deciding whether to reassign a case on remand, the Eleventh Circuit analyzes "whether the original judge would have difficulty putting his previous views and findings aside" and "whether reassignment is appropriate to preserve the appearance of justice," along with the efficiency gains that would be lost with reassignment.  *Chudasama*, 123 F.3d at 1373.

The most serious signal of the bankruptcy court's adverse predisposition in this case is the Opinion itself.  The Eleventh Circuit has held that the uncritical adoption of a proposed order "belie[s] the appearance of justice to the average observer."  *Id.* at 1373-74.  The Transeastern Lenders and other defendants each presented defenses that appear to have been totally disregarded by the bankruptcy court.  *See supra* at 35.  The Defendants collectively submitted over 500 pages of post-trial submissions, yet *not a single* case, exhibit, or other piece of evidence cited by them appears in the Opinion unless and to the extent it was also cited by the Committee.  The bankruptcy court simply adopted the Plaintiff's Proposed Opinion near-verbatim and did not address—if it ever even considered—the Defendants' counterarguments.

The court's one-sided conduct of the entire proceeding went farther, wholly defeating the appearance of justice by adopting early on a thinly-veiled foregone conclusion that the subject transactions were fraudulent and treating the Defendants and their arguments with aggressive hostility:

- Two days after the Committee acknowledged that it *withdrew* its motion for summary judgment arguing that the debtors operated as a single business enterprise, the bankruptcy court granted summary judgment to the Committee on that issue.  (D.E. 513 at 2, 8; D.E. 467 at 2.)

- The bankruptcy court's questioning of defense witnesses was often belligerent and dismissive.  Indeed, counsel for the Transeastern Lenders was compelled to object to a question posed by the bankruptcy judge as argumentative (which objection was overruled, though the bankruptcy judge later apologized to counsel and to the witness). (Trial Tr. 3366:8-10, July 24, 2009.)

- The bankruptcy court allowed rebuttal testimony by two of the Committee's expert witnesses based on nearly 150,000 pages of expert work papers produced on the second-to-last day of trial, stating that he "want[ed] to know what the truth is."  (Trial Tr. 3959:3-3960:17.)  The bankruptcy court then refused to allow any testimony from a single fact witness identified by the Defendants as rebuttal to the new expert testimony.

- In allowing the continued use of the cash collateral over the First Lien Lenders' objections, and denying their request for additional protection, the bankruptcy court judge stated, "their request . . . smacks of the kind of selfish financial excess which the entire country has been forced to confront in these last few months."  (Jan. 9, 2009 Hr'g Tr. 147:13-19.)

The bankruptcy court's disproportionate solicitude for the Committee is highlighted by its extraordinary authorization of payment of the Committee's prosecution costs from the debtors' cash which, until after the Judgment, was subject to the presumptively valid liens of the New Lenders.[32]  After a court allows more than $80 million in professional fees[33] to be paid from assets in which multiple parties have presumptively valid property interests, the objectivity of the court cannot be credited—clearly, the court already had reached conclusions on

---

[32]     As of January 28, 2009, after the Second Lien Lenders' unsuccessful appeal of the first cash collateral order, (*see* Initial Br. of Appellant, No. 08:cv-61335-ASG (S.D. Fla. Sept. 4, 2008) (D.E. 8)), both the First Lien Lenders and the Second Lien Lenders expressly objected to the use of their cash collateral to fund the expenses related to this adversary proceeding.  (*See* Am. Second Final Order at 10, No. 08-10928-JKO (Bankr. S.D. Fla. Jan. 28, 2009) (D.E. 2402).)  Judge Olson allowed the continued use of the cash collateral over these objections.  (*Id*. at 11.)

[33]     *See* D.E. 686, 687, 688, 689, 691, 692, 693, 694, 697, 698, 704, 738, 764, 770.

the merits of the action.  Once the payments were made, a contrary conclusion on the merits—
which would not have returned the already-paid professional fees of the estate-funded litigants—
was inconceivable.[34]

The Transeastern Lenders recognize that remanding the case to another judge—
assuming that any further proceedings are appropriate—would require some duplication of
effort, though how much is questionable given the bankruptcy court's failure to entertain one
side of the case in the proceedings below.  But the threat to the appearance of justice and the
court's inability to put its view of the merits aside are not in doubt.  Those harms vastly outweigh
any costs associated with having a new judge hear the case.

## CONCLUSION

For the reasons stated herein, this Court should conclude that the Transeastern
Lenders are not liable for a fraudulent transfer, or for the remedies ordered by the bankruptcy
court, and reverse the findings and conclusions of the bankruptcy court as to the Transeastern
Lenders.  To the extent this Court deems that remand is appropriate, this Court should assign this
matter to a new judge in the bankruptcy court.

---

[34]    Almost a year after allowing the Committee to use the lenders' collateral to pursue the
litigation, the effect of which was to force TOUSA and the Conveying Subsidiaries into
liquidation, the bankruptcy judge himself raised questions about his decision:  "had I
been confronted early on in this case with as dicey a financial position as the company
now occupies, my perspective on the—on the use of cash collateral might have been
different from the beginning."  (April 23, 2009 Hr'g Tr. 112:16-20.)

Respectfully submitted,

/s/ Nancy A. Copperthwaite

| | |
|---|---|
| Andrew M. Leblanc (*pro hac vice*) | Nancy A. Copperthwaite |
| Alan J. Stone (*pro hac vice*) | AKERMAN SENTERFITT |
| Andrew T. Beirne (*pro hac vice*) | SunTrust International Center |
| Atara Miller (*pro hac vice*) | One S.E. Third Avenue, 25th Floor |
| MILBANK, TWEED, HADLEY | Miami, Florida  33131 |
| & McCLOY LLP | Telephone:      305-374-5600 |
| 1 Chase Manhattan Plaza | Telefax:          305-374-5095 |
| New York, NY 10005 | Nancy.Copperthwaite@akerman.com |
| Telephone:      212-530-5000 | |
| Telefax:          212-530-5219 | Michael I. Goldberg |
| | AKERMAN SENTERFITT |
| | Las Olas Centre II, Suite 1600 |
| | 3350 East Las Olas Boulevard |
| | Fort Lauderdale, Florida  33301 |
| | Telephone:      954-463-2700 |
| | Telefax:          954-463-2224 |
| | Michael.Goldberg@akerman.com |

Counsel for Appellants Transeastern Lenders

CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that, on this 9th day of April 2010, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing is being served this day on all counsel of record identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner.

/s/ Nancy A. Copperthwaite
Nancy A. Copperthwaite
Florida Bar No. 549428

## TOUSA SERVICE LIST

Patricia A. Redmond, Esq.
STEARNS WEAVER MILLER
WEISSLER
     ALHADEFF & SITTERSON, P.A.
150 W. Flagler Street, Suite 2500
Miami, Florida  33130
Phone: 305-789-3553
Fax:     305-789-3395
*PRedmond@swmwas.com*

Scott L. Baena, Esq.
BILZIN SUMBERG BAENA PRICE
     & AXELROD LLP
200 S. Biscayne Boulevard, Suite 2500
Miami, Florida  33131
Phone: 305-374-7580
Fax:     305-374-7593
*SBaena@bilzin.com*

Allan E. Wulbern, Esq.
SMITH, HULSEY & BUSEY
225 Water Street, Suite 2800
Jacksonville, Florida  32202
Phone: 904-359-7700
Fax:     904-359-7708
*AWulbern@smithhulsey.com*

Lawrence S. Robbins, Esq.
ROBBINS RUSSELL ENGLERT
ORSECK
     UNTEREINER & SAUBER, LLP
1801 K Street, N.S., Suite 411
Washington, D.C.  20006
Phone:     202-775-4500
Fax:     202-775-4510
*LRobbins@robbinsrussell.com*

Beth A Williams, Esq.
Daniel T. Donovan, Esq.
KIRKLAND & ELLIS
655 15th Street, N.W., Suite 1200
Washington, D.C.  20005
Phone: 202-879-5000
Fax:     202-879-5200
*Beth.Williams@kirkland.com*

Amy D. Harris, Esq.
STRICHTER, RIEDEL, BLAIN &
PROSSER, P.A.
110 E. Madison Street, Suite 200
Tampa, Florida  33602
Phone: 813-229-0144
Fax:     813-229-1811
*AHarris.ecf@srbp.com*

Ceci Culpepper Berman, Esq.
FOWLER WHITE BOGGS P.A.
501 E. Kennedy Boulevard, Suite 1700
P.O. Box 1438
Tampa, Florida  33602
Phone: 813-222-2031
Fax:     813-384-2842
*CBerman@fowlerwhite.com*

Paul A. Avron, Esq.
BERGER SINGERMAN, P.A.
200 S. Biscayne Boulevard, Suite 1000
Miami, Florida  33131
Phone: 305-755-9500
Fax:     305-714-4340
*PAvron@bergersingerman.com*

Stephen M. Mertz, Esq.
Aaron Van Oort, Esq.
Melina K. Williams, Esq.
FAEGRE & BENSON, LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, Minn.  55402
Phone: 612-766-7000
Fax:     612-766-1600
*SMertz@faegre.com*

## APPENDIX A

      As used throughout the Transeastern Lenders' Appeal Brief, the following lenders

on a $450,000,000 Credit Agreement dated as of August 1, 2005 compose the "Transeastern

Lenders":

> 3V Capital Management, LLC / 3V Capital Master Fund Ltd.; Atascosa
> Investments, LLC; Aurum CLO 2002-1 Ltd.; Bank of America, N.A.; Bear
> Stearns Investment Products Inc.; Burnet Partners, LLC; Deutsche Bank Trust
> Company Americas; Flagship CLO III; Flagship CLO IV; Flagship CLO V;
> Gleneagles CLO Ltd.; Goldman Sachs Credit Partners, L.P.; Grand Central Asset
> Trust, CED Series; Grand Central Asset Trust, HLD Series; Grand Central Asset
> Trust, SOH Series; Hartford Mutual Funds, Inc., on behalf of The Hartford
> Floating Rate Fund by Hartford Investment Management Company, their Sub-
> Advisor; Highland CDO Opportunity Fund, Ltd.; Highland Credit Opportunities
> CDO Ltd.; Highland Floating Rate Advantage Fund; Highland Floating Rate
> LLC; Highland Legacy Limited; Highland Loan Funding VII, LLC; Highland
> Offshore Partners, L.P.; JPMorgan Chase Bank, N.A.; Jasper CLO, Ltd.; LL Blue
> Marlin Funding LLC; Liberty CLO, Ltd.; Merrill Lynch Credit Products LLC;
> Monarch Master Funding Ltd (f/k/a Quadrangle Master Funding Ltd.); Ocean
> Bank; Rockwall CDO, Ltd.; Silver Oak Capital LLC; Stedman CBNA Loan
> Funding LLC; The Foothills Group, Inc.; Van Kampen Dynamic Credit
> Opportunities Fund; Van Kampen Senior Income Trust; Van Kampen Senior
> Loan Fund; and Wells Fargo Bank, N.A.