**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NUMBER(S): 10-60017-CIV/GOLD**
**10-61478, 10-62032, 10-62035, 10-62037**

*In re* TOUSA, INC., *et al.*,

     Debtors

_____/

3V CAPITAL MASTER FUND LTD., *et al.*,

     Appellants,

v.

OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF TOUSA, INC., *et al.*,

     Appellees.

_____/

## OPINION AND ORDER ON APPEALS BY TRANSEASTERN LENDERS

### I.    INTRODUCTION

The Appellants in this bankruptcy appeal are a collection of financial entities (the "Traneastern Lenders")[1] that loaned appropriately $450 million in 2005 to a homebuilding joint venture involving TOUSA, Inc. ("TOUSA").[2] The Bankruptcy Court below ordered the Transeastern Lenders to disgorge, as "fraudulent transfers" under Section 548 of the Bankruptcy Code (11 U.S.C.

---

[1] The Appellants are a subgroup of Transeastern Lenders referred to in the Bankruptcy proceedings below as the "Senior Transeastern Lenders." They are referred to in this order as the "Transeastern Lenders." The identities of the Transeastern Lenders are identified below in Section II.B.

[2] TOUSA made its initial public offering in March 1998 under the name Newmark Homes Corp., and it changed its name to Technical Olympic USA, Inc. in June 2002. In May 2007, the company officially changed its name to TOUSA, Inc.

Sections 101, *et. seq.*), monies that they received on July 31, 2007, in repayment of their antecedent debt, and to pay prejudgment interest for a total disgorgement of more than $480 million dollars. The Transeastern Lenders appeal[3] from this ruling as established by the Amended Findings of Fact and Conclusions of Law [ECF No. 722 in Bankruptcy Case No. 08-10928] ("the Opinion" or "Op.") and the Amended Final Judgment (the "Judgment") entered on October 30, 2009 by U.S. Bankruptcy Judge John K. Olson. This Court has jurisdiction pursuant to 28 U.S.C. § 158 and Federal Rule of Bankruptcy Procedure 8001(a).

## II.   BACKGROUND

### A.   The Tousa Entities

The Debtors in the bankruptcy proceedings below were TOUSA and various affiliates and subsidiaries of TOUSA (collectively, "the Debtors"), which design, build, and market detached single-family residences, town homes, and condominiums under various brand names. [Stip., p. 2].[4] Several aspects of this

---

[3]

There are several pending appeal proceedings in this District related to the facts here, including Case Nos. 10-60017, 10-60018, 10-60019, 10-60589, 10-61478, 10-61681, 10-61731, 10-62032, 10-62035, 10-62037 and 10-62201. I refer to other related proceedings as necessary in this Order. The cases before me (10-60017, 10-61478, 10-62032, 10-62035, and 10-62037) all concern the Transeastern Lenders. After full consideration, I transferred Case Nos. 10-60018 and 10-61681 to the Honorable Adalberto J. Jordan because those cases concern the Second Lien Term Lenders and relate to appeals already pending before Judge Jordan concerning the First Lien Term Lenders. Likewise, I re-transferred Case No. 10-62201 to Chief Judge Moreno because that case involves an appeal from a separate underlying bankruptcy proceeding (09-1616), and the appeal concerns distinct legal questions of Delaware law on the fiduciary duties of corporate officers and directors.

[4]

Because of the extraordinary size of this dispute involving several appeals and a voluminous docket below, I will use abbreviations when citing to certain relevant submissions, exhibits, and orders.

From the bankruptcy proceedings below (Adversary Proceeding No. 08-1435-JKO), I refer to the following documents: Joint Stipulated Facts [Bankr. ECF No. 542] ("Stip."); Plaintiffs' Proposed Findings of Fact and Conclusions of Law [Bankr. ECF No. 690] ("Plaintiffs' Proposed Findings"); Senior Transeastern Lenders' Proposed Findings of Fact and Proposed Conclusions of Law [Bankr. ECF No. 713] ("Transeastern Lenders' Proposed Findings"); First Lien Term Loan Defendants' Proposed Findings of Fact and Conclusions of Law [Bankr. ECF No. 728] ("First Lien Proposed Findings"); Second Lien Agent and Lenders' Proposed Findings of Fact and Conclusions of Law

appeal focus on a subgroup of the Debtors called the "Conveying Subsidiaries." [5]

The TOUSA Group's assets include land and homes in various stages of completion and related assets. Between 1995 and 2005, the Debtors' business activities grew rapidly as they acquired other home-building companies. [Committee's Br., p. 13]. As of 2006, they operated the thirteenth largest home-building enterprise in the country with operations in Florida, Texas, the mid-Atlantic states, and the western United States. [First Lien Proposed Findings, pp. 1, 4]. The two main home-building subsidiaries, which held the majority of the

---

[Bankr. ECF No. 719] ("Second Lien Proposed Findings"). The Hearing Transcript from the bankruptcy proceedings below is referred to as "Bankr. Hr'g Tr.," and all trial exhibits from the proceedings below are referred to as "Trial Exh(s)." Depositions taken below are referred to as "[Last name of Deponent] Dep." Any other references to the bankruptcy proceedings or the docket below are preceded by "Bankr." (e.g., "Bankr. ECF No.").

The briefs on appeal in Case No. 10-60017 before me are referred to in the following manner: Brief for Appellee Official Committee of Unsecured Creditors of TOUSA, Inc., et al. [ECF No. 111] ("Committee's Br."); Appellant Senior Transeastern Lenders' Brief [ECF No. 75] ("Transeastern Lenders' Br."); Appellant Senior Transeastern Lenders' Reply Brief [ECF No. 118] ("Transeastern Reply Br."); Intervenor Citicorp North America, Inc.'s and First Term Lenders' Brief [ECF No. 113] ("Intervenor's Br.").

Briefs from other appeal proceedings are referred to as follows: Appellant Wells Fargo Bank's Brief [ECF No. 71 in Case No. 10-60018] ("Second Lien Br."); Appellee TOUSA, Inc., et al.'s Brief [ECF No. 108 in Case No. 10-60018] ("TOUSA Br."); Appellant Wells Fargo Bank's Reply [ECF No. 112 in Case No. 10-60018] ("Second Lien Reply Br."); Appellant Citicorp North America, Inc. Monarch Master Funding Ltd., Trilogy Portfolio Company, LLC's Brief [ECF No. 69 in Case No. 10-60019] ("First Lien Br."); Appellant Citicorp North America, Inc. Monarch Master Funding Ltd., Trilogy Portfolio Company, LLC's Reply [ECF No. 119 in Case No. 10-60019] ("First Lien Reply Br.").

[5]   The Conveying Subsidiaries are the following entities: Engle Homes Commercial Construction, LLC; Engle Homes Delaware, Inc.; Engle Homes Residential Construction, L.L.C.; Engle Sierra Verde P4, LLC; Engle Sierra Verde P5, LLC; Engle/Gilligan LLC; Engle/James LLC; LB/TE #1, LLC; Lorton South Condominium, LLC; McKay Landing LLC; Newmark Homes Business Trust; Newmark Homes Purchasing, L.P.; Newmark Homes, L.L.C.; Newmark Homes, L.P.; Preferred Builders Realty, Inc.; Reflection Key, LLC; Silverlake Interests, L.L.C.; TOI, LLC; TOUSA Associates Services Company; TOUSA Delaware, Inc.; TOUSA Funding, LLC; TOUSA Homes Arizona, LLC; TOUSA Homes Colorado, LLC; TOUSA Homes Florida, L.P.; TOUSA Homes Investment #1, Inc.; TOUSA Homes Investment #2, Inc.; TOUSA Homes Investment #2, LLC; TOUSA Homes Mid-Atlantic Holding, LLC; TOUSA Homes Mid-Atlantic, LLC; TOUSA Homes Nevada, LLC; TOUSA Homes, Inc.; TOUSA Investment #2, Inc.; TOUSA Mid-Atlantic Investment, LLC; TOUSA Realty, Inc.; TOUSA, LLC; and TOUSA/West Holdings, Inc. [Stip., Exhibit A].

home-building assets, were TOUSA Homes, Inc. ("THI") and its wholly owned subsidiary, Newmark Homes LP ("Newmark"). [Stip., p. 22 n.11].

### i.      Funding for the TOUSA Entities

To finance operations for itself and its subsidiaries, TOUSA relied on two principle sources of funding: bonds and a revolving credit facility.

### 1.      Bonds

The TOUSA entities took on unsecured bond indebtedness through six major issuances between June 2002 and April 2006. On June 25, 2002, $200 million of notes were issued, which were due in 2010; on the same date, an additional $150 million of notes were issued, which were due in 2012; on February 3, 2003, $100 million in notes were issued, which were due in 2010; on March 17, 2004, $125 million of notes were issued, which were due in 2011; on December 21, 2004, $200 million of notes were issued, which were due in 2015; and on April 12, 2006, $250 million of notes were issued, which were due in 2011. [Stip., pp. 3–8; Trial Exhs. 3064–69].[6]

### a.      Information Contained in Bond Prospectus Documents

For each bond indenture, a Prospectus was issued, which contained information about TOUSA's structure and the nature of its operations.[7] Bondholders who reviewed the information in the Prospectuses learned that TOUSA operated as a diverse but highly integrated enterprise in which the

---

[6] Each of these indentures was amended by supplemental indentures. [Trial Exhs. 2444–49]. None of these amendments alters the analysis as it pertains to this appeal.

[7] The Prospectuses in the record were issued after the bond indentures, and provided twenty days for holders to exchange notes for identical new notes under the Securities Act. [Trial Exhs. 3296–3300].

company's subsidiaries played a critical role in the vitality of the organization as a whole.

The Prospectuses provided collective information about the enterprise as a whole to explain its operations. They referenced "consolidated" or "combined" financial statements; they referred to the "consolidated net worth" of the enterprise; and they noted that TOUSA marketed homes under "various brand names." [*E.g.*, Trial Exh. 3296, pp. 1, 7, 10]. The Prospectuses also provided information about how bond notes would be paid, including details on interest rates. TOUSA was primarily responsible for payment of the notes, but the consolidated financial statements made it clear that the funds used to pay the notes would derive from the *net operations of TOUSA and its subsidiaries*. [Trial Exh. 3064, p. 41]. On each level, the TOUSA enterprise's decision to raise money through bonds and then guarantee those bonds was a collective, group effort. [Appeal Hr'g Tr. 11:24–12:2 (counsel for the Committee noting that "the bond debt was used for the purchase of real estate and companies that were being rolled up, and those decisions, it is true, were made at headquarters"); *id.* at 13:17–22 (counsel for the Committee agreeing that "there was no money that went initially on the bonds that later became notes directly to the subsidiaries [because the bond debt was a joint effort among the TOUSA and its subsidiaries]")].

When identifying certain "Risks related to the Notes," TOUSA stated in the Prospectuses that "[w]e may not have sufficient funds to satisfy our repurchase obligations that arise upon a change in control or a decline in our *consolidated*

*net worth*." [Trial Exh. 3296, p. 12 (emphasis added)]. The Prospectuses also noted that cash flows for the TOUSA enterprise were heavily dependent on the role of the subsidiaries:

> Substantially all of our operations are conducted through our subsidiaries. Therefore, *our ability to service our debt, including the notes, is dependent upon the cash flows of those subsidiaries* and, to the extent they are not subsidiary guarantors, their ability to distribute those cash flows as dividends, loans or other payments to the entities which are obligors under the notes and the guarantees.
>
> [*Id.* at 13 (emphasis added)].

Because the subsidiaries played such a vital role to the bondholders, the Prospectuses also specifically referenced and disclosed other debts of the borrowers, including the subsidiaries. For example, the Prospectuses provided information to bondholders about the guarantees provided by TOUSA's subsidiaries under the Revolving Credit facility as discussed in further detail below.[8]

### b.    Guarantors of the Bond Indentures

TOUSA was the obligor under each of the six bond indentures, and most of the Conveying Subsidiaries[9] were jointly and severally liable as guarantors. [Stip., p. 3].

---

[8]  The Prospectuses provided: "Revolving Credit Facility: On March 9, 2006, we entered into a new unsecured credit facility, which we refer to as our New Credit Facility, with the lenders and issuers party thereto, and Citicorp North America, Inc., as agent, replacing our previous $600 million revolving credit facility. . . .  Our obligations under the New Credit Facility are guaranteed by our material domestic subsidiaries, other than our mortgage and title subsidiaries." [Trial Exh. 3296, p. 18].

[9]  For each of the six indentures, the Parties jointly stipulated as to the names of each of the subsidiaries that was liable as of July 31, 2007. [Stip., pp. 3–8]. For all six indentures, all of the Conveying subsidiaries were liable except for the following four entities: (1) Engle Sierra Verde P4, LLC; (2) Engle Sierra Verde P5, LLC; (3) Engle/Gilligan LLC; LB/TE #1, LLC; and (4) Reflection Key, LLC.  In addition, two TOUSA subsidiaries, which were not "Conveying Subsidiaries," were liable under all six indentures: (1) TOUSA Homes, L.P. and (2) TOUSA Ventures, LLC.

The Prospectuses described these guarantees, noting that "[a]lthough the notes are our obligations, they are unconditionally guaranteed on a senior unsecured basis by all of our material domestic subsidiaries, other than our mortgage and title subsidiaries." [Trial Exh. 3296, p. 13; *see also* Appeal Hr'g Tr. 10:24–25 (counsel for the Committee noting that "the conveying subs were guarantors on [the bonds]")]. Likewise, the bond indentures themselves specified the nature of the subsidiary guarantees:

> Section 10.01. SUBSIDIARY GUARANTY
>
> (a) Subject to this Article 10, each of the Subsidiary Guarantors hereby, jointly and severally, unconditionally Guarantees to each Holder of a Note . . . that (a) the principal of, premium, if any, and interest, including Special Interest, if any, on the Notes shall be promptly paid in full when due, whether at maturity, by acceleration, redemption or otherwise, . . . and (b) in case of any extension of time of payment or renewal of any Notes or any of such other Obligations, that same shall be promptly paid in full when due or performed in accordance with the terms of the extension or renewal, whether at Stated Maturity, by acceleration or otherwise.  Failing payment when due on any amount so Guaranteed or any performance so Guaranteed for whatever reason, the Subsidiary Guarantors shall be jointly and severally obligated to pay the same immediately.  Each Subsidiary Guarantor agrees that this is a guarantee of payment and not a guarantee of collection.
>
> (b) Each Subsidiary Guarantor hereby agrees that its Obligations with regard to this Subsidiary Guaranty shall be absolute and unconditional.
>
> [Trial Exhs. 3064–69 § 10.01].

As counsel for the Committee confirmed during oral argument, these subsidiary guarantees played a critical role in the bond offerings because the subsidiaries provided a rich cash flow to the TOUSA enterprise.  [Appeal Hr'g Tr. 14:22–15:1 ("Yes. [The Prospectuses] presented consolidated financial statement, and it made very clear that the credit worthiness of the bonds turned in large part, in principal part, on the case flow of the subsidiaries which is why

the bondholders took guarantees from the individual subsidiaries.")]. As such, the bondholders dealt with TOUSA and its subsidiaries "as a consolidated enterprise that was interdependent, both in terms of structure and the flow of money." [*Id.* at 16:20–25].

### c.    *Default*

Pursuant to Articles 6.01–02 of each indenture, a judgment for more than $10 million against TOUSA or its subsidiaries or a bankruptcy filing by TOUSA or its subsidiaries would constitute an event of "default," which would permit the note holders to declare all outstanding amounts under the bond debt to be immediately due.

> Section 6.01 EVENTS OF DEFAULT
>
> (a) Each of the following is an "Event of Default":
>
> > . . . .
>
> > (vi) any judgment or judgments for the payment of money in an aggregate amount in excess of $10.0 million that shall be rendered against the Company or any Restricted Subsidiary and that shall not be waived, satisfied or discharged for any period of 30 consecutive days during which a stay of enforcement shall not be in effect;
>
> > . . . .
>
> > (vii) the Company or any Significant Subsidiary pursuant to or within the meaning of any Bankruptcy Law:
>
> > > (1) commences a voluntary case,
> > >
> > > (2) consents to the entry of an order for relief against it in an involuntary case,
> > >
> > > (3) consents to the appointment of a custodian of it or for all or substantially all of its property,
> > >
> > > (4) makes a general assignment for the benefit of its creditors, or

(5) generally is not paying its debts as they become due ;

(viii) a court of competent jurisdiction enters an order or decree under any Bankruptcy law that:

(1) is for relief against the Company or any Significant Subsidiary in an involuntary case,

(2) appoints a custodian of the Company or any Significant Subsidiary or for all or substantially all of the property of the Company or any Significant Subsidiary, or

(3) orders the liquidation of the Company or any Significant Subsidiary,

and the order or decree remains unstayed and in effect for 60 days; or

(ix) any Subsidiary Guaranty relating to the Notes ceases to be in full force and effect (other than in accordance with the terms of such Subsidiary Guaranty), or any Subsidiary Guarantor denies or disaffirms its obligations under its Subsidiary Guaranty relating to the Notes.

(b) a Default under clause (a)(iv) is not an Event of Default in respect of the Notes until the Trustee or the Holders of not less than 25% in aggregate principal amount of Notes then outstanding notify the Company of the Default, and the Company does not cure such Default within the time specified after receipt of such notice.  Such notice must specify the Default, demand that it be remedied and state that such notice is a "Notice of Default."

Section 6.02 ACCELERATION

(a) If an Event of Default (other than an Event of Default specified in Section 6.01(a)(vii) or (a)(viii)), shall have occurred and be continuing, the Trustee or Holders of not less than 25% in aggregate principal amount of the Notes then outstanding may declare to be immediately due and payable the principal amount of all the Notes then outstanding, plus accrued but unpaid interest, including Special Interest, if any, to the date of acceleration.  In the case of an Event of Default specified in Section 6.01(a)(vii) or (a)(viii), such amount with respect to the all the Notes will become due and payable immediately without any declaration or other act on the part of the Trustee or the Holders.

[Trial Exhs. 3064–69 §§ 6.01–02].

As of July 31, 2007, the total amount of principal outstanding on the

TOUSA bond debt was approximately $1.06 billion. [Stip., p. 3].

### 2. *Revolving Credit Facility*

On March 9, 2006, TOUSA established a revolving credit facility ("the Revolver") with Citicorp North America, Inc. serving as Administrative Agent. [*Id.* at 8]. TOUSA used this facility to fund working capital and land acquisitions and to support letter of credit requirements under land option agreements. [*Id.*]. The credit line capped at $800 million. [Trial Exh. 2017]. The amount of credit under the Revolver was determined once per month based on the combined value of the TOUSA enterprise's collateralized assets that made up the "Borrowing Base" as defined in the Revolver. [Trial Exh. 2017, pp. 3–4, 15, 54 (defining "Borrowing Base" and explaining how "Maximum Credit" is determined by level of "Borrowing Base")].  Citicorp representative Marni McManus explained the concept of the "Borrowing Base" in the following manner:

> The borrowing base is a construct which is in most of the homebuilder deals, whether secured or unsecured, and essentially it governs the percentage of dollars that can be borrowed against a certain category of assets that the home builder may have on its balance sheet. So, for example a completed home, you may be able to borrow 90 cents, versus an uncompleted home it would be 50 cents and a piece of raw land, 10 cents. . . .  [T]he company would be limited in the amount they could borrow to either the amount that the borrowing base—their assets allowed them to or the total size of the facility.

[Bankr. Hr'g Tr. 3605:4–24].

The Revolver was the primary source of liquidity for TOUSA, and it allowed TOUSA to post letters of credit and surety bonds. [*Id.* at 258:16–259:21, 3900:1–3901:11].

### a.    Amendments to the Revolver

Several of the Conveying Subsidiaries were guarantors under the Revolver as of March 9, 2006.[10] The Revolver was amended twice before the July 31, 2007 transactions at issue in this appeal (the "July 31 Transaction").[11] Both of these amendments had an impact on TOUSA's subsidiaries.  On October 23, 2006, TOUSA and Citicorp amended the Revolver, requiring TOUSA's subsidiaries, including the Conveying Subsidiaries, to pledge assets as security under the Revolver. [Stip., p 9; Trial Exhs. 209, 3062].[12] On January 30, 2007, TOUSA's subsidiaries, again including Conveying Subsidiaries, were added as

---

[10] Of the Conveying Subsidiaries, the entities listed in bold were guarantors under the March 9, 2006 Revolver: Engle Homes Commercial Construction, LLC; **Engle Homes Delaware, Inc.; Engle Homes Residential Construction, L.L.C**.; Engle Sierra Verde P4, LLC; Engle Sierra Verde P5, LLC; Engle/Gilligan LLC; **Engle/James LLC**; LB/TE #1, LLC; Lorton South Condominium, LLC; **McKay Landing LLC**; Newmark Homes Business Trust; **Newmark Homes Purchasing, L.P.; Newmark Homes, L.L.C.; Newmark Homes, L.P.; Preferred Builders Realty, Inc**.; Reflection Key, LLC; **Silverlake Interests, L.L.C.; TOI, LLC; TOUSA Associates Services Company; TOUSA Delaware, Inc.; TOUSA Funding, LLC;** TOUSA Homes Arizona, LLC; TOUSA Homes Colorado, LLC; TOUSA Homes Florida, L.P.; **TOUSA Homes Investment #1, Inc.; TOUSA Homes Investment #2, Inc.; TOUSA Homes Investment #2, LLC**; TOUSA Homes Mid-Atlantic Holding, LLC; TOUSA Homes Mid-Atlantic, LLC; TOUSA Homes Nevada, LLC; **TOUSA Homes, Inc.; TOUSA Investment #2, Inc**.; TOUSA Mid-Atlantic Investment, LLC; TOUSA Realty, Inc.; **TOUSA, LLC; and TOUSA/West Holdings, Inc**.

[11] The Parties dispute whether the transactions that occurred on July 31, 2007 could be considered part of a "single integrated transaction." As discussed in further detail below, I conclude that the transactions that occurred on July 31 were *not* a "single integrated transaction." Nevertheless, I refer to these transactions in the singular as "the July 31 Transaction" for purposes of consistency because that is how the Parties and the Bankruptcy Court referred to them.

[12] Of the Conveying Subsidiaries, the entities listed in bold pledged assets as security under the October 23, 2006 Revolver: **Engle Homes Commercial Construction, LLC; Engle Homes Delaware, Inc.; Engle Homes Residential Construction, L.L.C**.; Engle Sierra Verde P4, LLC; Engle Sierra Verde P5, LLC; Engle/Gilligan LLC; **Engle/James LLC**; LB/TE #1, LLC; **Lorton South Condominium, LLC; McKay Landing LLC**; Newmark Homes Business Trust; **Newmark Homes Purchasing, L.P.; Newmark Homes, L.L.C.; Newmark Homes, L.P.; Preferred Builders Realty, Inc**.; Reflection Key, LLC; **Silverlake Interests, L.L.C.; TOI, LLC; TOUSA Associates Services Company; TOUSA Delaware, Inc.;** TOUSA Homes Arizona, LLC; TOUSA Homes Colorado, LLC; TOUSA Homes Florida, L.P.; **TOUSA Homes Investment #1, Inc.; TOUSA Homes Investment #2, Inc.; TOUSA Homes Investment #2, LLC**; TOUSA Homes Mid-Atlantic Holding, LLC; TOUSA Homes Mid-Atlantic, LLC; TOUSA Homes Nevada, LLC; **TOUSA Homes, Inc.; TOUSA Investment #2, Inc**.; TOUSA Mid-Atlantic Investment, LLC; TOUSA Realty, Inc.; **TOUSA, LLC; and TOUSA/West Holdings, Inc**.

"Subsidiary Borrowers" on the Revolver. [Stip., p. 10; Trial Exh. 210].[13] As the largest consumers of Revolver funds and the two subsidiaries holding most of the enterprise's assets, THI and Newmark—both of which are Conveying Subsidiaries—were most affected by these amendments. [Bankr. Hr'g Tr. 1626:1–7].

The terms of the January 30, 2007 Revolver governed until the July 31 Transaction at issue in this case. Under the January 30, 2007 Revolver, TOUSA and its subsidiaries had full access to the Revolver.[14] TOUSA, as "Administrative Borrower," exercised more control than the "Subsidiary Borrowers." For example, under Section 2.2, labeled "Borrowing Procedures," TOUSA was authorized to give notice requesting funds for each instance of borrowing on behalf of all of the Borrowers. [Trial Exh. 210, pp. 33, 59]. The agreement provided a specific form for "Notice of Borrowing" to be submitted by TOUSA for each "Proposed Borrowing." [*Id.* at Exhibit D]. Also, each of the Borrowers under the Revolver appointed TOUSA as their "agent" for "all purposes" under the agreement, and "[a]ny acknowledgment, consent, direction, certificate or other action which might

---

[13]
Of the Conveying subsidiaries, the entities listed in bold were guarantors under the January 30, 2007 Revolver: **Engle Homes Commercial Construction, LLC; Engle Homes Delaware, Inc.; Engle Homes Residential Construction, L.L.C.**; Engle Sierra Verde P4, LLC; Engle Sierra Verde P5, LLC; Engle/Gilligan LLC; **Engle/James LLC; LB/TE #1, LLC; Lorton South Condominium, LLC; McKay Landing LLC; Newmark Homes Business Trust; Newmark Homes Purchasing, L.P.; Newmark Homes, L.L.C.; Newmark Homes, L.P.; Preferred Builders Realty, Inc**.; Reflection Key, LLC; **Silverlake Interests, L.L.C.; TOI, LLC; TOUSA Associates Services Company; TOUSA Delaware, Inc.; TOUSA Funding, LLC; TOUSA Homes Arizona, LLC; TOUSA Homes Colorado, LLC; TOUSA Homes Florida, L.P.; TOUSA Homes Investment #1, Inc.; TOUSA Homes Investment #2, Inc.; TOUSA Homes Investment #2, LLC; TOUSA Homes Mid-Atlantic Holding, LLC; TOUSA Homes Mid-Atlantic, LLC; TOUSA Homes Nevada, LLC; TOUSA Homes, Inc.; TOUSA Investment #2, Inc**.; TOUSA Mid-Atlantic Investment, LLC; **TOUSA Realty, Inc.; TOUSA, LLC; and TOUSA/West Holdings, Inc**.

[14]
Bankr. Hr'g Tr. 2566:19–22 ("[T]he conveying subsidiaries as co-obligors had access, direct access, to the revolver, and that obviously had tremendous help and advantage to the conveying subsidiaries.").

otherwise be valid or effective only if given or taken by all of the Borrowers or acting singly, *shall be valid and effective if given or taken only by the Administrative Borrower [TOUSA], whether or not any of the other Borrowers joins therein.*" [*Id.* at 111 (emphasis added)].

### b.    Default Provisions

The Revolver had specific default provisions similar to those contained in the bond indentures. Pursuant to Section 8 of the January 30, 2007 Revolver, any bankruptcy proceeding or judgment for over $10 million involving TOUSA or any subsidiary constituted a default, which would have made all outstanding amounts of principal and interest immediately due and payable to the Revolver lenders from TOUSA or any of the Subsidiary Borrowers.

EVENTS OF DEFAULT

Section 8.1    Events of Default

Each of the following events shall be an Event of Default:

. . . .

(f) (ii) any proceeding shall be instituted by or against the Administrative Borrower or any of its Restricted Subsidiaries seeking to adjudicate it a bankrupt or insolvent, or seeking liquidation, winding up, reorganization, arrangement, adjustment, protection, relief or composition of it or its debts under any Requirement of Law relating to bankruptcy, insolvency or reorganization or relief of debtors . . . .

(g) any final judgment or order (or other similar process) involving, in any single case or in the aggregate, an amount in excess of $10,000,000 in the case of a money judgment, to the extent not covered by insurance, or that could reasonably be expected to have a Material Adverse Effect, in the case of a non-monetary judgment, shall be rendered against one or more of the Administrative Borrower and its Restricted Subsidiaries by a court having jurisdiction, and such judgment or order shall continue unsatisfied and in effect for a period of thirty days without being vacated, discharged, satisfied, or stayed or bonded pending appeal . . . .

. . . .

Section 8.2      Remedies

During the continuance of any Event of Default, the Administrative Agent (a) may, and at the request of the Requisite Lenders shall, by notice to the Administrative Borrower declare that all or any portion of the Revolving Credit Commitments be terminated, whereupon the obligation of each Lender to make any Loan and each Issuer to Issue any Letter of Credit shall immediately be decreased or terminate, as the case may be, and/or (b) may, and at the request of the Requisite Lenders shall, by notice to the Administrative Borrower, declare the Loans, all interest thereon and all other amounts and Obligations payable under this Agreement to be forthwith due and payable, whereupon the Loans, all such interest and all such amounts and Obligations shall immediately become and be forthwith due and payable, without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by the Borrowers; provided, however, that upon the occurrence of the Events of Default specified in Section 8.1(f)(ii) [the bankruptcy provisions], the Revolving Credit Commitments of each Lender to make Loans and the commitments of each Lender and Issuer to Issue or participate in Letters of Credit shall each automatically be terminated and the Loans, all such interest and all such amounts and Obligations shall automatically become and be due and payable, without presentment, demand, protest or any notice of any kind, all of which are hereby expressly waived by the Borrowers.

[*Id.* §§ 8.1(g), 8.2 (emphasis in original)].

As of July 31, 2007, TOUSA and the subsidiary borrowers owed $373 million on the Revolver loan. [Trial Exh. 3429; Appeal Hr'g Tr. 60:22, 66:4–8]. As noted above, TOUSA and the subsidiary borrowers simultaneously owed approximately $1.06 billion under the bond issuances as of this date. As also noted above, the bondholders were aware of obligations of TOUSA and the Conveying Subsidiaries under the Revolver.

B.      **The Transeastern Joint Venture**

In June 2005, TOUSA became involved in a joint venture, which plays a central role in the origins of the current dispute. Tousa Homes LP ("Homes LP"), a wholly owned subsidiary of TOUSA, and Falcone/Ritchie LLC ("Falcone") formed a joint venture called TE/TOUSA LLC ("Transeastern JV" or "the Joint

Venture"). [Stip., p. 11]. They formed the Joint Venture for the purpose of acquiring certain home-building assets owned by Transeastern Properties, Inc. ("TEP"), which was a leading developer in Florida. [*Id.*]. TOUSA viewed this acquisition of TEP as attractive because it offered TOUSA the chance to become a dominant player in Florida's real estate market, and it provided TOUSA a partner that could obtain independent financing and share business risks. [Trial Exh. 104, p. 042818; Bankr. Hr'g Tr. 263:13–21].

Within the Joint Venture, Homes LP served as Managing Member and held a 50 percent voting interest shared with Falcone. [Stip., p. 11]. There were also a series of "tiered" special purpose subsidiaries: EH/Transeastern ("EHT") served as the primary operating subsidiary; TE/TOUSA Senior LLC ("TOUSA Senior") served as managing member and sole owner of EHT; TE/TOUSA Mezzanine LLC ("TOUSA Mezz") owned all of the membership interests in TOUSA Senior; and TE/TOUSA Mezzanine Two LLC ("TOUSA Mezz II") owned all of the membership interests in TOUSA Mezz. [*Id.*].

### i.    Funding for the Transeastern Joint Venture

The Transeastern JV was funded independently of the TOUSA enterprise, using $675 million of third-party debt capacity, a subordinated loan from Homes LP, and equity. [*Id.*]. The $675 million third-party debt lies at the heart of these appeals. The entities responsible under the pledges, liens, and guarantees for this debt were TOUSA, Homes LP, TOUSA Senior, EHT, TOUSA Mezz, and TOUSA Mezz II—none of which are Conveying Subsidiaries. The debt consisted

of three parts, stemming from three agreements, which were all executed on August 1, 2005 (the "Transeastern Credit Agreements").

### 1.   Senior Debt

TOUSA Senior and EHT entered into a "Senior Credit Agreement" with Deutsche Bank Trust Company Americas ("DBTCA") as Administrative Agent. [15] [Trial Exhs. 2007, 2010, 3071, 3076]. The Senior Credit Agreement provided a $335 million senior secured term loan and a $115 million senior secured revolving credit agreement from the "Senior Transeastern Lenders"[16] with TOUSA Senior and EHT obligated as borrowers. The Senior Debt was secured by first priority liens on substantially all of the assets of EHT and a pledge of the membership interests in EHT held by TOUSA Senior. [Stip., p. 12].

---

[15]
 Citibank succeeded DBTCA as Administrative Agent for the Senior Debt on March 13, 2007.  [Stip., p. 13].

[16]
 The Senior Transeastern Lenders are the following entities: 3V Capital Master Fund Ltd.; Atascosa Investments, LLC; Aurum CLO 2002-1 Ltd.; Bank of America, N.A.; Bear Stearns Investment Products Inc.; Black Diamond CLO 2005-1; Burnet Partners, LLC; Centurion CDO 10, Ltd.; Centurion CDO 8, Limited; Centurion CDO 9, Ltd.; Centurion CDO II, Ltd.; Centurion CDO VI, Ltd.; Centurion CDO VII, Ltd.; Centurion CDO XI, Ltd.; Deutsche Bank Trust Company Americas; Distressed High Yield Trading Ops. Fund Ltd; Eaton Vance Credit Opportunities Fund; Eaton Vance Floating-Rate Income Trust; Eaton Vance Grayson & Co.; Eaton Vance Limited Duration Income Fund; Eaton Vance Senior Debt Portfolio; Eaton Vance Senior Floating-Rate Trust; Eaton Vance Senior Income Trust; Eaton Vance VT Floating-Rate Income Fund; Farallon Capital Institutional Partners II, L.P.; Farallon Capital Institutional Partners III, L.P.; Farallon Capital Institutional Partners, L.P.; Farallon Capital Offshore Investors II, L.P.; Farallon Capital Offshore Investors, Inc.; Farallon Capital Partners, L.P.; Flagship CLO III; Flagship CLO IV; Flagship CLO V; Gleneagles CLO Ltd; Goldman Sachs Credit Partners, L.P.; Grand Central Asset Trust, CED Series; Grand Central Asset Trust, HLD Series; Grand Central Asset Trust, SOH Series; Hartford Mutual Funds, Inc., on behalf of The Hartford Floating Rate Fund by Hartford Investment Management Company, their Sub- Advisor; Highland CDO Opportunity Fund, Ltd.; Highland Credit Opportunities CDO Ltd.; Highland Floating Rate Advantage Fund; Highland Floating Rate LLC; Highland Legacy Limited; Highland Offshore Partners, L.P.; Jasper CLO, Ltd.; JPMorganChase Bank, N.A.; Liberty CLO, Ltd.; LL Blue Marlin Funding LLC; Loan Funding VII, LLC; Merrill Lynch Credit Products, LLC; Ocean Bank; The Quadrangle Master Funding Ltd.; Riversource Floating Rate Fund; Rockwall CDO, Ltd.; Sequils-Centurion V, Ltd.; Silver Oak Capital, LLC; Stedman CBNA Loan Funding LLC; The Foothills Group, Inc.; Tinicum Partners, L.P.; Van Kampen Dynamic Credit Opportunities Fund; Van Kampen Senior Income Trust; Van Kampen Senior Loan Fund; and Wells Fargo Bank, N.A. [Id. at 26].

### 2.      *Senior Mezzanine Debt*

TOUSA Mezz entered into a Senior Mezzanine Credit Agreement with DBTCA as Administrative Agent. [Trial Exhs. 2008, 2009, 3072, 3079]. That agreement provided a $137.5 million term loan from the "Senior Mezzanine Lenders"[17] with TOUSA Mezz obligated as borrower.  [Stip., p. 12].

### 3.      *Junior Mezzanine Debt*

TOUSA Mezz II entered into a "Junior Mezzanine Credit Agreement" with DBTCA as Administrative Agent. [Trial Exhs. 2011, 3082]. That agreement provided an $87.5 million loan from the "Junior Mezzanine Lender."[18]

### 4.      *Carve Out and Completion Guarantees*

As a condition precedent to the Transeastern Credit Agreements, TOUSA and Homes LP also granted two types of guarantees, completion and carve-out guarantees, on the Senior Debt, the Senior Mezzanine Debt, and the Junior Mezzanine Debt, for a total of six guarantees (the "Completion and Carve-Out Guarantees"). [Stip., p. 13]. The "Completion" part of the guaranty obligated TOUSA and Homes LP to complete work on Transeastern JV properties in progress when the Joint Venture was created in the event the Joint Venture itself failed to do so. [*Id.*]. The "Carve-Out" part of the guarantee required TOUSA and Homes LP to indemnify the lenders for losses resulting from fraud, misappropriation and similar acts by the Joint Venture, and it required full

---

[17]
 The Senior Mezzanine Lenders are the following: DBTCA; Highland CDO Opportunity Fund, Ltd.; Highland Floating Rate Advantage Fund; Highland Floating Rate Limited Liability Company; Highland Legacy Limited; Highland Offshore Partners, L.P.; Jasper CLO, Ltd.; Loan Funding VII LLC; and Quadrangle Master Funding Ltd. [*Id.* at 27].

[18]
 The Junior Mezzanine Lender was DBTCA. [*Id.*].

repayment of the Transeastern Loans if the Joint Venture voluntarily filed for bankruptcy protection. [*Id.*]. In the event of bankruptcy, the guarantors would also have a 100 percent obligation to pay the debt in full. [Trial Exh. 3075, pp. 1–2; Bankr. Hr'g Tr. 1594–99].

The guarantee provisions in the Completion and Carve Out agreements provided the following:

> Guarantors do hereby, jointly and severally, unconditionally, absolutely and irrevocably guarantee [the debt] to the Administrative Agent . . . . This is an irrevocable, absolute, continuing guaranty of payment and performance and not a guaranty of collection. Guarantors waive any right to require that any resort be had by the Administrative Agent or any lender to any of the security held for payment of the Guaranteed Obligations or to any balance of any deposit account or credit on the books of the Administrative Agent or any lender in favor of Borrowers or any other person. This Guaranty may not be revoked by Guarantors and shall continue to be effective with respect to the Guaranteed Obligations arising or created after any attempted revocation by Guarantors. It is the intent of Guarantors that the obligations and liabilities of Guarantors hereunder are absolute and unconditional under any and all circumstances and that until the Guaranteed Obligations are fully and finally satisfied, such obligations and liabilities shall not be discharged or released in whole or in part, by any act or occurrence which might, but for the provisions of this Guaranty, be deemed a legal or equitable discharge or release of Guarantors.

> [Trial Exhs. 3074, 3075, 3077, 3078, 3080, 3081].

### c.      The Transeastern Litigation

The downturn in the housing market and the weak overall economy soon threatened the viability of the Joint Venture. Several events marked the decline of business for the Transeastern JV. On September 29, 2006, DBTCA, as Administrative Agent for all of the Transeastern Lenders, entered into a "Consent and Agreement" with TOUSA Senior, EHT, TOUSA Mezz, and TOUSA Mezz II, recognizing that a potential default or an event of default had occurred under the

Transeastern Credit Agreements. [Trial Exh. 4044, pp. 1–2]. On October 2, 2006, TOUSA disclosed potential losses associated with the Transeastern JV in its Form 8-K SEC filing. [Trial Exh. 5005]. On October 4, 2006, certain Falcone entities gave notice of default to the Transeastern JV on existing land option agreements. [Stip., p. 14].

On October 31 and November 1, 2006, Deutsche Bank sent demand letters to TOUSA and Homes LP, demanding payment of all debt under the Transeastern Credit Agreements pursuant to the Completion and Carve-Out Guarantees. [Trial Exhs. 398, 399]. On November 14, 2006, TOUSA filed Form 10-Q, disclosing that the Transeastern JV would not have the ability to continue as a going concern. [Trial Exh. 2034, pp. 13, 37].

As noted above, Citicorp, the Administrative Agent under the Revolver, required TOUSA and its subsidiaries to increase their obligations under the Revolver in light of TOUSA's ongoing difficulties with the Transeastern JV. Specifically, the Revolver lenders recognized that TOUSA was "no longer able to satisfy all of the conditions precedent under the March 2006 Credit Agreement" because of "Transeastern Events." [Trial Exh. 209, p. 1]. In response, the Conveying Subsidiaries agreed on October 23, 2006, to pledge assets as security under the Revolver so that the Revolver lenders would continue to grant the TOUSA enterprise access to its most important source of liquidity. [Stip., p 9; Trial Exhs. 209, 3062; Trial Exh. 5006 at Ex. 10.1]. When difficulties with the Transeastern JV continued, the Conveying Subsidiaries agreed on January 30,

2007 to provide additional guarantees, now listing themselves as "Subsidiary Borrowers" under the Revolver. [Stip., p. 10; Trial Exh. 210].

Litigation also ensued between TOUSA and the Transeastern Lenders. TOUSA and Homes LP filed an action against DBTCA in Florida on November 28, 2006, seeking a declaratory judgment that they were not obligated under the Completion and Carve-Out Guarantees. [Trial Exh. 3105, pp. 11–12]. On December 4, 2006, DBTCA, on behalf of the Senior Transeastern Lenders and the Senior and Junior Mezzanine Lenders, filed action against TOUSA and Homes LP in New York state court. [Trial Exh. 3089]. DBTCA sought repayment of the Transeastern loans and damages for the various breaches by TOUSA and Homes LP of the Completion and Carve-Out Guaranties. [Stip., p. 15; Trial Exh. 3089].[19] When TOUSA and Homes LP moved to dismiss the New York action, the court denied their motion. [Trial Exhs. 3094–98]. The Parties agreed to consolidate the Florida and New York actions. [Trial Exh. 3112, p.3].

In its Complaint, DBTCA alleged that "[t]o date, more than $600 million has been advanced to the joint venture borrowers under various related credit facilities" and DBTCA requested "an award of damages for the various breaches by TOUSA and TOUSA Homes . . . in an amount to be determined at trial up to the full amounts outstanding under the Credit Agreements, plus interest thereon." [Trial Exh. 3089, pp. 2, 59]. One month after filing its complaint, Deutsche Bank

---

[19] DBTCA alleged a variety of misrepresentations and defaults on the Transeastern Loans. [Trial Exh. 3089, p. 3 (alleging violations of "completion guaranties" on the basis that the "joint venture borrowers have indisputably not paid material Project Costs relating to the Florida Projects and have otherwise failed to complete those critical Development Activities necessary to preserve the value of the Collateral"); id. (alleging violations of the "carve out guaranties" on the basis that the joint venture borrowers filed "false reports and certifications" which "effectively hid [their losses]")].

sent a letter to TOUSA to "clarify" the "potential scope of TOUSA's liability." [Trial Exh. 443, p. 1]. Specifically, Deutsche Bank argued that "it is DBTCA's view that [the Completion Guarantees] apply the horizontal and vertical construction of all phases of all developments for which there was any work . . . commenced as of the closing of the transaction. . . .  By our rough calculation, the indemnifiable costs under the reading exceed the full amounts outstanding under the Credit Agreements several times over." [*Id.* (emphasis added)]. TOUSA management personnel believed that "the ultimate . . . claim from Deutsche Bank was in excess of the amount of the debt . . .  it was $2 billion and above." [Bankr. Hr'g Tr. 1616:16–1617:7, 2829:16–17].

To resolve the Transeastern litigation, TOUSA faced three possibilities: (1) litigate the claims, (2) file for bankruptcy, or (3) settle the claims. TOUSA management believed that "the senior lenders [to the Senior Credit Agreement] were entitled to get 100 percent cash.  Everyone took the position if we didn't pay them 100 percent, we had no deal. . . .  Certainly, we had a series of advisors, and the decision was that there was no sense spending time trying to negotiate with them. " [*Id.* at 1611:4–16; *see also id.* at 506:15–16 (former TOUSA Executive Vice President and CEO Steve Wagman stating that he "believed that there was significant risk associated with continuing to litigate"); *id.* at 3616:20–23 (Citicorp's Manager on TOUSA Relations, Marni McManus, stating that "the company had a clear view that it had come to with the advice of their counsel as well as their financial advisors that settlement was better for the company overall"); Appeal Hr'g Tr. 20:25–21:14 ("[T]here was no dispute in this

litigation that the amounts paid by TOUSA to the Transeastern lenders were, in fact owed. . . .   Nobody has contended that the guarantees weren't valid obligations of TOUSA that arose to at least the level that was paid, so there isn't an argument of a gift. . . .   And just to be clear, the fear of the parent was that the judgment against it would be far in excess of what it paid ultimately to resolve the Transeastern litigation.")]. Counsel for the Committee even conceded at oral argument that settlement was in the best interests of TOUSA as the parent company. [Appeal Hr'g Tr. 20:12–16 ("I agree with the Court that there's no question at some point that the parent decided to honor the guarantee and settle the case because it, in contrast to the conveying subsidiaries, was on the hook for the guarantee.")].

TOUSA's consultants and advisors also believed that settlement was in the best interests of the TOUSA enterprise. According to Kirkland & Ellis and Lehman Brothers, there was "a substantial risk of a judgment against TOUSA," and time was "of the essence and the Company [did] not have the luxury of continuing to negotiate with the EHT lenders over a longer period of time." [Trial Exh. 187, p. 35]. When TOUSA sought advice from its consultants regarding bankruptcy, Lehman Brothers provided a detailed "waterfall analysis," concluding that if bankruptcy occurred, TOUSA "may not be able to continue operating as a going concern and reorganize" and such a bankruptcy would be "likely to have a negative impact on TOUSA's liquidity, value of its assets and its ability to obtain performance bonds." [*Id.* at 36–39]. TOUSA management shared these same concerns on behalf of the subsidiaries. [Bankr. Hr'g Tr. 1848:8–9 ("[W]e didn't

see how the company could exist with the parent in bankruptcy.")]. In light of these concerns, TOUSA chose to settle the Transeastern litigation.

### D.   The Transeastern Settlement

To repay the Transeastern Lenders, TOUSA had to obtain new financing (the "New Loans"). TOUSA selected Citicorp North America, Inc. ("CNAI") as the Administrative Agent for the new lenders (the "New Lenders"), and on June 27, 2007, CNAI sent TOUSA a final commitment letter reflecting the structure of their intended transactions. [Trial Exh. 3301].

### *i.    The Settlement Agreements*

TOUSA entered into a number of settlement agreements during this time. On May 30, 2007, TOUSA, Homes LP, and the Transeastern JV Subsidiaries reached a settlement agreement with Falcone and related entities under which TOUSA became the sole owner of the Joint Venture and paid approximately $49 million to receive properties related to the Joint Venture. [Stip., p. 18; Trial Exh. 2116].[20]

The Transeastern assets that were sold resulted in proceeds that went into a centralized cash management system "available for all of the various subsidiaries to use." [Bankr. Hr'g Tr. 551:15–21]. In addition to real estate, TOUSA acquired Transeastern's unrestricted cash, restricted cash, fixed assets, and other assets.  [Valdes Dep., pp. 60:18–63:13]. A portion of this was cash held in escrow deposits that would become actual, unrestricted cash upon the closing of the homes. [Devendorf Dep., pp. 46–47]. The Parties dispute the

---

[20]  The Transeastern entities also merged into TOUSA Homes Florida LP, one of the Conveying Subsidiaries that now held the assets of the Joint Venture. [Trial Exh. 5069, pp. 2–3].

actual value of these Transeastern assets as of July 2007,[21] but it is undisputed that proceeds from the sales of all these Transeastern assets and deposits that Transeastern held prior to TOUSA's acquisition were swept into TOUSA's central cash management system, which was available to the Conveying Subsidiaries. [McAden Dep., pp. 154–55; Bankr. Hr'g Tr. 1675:17–21].

The acquisition of the Transeastern assets also affected the "Borrowing Base" of the collective borrowers' assets under the Revolver. TOUSA's former Executive Vice President and CFO believed that "as a result of the July 31 transactions, the available credit, the borrowing base available credit under the revolver increased . . . by $150 million . . . [and] that additional liquidity of value [was] . . . available to the various subsidiary borrowers on the revolver." [Bankr. Hr'g Tr. 545:9–546:15; Trial Exh. 362, p. 7]. This was especially valuable to the Conveying Subsidiaries in July 2007 because it would have been "pretty close to impossible" for the Conveying Subsidiaries to secure their own financing at that time. [Bankr. Hr'g Tr. 546:19–547:1].

On June 29, 2007, TOUSA, Homes LP, and the Transeastern JV Subsidiaries executed settlement agreements with the Mezzanine Lenders. [Trial Exhs. 2134, 3111].[22] On July 31, 2007, TOUSA, Homes LP, and the Transeastern JV Subsidiaries reached a settlement agreement with lenders

---

[21]

   See First Lien Proposed Findings, p. 58 (noting the dispute between the Parties where the Committee asserts that the assets were worth $28,187,521 whereas the First Lien Term Lenders valued the assets as worth at least $160 million).

[22]

Pursuant to the Senior Mezzanine Settlement Agreement, new Subordinates Notes were issued dated July 31, 2007. [Stip., p. 16]. Pursuant to the Junior Mezzanine Settlement Agreement, TOUSA agreed to issue to Junior Mezzanine Lenders $16.25 million in warrants to purchase shares of its common stock. [Id. at 17].

under the Senior Credit Agreement (the "CIT Settlement Agreement"). [Stip., p. 16; Trial Exh. 2182]. Under the terms of the CIT Settlement Agreement, EHT and TOUSA Senior agreed to pay $421,522,193.46 to the lenders, plus additional interest payments of approximately $140,000.00 per day. [Stip., p. 16; Trial Exh. 2182].

To fund the settlement agreements with the Transeastern Lenders, TOUSA entered into two separate credit agreements with the New Lenders—First and Second Term Loan facilities with CNAI as Administrative Agent for the First and Second Lien Term Lenders. [Trial Exhs. 360, 361].[23] The First Lien Term Loan provided $200 million, and the Second Lien Term Loan provided $300 million to the borrowers. [Trial Exhs. 360, 361].[24] Both of the New Loans directed that loan proceeds be used to satisfy the Transeastern Settlement, which the New Loans referred to as the "Acquisition." [Trial Exh. 360 §§ 1.1, 4.12; Trial Exh. 361 §§ 1.1, 4.12].[25] Specifically, Section 4.12 provided

---

[23] On January 28, 2008, CNAI resigned as Administrative Agent under the Second Lien Term Loan and was replaced by Wells Fargo Bank, N.A. ("Wells Fargo"). [Id. at 18].

[24] Certain lenders served as both Transeastern Lenders and First or Second Lien Term Loan Lenders. The Parties dispute which entities were on both sides of the July 31 Transaction and the effect or relevance of this overlap. [See Committee's Proposed Findings, p. 21; Transeastern Proposed Findings p. 46; Second Lien Proposed Findings, p. 16; First Lien Proposed Findings, pp. 19, 21; Committee's Br., p. 27; Transeastern Reply Br., p. 40–41 & nn.41–42; Second Lien Reply Br., p. 12 n.10]. This dispute has no bearing on my ultimate conclusion about the liability of the Transeastern Lenders.

[25] The New Loans specifically defined the "Acquisition" as "the contribution by the Administrative Borrower to the Transeastern JV Entities of an amount necessary to discharge all amounts of outstanding Indebtedness of the Transeastern JV Entities listed on Schedule 1.l(a) on terms and conditions set forth in the Settlement Documents and (ii) the cancellation of Falcone/Ritchie's membership interests in TE/TOUSA, LLC as contemplated in Section 1 of the Falcone Settlement Agreement resulting in TE/TOUSA, LLC becoming a Wholly-Owned Subsidiary of the Administrative Borrower [TOUSA]." [Trial Exhs. 360, 361 §§ 1.1, 4.12]. TOUSA also explained in its 8-K that the "proceeds from the [term loans] were used to satisfy claims of the senior lenders against the Transeastern JV." [Trial Exh. 3273, p. 4].

that loan funds be used to "discharge all amounts of outstanding indebtedness of the Transeastern JV Entities" and that TOUSA was to serve as the sole "Administrative Borrower." [Trial Exh. 360 § 4.12; Trial Exh. 361 § 4.12].

Unlike the Transeastern Credit Agreements, both of these New Loan agreements named all of the Conveying Subsidiaries as "Subsidiary Borrowers." [Trial Exhs. 360, pp. 132–36; Trial Exh. 361, pp. 131–35]. In accordance with their obligations as "Subsidiary Borrowers," the Conveying Subsidiaries were required to pledge their assets as security under the New Loans. Because the Conveying Subsidiaries had already pledged their assets as security to the Revolver lenders under the Revolver amendments described above, the New Lenders had to obtain the consent of the Revolver lenders before they could enter into the First and Second Lien Term Loan facilities. Thus, on May 1, 2007, TOUSA made a presentation to a Steering Committee of Revolving Credit Lenders, and 79.125% of the Revolver lenders approved the terms of the new financing. [Trial Exh. 352; Bankr. Hr'g Tr. 3667:1–12]. As Marni McManus of Citicorp explained on behalf of the New Lenders, the "revolvers had taken collateral in the fall [on October 23, 2006], so we needed their approval in order to share that collateral with any other lenders." [Bankr. Hr'g Tr. 3615:17–25].

In accordance with the May 1, 2007 creditor presentation, the Revolver Lenders, the First Lien Lenders, and the Second Lien Lenders entered into an "Intercreditor Agreement" on July 31, 2007 to clarify the priorities of their liens. [Trial Exh. 2166]. Citicorp acted as Administrative Agent in the agreement on behalf of all of the lenders involved. [*Id.* at 1]. The agreement provided for equal

priority of liens among the Revolver lenders and the First Lien Term Loan Lenders. [*Id.* at 4–8].

The Revolver lenders also independently required the borrowers under the Revolver to amend that agreement again on July 31, 2007. Under the new amendments, the maximum credit available under the Revolver was reduced from $800 million to $700 million. [Trial Exh. 362, p. 1].[26] The Conveying Subsidiaries remained listed as "Subsidiary Borrowers" that were jointly and severally liable with TOUSA under the terms of the Revolver, and their assets remained pledged as collateral. [*Id.* at 1, 139–41; Trial Exh. 2172, pp. 5–7].

The parties to the Revolver amended their agreement two more times after July 31, 2007. On October 25, 2007, they amended the Revolver to provide for a waiver of solvency certification requirements for the third quarter and to permit borrowings of up to $65 million through the end of 2007. [Trial Exh. 216, pp. 2–3, 9]. In December 2007, TOUSA negotiated another amendment to the Revolver, providing for an extension of the prior certification waiver through February 1, 2008. [Trial Exh. 389 ¶ 46].

The internal corporate decisions approving the New Loans as part of the Transeastern Settlement play an important role in this dispute and should be examined carefully.  On June 20, 2007, TOUSA's board, which consisted of five inside directors and six outside directors, unanimously approved settlement of the Transeastern Litigation. [Trial Exh. 255; Bankr. Hr'g Tr. 189:21–190:11, 248:25–250:18]. The resolutions passed by TOUSA's Board explicitly state that

---

[26] The actual credit available at any particular time remained limited by the value of the "Borrowing Base" assets as defined in the previous Revolver agreements. [Trial Exh. 362, p. 6].

the New Loans were not only in the best interest of TOUSA but were also
"necessary and convenient to the conduct, promotion and attainment of the
business of the Administrative Borrower [TOUSA] *and its subsidiaries*." [Trial
Exh. 374, pp. 5, 8 (emphasis added)]. Of critical importance, officers and
directors of all of the Conveying Subsidiaries also executed formal resolutions or
consents approving their obligations under the New Loans. [Trial Exhs. 375–76,
501–31, 2163; *see also* First Lien Br., p. 62]. These formal documents all contain
substantially the same language, specifically recognizing the New Loans as
being in the "best interest" and for the "benefit" of the individual subsidiaries.  For
example, the resolution passed by THI, one of the two largest Conveying
Subsidiaries holding most of TOUSA's assets, provides the following:

> WHEREAS, it is a condition to the extension of loans under the [First and
> Second] Lien Credit Agreement[s] that certain subsidiaries, including the
> Corporation, guaranty the obligations of the Administrative Borrower and
> each other Borrower under the   [First and Second] Lien Credit
> Agreement[s];
>
> WHEREAS, *the Board [of THI] deems to be in the best interest of the
> Corporation to become Borrower under the   [First and Second] Lien
> Credit Agreement[s]* and to guaranty the obligations of the Administrative
> Borrower and each other Borrower under the  [First and Second] Lien
> Credit Agreement[s] . . . .
>
> . . .
>
> WHEREAS, *the Corporation will obtain benefits from the incurrence of the
> Loans and the other obligations under the [First and Second] Lien Credit
> Agreement[s]* and the other Loan Documents which are necessary and
> convenient to the conduct, promotion and attainment of the business of
> the Corporation.
>
> NOW, THEREFORE BE IT:
>
> RESOLVED, that *the Board finds that the Loan Documents (i) are in the
> best interest of the Corporation*, (ii) are necessary and convenient to the
> conduct, promotion and attainment of the business of the Administrative
> Borrower   and   its   subsidiaries,   including,   without   limitations,   the

Corporation, and (iii) may reasonably be expected to benefit, directly or indirectly, the Corporation . . . .

[Trial Exh. 504, pp. 4–5, 7–8 (emphasis added)].

The settlement also resulted in significant tax benefits for the TOUSA subsidiaries. In exchange for the conveyances associated with the First Lien Term loan, TOUSA and the Conveying Subsidiaries obtained the right to future tax benefits totaling approximately $74.8 million. [Trial Exh. 5404 ¶ 40; Trial Exh. 3000, p. 147]. As with all TOUSA receipts, those funds were expected to be placed into the TOUSA centralized cash management system, on which all TOUSA subsidiaries could draw. [Bankr. Hr'g Tr. 1675:17–21].

### ii.      The Flow of Funds on July 31, 2007

The exchange of property interests and funds that make up the "July 31 Transaction" can be broken down into three parts. First, as a result of the New Loan agreements, TOUSA and the Conveying Subsidiaries pledged their assets as security to the New Lenders, which, in turn, placed liens on those assets. Second, in exchange for these liens, the New Lenders disbursed $500 million in funds to TOUSA, the parent. Of the $500 million that TOUSA received from the New Lenders, the net proceeds were $476,418,784.40 after accounting for fees and expenses, including legal and syndicate costs. [Trial Exh. 442]. In accordance with the New Loans, the Conveying Subsidiaries provided written authorization to TOUSA, appointing TOUSA as their agent for the purpose of using these funds to settle the Transeastern debts. [Trial Exh. 360 § 10.21].

The exact disbursement of these funds was as follows: On July 31, 2007, CNAI, as Administrative Agent for the New Lenders, wired $476,418,784.40 to

Universal Land Title, Inc. ("ULT"), a wholly-owned subsidiary of TOUSA. [Stip. ¶ 43]. CNAI's instructions for the wire transfer provided that the funds were to be received by David Bronson of ULT and credit for the wire was to go to Technical Olympic USA, Inc., which was TOUSA's former corporate name. [Trial Exh. 442]. TOUSA management explained that ULT was a "non-conveying, non-filing" subsidiary that acted as part of TOUSA's financial services group in the capacity of a title company or escrow agent. [Bankr. Hr'g Tr. 1709:25–1710:9]. Management further confirmed that TOUSA's subsidiaries, including the Conveying Subsidiaries, exercised no control over the $476,418,784.40 transferred from the New Lenders to ULT. [*Id.* at 1711:22–1712:7]. CNAI personnel also explained that "[n]one of the subsidiaries had a right to the funds." [*Id.* at 3696:23–24; *see also* Appeal Hr'g Tr. 93:2–10 (counsel for the committee stating that the $476,418,784.40 "actually went to a particular subsidiary of TOUSA that is not one of the conveying subsidiaries and was then earmarked directly, pursuant to the very loan documents, *to go directly to the Senior Transeastern Lenders. . . . [The Conveying Subsidiaries] didn't formally hold the money*") (emphasis added)].

Third, following this transfer of $476,418,784.40, ULT wired $426,383,828.08 to Citibank, as Administrative Agent for the Transeastern Lenders. Citibank disbursed these proceeds to the other Transeastern Lenders by separate wire transfers taking place on July 31, 2007 and August 1, 2007. [Stip., p. 20; Trial Exhs. 136, 5107, 5109].[27]

---

[27] The remainder of the net New Loan proceeds went to fees for financing, legal, and professional services. [Plaintiffs' Proposed Findings, p. 6 n.4; Transeastern Lenders' Proposed Findings pp. 50–56; First Lien Proposed Findings, p. 22; Transeastern Lenders' Br., p. 12; Committee's Br., p. 3].

E.     **The Bankruptcy Pre-Trial Proceedings**

Despite the July 31 Transaction, it became clear between August 2007 and the beginning of 2008 that TOUSA and its subsidiaries would not be able to continue as going concerns. TOUSA's eventual collapse was caused in large part by the catastrophic economic events that independently doomed the housing market shortly after the July 31 Transaction. According to company management, nobody within TOUSA predicted that the housing market would get anywhere near as bad as it did after July 31, 2007. [Bankr. Hr'g Tr. 287:12–288:4, 543:4–10]. Media reports in the record referred to August 2007 as a "once in a century credit tsunami," a "Black Swan" event, and an "economic Pearl Harbor." [Trial Exhs. 4168–70]. Real estate valuation experts, such as Christopher James who testified at the trial below, confirmed that homebuilders like TOUSA were devastated by the tightening of credit markets in August 2007. [Bankr. Hr'g Tr. 2142:8–2146:10; Trial Exh. 3002 ¶¶ 7–54 ("Like many homebuilders, TOUSA was hit hard by the August 2007 credit-market freeze and the consequent collapse of the mortgage market, which dried up the pool of home buyers."); Intervenor's Br., p. 5].

The Committee's own expert, Charles Hewlett, even conceded that the economy must have played a role in TOUSA's downturn after the July 31 Transaction: "There is absolutely no question, and no one would dispute, that after July 31, 2007, the market got even worse." [Bankr. Hr'g Tr. 757:21–23]. Similarly, the Bankruptcy Court acknowledged in its Order that it was

31

"undisputed" that the national housing market "went to hell in a handcart beginning in August 2007." [Op., p. 50].

Given these catastrophic conditions, TOUSA and most of its subsidiaries filed petitions for relief under Title 11 of the U.S. Code on January 29, 2008. [Stip., p. 22].[28] On February 13, 2008, the Office of the U.S. Trustee for the Southern District of Florida appointed the Official Committee of Unsecured Creditors of TOUSA, Inc. (the "Committee").[29] [Id.]. On July 14, 2008, the Committee brought[30] this adversary proceeding on behalf of the Conveying Subsidiaries. [Id.].[31]

The Committee claims that when TOUSA and the Conveying Subsidiaries filed for bankruptcy, the Transeastern Lenders and the First and Second Lien Term Lenders "elbow[ed] their way to the front of the creditors' line" and "the unsecured creditors [i.e., the bondholders] were pushed to the back of that line" as a result of the July 31 Transaction. [Committee's Br., pp. 3, 32]. In total, the Committee asserted twenty claims collectively against the Transeastern Lenders and the New Lenders. [Bankr. ECF No. 243]. The Committee alleged that the

---

[28] The Debtors are TOUSA, Homes LP, and the Conveying Subsidiaries.

[29] The Committee consists of seven entities: Wilmington Trust Co., as indenture trustee; HSBC Bank USA, N.A., as indenture trustee; Trapeza CDOX, Ltd.; Capital Research and Management Company; SMH Capital Advisors, Inc.; Geotek, Inc./Geotek Insite, Inc.; and SelectBuild Arizona. In its Brief, the Committee notes that "[b]ecause the Conveying Subsidiary debtors here labored under a conflict of interest and therefore could not bring the case in their own right, the bankruptcy court empowered the Committee to file it on their behalf." [Committee's Br., p. 5 n.3].

[30] The Adversary Complaint was amended three times, with the final operative document, the Third Amended Adversary Complaint, filed on February 4, 2009. [Bankr. ECF No. 243].

[31] The Committee brought the adversary proceeding on behalf of the Conveying Subsidiaries, not including TOUSA or Homes LP, but TOUSA was named as a plaintiff in respect to the Tax Refund preference count of the Complaint.

July 31 Transaction constituted a fraudulent transfer under 11 U.S.C. § 548. [2]3 The Committee argued that the July 31 Transaction rendered the Conveying Subsidiaries insolvent and that the Conveying Subsidiaries did not receive "reasonably equivalent value" for the New Loans because TOUSA used the loan proceeds to finance the settlement of the Transeastern Litigation, in which the Conveying Subsidiaries held no stake because they were not defendants. The Committee brought claims on behalf of the Conveying Subsidiaries against the Transeastern Lenders, seeking recovery of the settlement funds they received in the July 31 Transaction.[33]

The Debtors were not originally parties to the Committee's action, but they became involved when the New Lenders brought identical third-party claims against certain of the Debtors in the Fall of 2008. [Bankr. ECF Nos. 28, 276]. CNAI and Wells Fargo, as Administrative Agents for the New Lenders, brought contingent claims, denying the Committee's allegations, but alleging that *if* the Committee were to establish the allegations in the Complaint, then the Debtors had "materially breached" the New Loans in which they represented that they were solvent. [Bankr. ECF No. 28 ¶ 12; Bankr. ECF No. 276 ¶ 218].

The Bankruptcy Court entered several significant pretrial orders. Two of them are relevant to the appeal proceedings before me concerning the

---

[32] The Committee also asserted claims for fraudulent conveyance under New York and Florida state law pursuant to 11 U.S.C. § 544. The Bankruptcy Court held that there were "no material differences" between the legal standards under the Bankruptcy Code and Florida or New York law. [Op., p. 129 n.47].

[33] Besides the fraudulent transfer claims, the Committee also brought claims against the First and Second Lien Term Lenders to avoid certain tax refunds as unlawful preferences under 11 U.S.C. § 547. All appeals relating to the First and Second Lien Term Lenders on appeal are before the Honorable Adalberto J. Jordan.

Transeastern Lenders: First, on July 2, 2009, the Bankruptcy Court granted the Debtors' Motion to Strike the Senior Transeastern Lenders' Counterclaim and Third-Party Claim. [Bankr. ECF No. 508]. Second, on July 8, 2009, the Bankruptcy Court granted the Committee's Motion for Summary Judgment on the Defendants' Affirmative Defenses of Substantive Consolidation, Single Business Enterprise and Alter Ego. [Bankr. ECF No. 513].[34]

F.     **The Bankruptcy Trial**

The Bankruptcy Court held a bench trial from July 13 to July 28, 2009, in which more than twenty witnesses testified, including several witnesses who provided extensive information on the July 31 Transaction and TOUSA's decision-making process leading up to that date.[35]

TOUSA management testified about the danger faced by the Conveying Subsidiaries if the July 31 Transaction had not gone through. In particular, if the Transeastern Lenders received a judgment against TOUSA in excess of $10 million dollars or if TOUSA filed for bankruptcy, TOUSA would be in default of the bond indentures, and "the bond debt was placed at TOUSA, Inc., but with guarantees from each of the TOUSA subsidiaries. They were absolutely and

---

[34]

As discussed further below, I do not ultimately address the Bankruptcy Court's conclusions on either of these pretrial orders because my conclusion as to the liability of the Transeastern Lenders renders the appeals concerning these orders moot. *See supra* note 41. The Parties have not briefed the issues relating to the pretrial orders on appeal because I have stayed the appeals concerning those orders. Although I have not heard the Parties' arguments concerning the merits of the Transeastern Lenders' appeals relating to the pretrial orders, I note that the orders present additional significant concerns about the proceedings below and could potentially provide independent grounds for remand and a new trial below.

[35]

The Committee also provided one extra day of rebuttal after completion of the trial on August 28, 2009.

unconditional guarantees." [Bankr. Hr'g Tr. 1623:10–1624:13]. Likewise, in the case of a $10 million judgment or a bankruptcy filing, that "would have triggered the Citibank obligation, the $800 million revolver. And, again, those subsidiaries were absolutely, unconditionally guarantors and were co-borrowers, and their assets were pledged." [*Id.* at 1678:4–25, 1688:1–1689:25].

TOUSA management and their advisors testified that they believed that the Transeastern litigation presented an existential threat to the TOUSA enterprise because of the default provisions in the Revolver and the bond indentures. There was a "significant risk associated with continuing to litigate," and "settlement was better for the company overall." [*Id.* at 505:8–507:23, 3616:19–25]. TOUSA's outside counsel advised that the proposed settlement "was likely a better outcome than full litigation." [Trial Exh. 187, p. 20]. As to the possibility of bankruptcy, TOUSA's Executive Vice President and Chief of Staff testified that it would not have been possible to keep TOUSA's subsidiaries out of bankruptcy if TOUSA filed for bankruptcy. [Bankr. Hr'g Tr. 1623:10–1624:13, 1678:3–1679:21, 1847:25–1848:16 ("[W]e didn't see how the rest of the company could exist with the parent in bankruptcy.")]. One of the primary concerns facing the Conveying Subsidiaries in the event of default was their failure to have maintained individualized audited statements because they "absolutely could not" obtain their own financing given the interrelated nature of the TOUSA enterprise. [*Id.* at 1877:5–1879:16].

Because of these considerations, the TOUSA Board, including five outside directors, unanimously approved the Transeastern Settlement. [*Id.* at

189:21–190:2,  248:18–250:18].[36]  Paul  Berkowitz,  who  signed  corporate resolutions  consenting  to  the  Transeastern  Settlement  on  behalf  of  the Conveying Subsidiaries, testified that he "thought the transaction was in the best interest of the company as a whole and each of the its subsidiaries," and that he believed  that  the  subsidiaries  "benefitted"  from  the  transaction.  [*Id.* at 1592:12–24,  1692:4–5,  1718:10–1719:22  ("I  believed  it  was  benefitting  the organization as a whole.")]. The former TOUSA Executive Vice President and CFO confirmed  that  when  he  signed  the  resolutions  approving  the  July  31 Transaction, he felt that "what would benefit TOUSA, Inc., would also benefit the subsidiaries, given out structure and how we operated the business." [*Id.* at 528:19–21].

The Bankruptcy Court also spent significant time during the bench trial to consider arguments concerning the solvency of TOUSA and its subsidiaries as it related  to  the  Committee's  claims  against  the  First  and  Second  Lien  Term Lenders. Accordingly, the Parties relied heavily on expert witness testimony concerning  the  valuation  of  TOUSA  and  its  subsidiaries  with  the  Committee's witnesses coming to very different conclusions than the Defendants' witnesses. The Defendants filed pre-trial *Daubert* motions to exclude the expert testimony as to two of the Committee's key expert witnesses on these issues—Charles A. Hewlett  and  William  Q.  Derrough—which  the  Bankruptcy  Court  denied.  [Bankr. ECF Nos. 387, 392, 397–98, 474; *see also* Op., pp. 67, 132–34, 182].[37]

---

[36]

The minutes demonstrating unanimous approval are in the record. [Trial Exh. 255].

[37]

Among other things, the Defendants noted that Hewlett was not licensed or certified as an appraiser or expert in real estate valuation in any state and had concluded that 83 percent of the TOUSA Group's lots with raw land parcels had zero or negative value. The Defendants also expressed

G.        **The Bankruptcy Court Order & Post-Order Proceedings**

Following the bench trial, the Bankruptcy Court ordered the Parties to submit post-trial submissions in the form of Proposed Findings of Fact and Conclusions of Law. On October 30, 2009, the Bankruptcy Court issued its Order,[38] holding in the Committee's favor on all of its claims. Specifically, it held that (1) the obligations incurred by the Conveying Subsidiaries to the First and Second Lien Lenders, and the Liens transferred to secure those obligations, could be avoided pursuant to 11 U.S.C. §§ 544 and 548; (2) the Senior Transeastern lenders were entities "for whose benefit" the improper transfer was made; and (3) the transfer of more than $421 million to the Senior Transeastern Lenders could also be avoided pursuant to Sections 544 and 548. [Op., p. 171].

As the Order relates to the Transeastern Lenders, the Bankruptcy Court found that the Conveying Subsidiaries did not receive reasonably equivalent value in exchange for the obligations they obtained by pledging their assets to the New Lenders. [*Id.* at 104]. To the extent the Conveying Subsidiaries received "any value at all, it was minimal and did not come anywhere near the $403 million of obligations they incurred." [*Id.* at 105]. The Conveying Subsidiaries received no "direct benefits" because "the money was transferred by the lenders to Universal Land Title, Inc." [*Id.*]. It also found that the Conveying Subsidiaries

_____

concerns that Derrough acknowledged that there were no authoritative treatises, training manuals, or textbooks that recognized his valuation methodology and that Derrough had never offered an opinion on the solvency of any company or homebuilder before testifying in this case.

[38] The Bankruptcy Court originally issued its Findings of Fact and Conclusions of Law on October 13, 2009, [Bankr. ECF No. 658], and then it issued an Amended Findings of Fact and Conclusions of Law on October 30, 2009. [Bankr. ECF No. 722]. The original order granted judgment against the Revolver Lenders who had been dismissed from the case and did not appear at trial. [Bankr. ECF No. 658, pp. 163–70; Bankr. ECF No. 659, p. 4].

received "minimal indirect benefits" because the "July 31 Transaction did not in fact prevent the bankruptcy of the parent company" and because "the Conveying Subsidiaries would not have been seriously harmed by such an earlier bankruptcy." [*Id.* at 108–09]. As for the danger presented by defaulted bonds, the Bankruptcy Court noted:

> [One of the Committee experts, William Q. Derrough] testified, based on his experience with similar situations, that the Conveying Subsidiaries could have come to an accord with the bondholders, possibly by obtaining their own financing to refinance the bonds, which would have allowed them to continue as going concerns despite the default. [Another Committee expert, Charles A. Hewlett], confirmed, based on his particular experience with the real-estate industry, that the Conveying Subsidiaries—which held some 95% of TOUSA's assets—could have obtained their own financing even if the parent were in bankruptcy.

> [*Id.* at 109].

In response to arguments regarding the dangers faced by the Conveying Subsidiaries about defaulting under the Revolver, the Bankruptcy Court found "no reason to believe that the Conveying Subsidiaries could not have dealt with a possible Revolver default by transitioning to an alternative source of financing." [*Id.* at 111]. It further found that the New Lenders and the Transeastern Lenders did not act in good faith and were grossly negligent when they engaged in the July 31 Transaction on the basis that there was "overwhelming evidence that TOUSA was financially distressed." [*Id.* at 116–17].

The Bankruptcy Court held that under the language of 11 U.S.C. § 548(a)(1)B)(I),

> an "indirect benefit" is cognizable only if three requirements are satisfied. First, the benefit must be received, even if indirectly, by "the debtor," *i.e.*, by an individual Conveying Subsidiary. . . . Second, any purported "indirect benefits" defense must also be limited to cognizable "value." . . .

> Since this case does not concern the satisfaction of the debt of any Conveying Subsidiary, "property" received by a Conveying Subsidiary is the only value that is relevant here.  Third, properly must have been received by a Conveying Subsidiary "in exchange for" the transfer of obligation.

[*Id*. at 146–47].

It went on to define "property" according to WEBSTER'S DICTIONARY as "some kind of enforceable entitlement to some tangible or intangible article." [*Id*. at 148 n.55].

The Bankruptcy Court further held that the Transeastern Lenders were entities "for whose benefit the transfer was made" under 11 U.S.C. § 550(a)(1). It held that payment to them in order to extinguish the Transeastern debt was a fraudulent transfer, and it rejected their defenses of recoupment and good faith. [*Id.* at 151–63].

The Bankruptcy Court also adopted the same remedy scheme proposed by the Committee. It ordered the disgorgement of $403 million in principal amount of the total funds paid to the Transeastern Lenders and further held that the Transeastern Lenders would have to pay prejudgment interest on the full amount of that disgorgement. [*Id.* at 177]. The Bankruptcy Court justified this remedy on the basis that "a complete recovery from only one set of Defendants . . . would mean that the other set of Defendants would retain the benefits obtained in the avoided transfer. In effect, one set of Defendants would obtain a windfall, at the expense of the other set of Defendants." [*Id.* at 176].

Following the Order, the Defendants moved the Bankruptcy Court to stay proceedings pending appeals. [Bankr. ECF Nos. 666, 669, 671]. On October 30, 2010, the Bankruptcy Court granted the stays conditioned on the Defendants posting nearly $700 million in bonds or cash. [Bankr. ECF No. 723]. The

Transeastern Lenders' aggregate bond amount was $531,182,705. [*Id.* at 8]. On May 28, 2010, the Bankruptcy Court entered an order changing the judgment against the Transeastern Lenders to extend the date through which prejudgment interest would accrue from October 13, 2009 to May 28, 2010, and it simultaneously entered final judgment directing the disgorgement of specific amounts of money from certain Defendants. [Bankr. ECF Nos. 985, 986]. The Transeastern Lenders assert that this seven-and-a-half month extension increased the prejudgment interest award against them by nearly $23 million. [ECF No. 18 in Case No. 10-61478].

### III.    THE NATURE OF THESE APPEALS

In the instant primary appeal proceeding concerning liability (Case No. 10-60017), the Transeastern Lenders present the following questions:

> Whether the Transeastern Lenders can be compelled to disgorge to the Conveying Subsidiaries funds paid by TOUSA to satisfy a legitimate, uncontested debt, where the Conveying Subsidiaries did not control the transferred funds.
>
> Whether the Transeastern Lenders are liable for disgorgement as the entities "for whose benefit" the Conveying Subsidiaries transferred the Liens to the New Lenders, where the Transeastern Lenders received no direct and immediate benefit from the Lien Transfer.[39]
>
> [Transeastern Lenders' Br., p. 5].

In addition, the Transeastern Lenders challenge several of the Bankruptcy Court's pretrial orders and orders following its findings of liability. In particular, the Transeastern Lenders appeal the following orders: (1) Order Granting the

---

[39] In the same appeal concerning liability, the Transeastern Lenders also challenge certain aspects of the Bankruptcy Court's imposition of remedies after issuing its Order regarding liabilities. [Transeastern Br., p. 5 (listing five additional questions for appeal concerning remedies)]. As discussed below, I need not address these questions because I reverse the Bankruptcy Court as to its holdings on liability.

Debtor's Motions to Strike their Counterclaim and Third Party Complaint; (2) Order Granting the Committee's Motion for Summary Judgment on the Defendant's Affirmative Defenses of Substantive Consolidation, Single Business Enterprise, and Alter Ego; (3) Order Granting in Part the Committee's Motion to Set Payment Amounts as Against the Senior Transeastern Lenders; and (4) Order Granting Final Judgment on Counts VII–XVIII of the Third Amended Complaint. [Bankr. ECF Nos. 508, 513, 985, 986].

A subset of the First Lien Term Lenders also filed a Motion to Intervene in these proceedings, which I have granted. [ECF Nos. 74, 109 in Case No. 10-60017]. The Intervenors present the following three issues for appeal:

> Whether the Bankruptcy Court had jurisdiction to order the distribution of property of the estate recovered from a defendant in an action for fraudulent conveyance under Section 548 of the Bankruptcy Code.
>
> Whether the Bankruptcy Court had the power under the Bankruptcy Code to order distribution of property of the estate to the Term Lenders as equitable credit for the hundreds of millions of dollars they had previously transferred to the estates.
>
> Whether the Bankruptcy Code's remedial scheme relies on a clear error of judgment or erroneous legal standard sufficient to qualify as an abuse of discretion.

[Intervenor's Br., p. 5].

Because I reverse the Bankruptcy Court on the issue of liability as to the Transeastern Lenders, I need not address the issues raised on appeal as they relate to remedies. [Transeastern Reply Br., p. 23 n.29 ("If this Court reverses the bankruptcy court's findings of liability against the Transeastern Lenders, it need not consider the issues relating to remedies.")].[40] Likewise, by reversing the

---

[40] The Transeastern Lenders have also requested that this case should be reassigned to another judge if remand is warranted. [Transeastern Lenders' Br., p. 53–55; Transeastern Reply Br., pp. 64–68].

Bankruptcy Court's Order in all aspects as it relates to the liability of the Transeastern Lenders, this Order also renders the Transeastern Lenders' appeals concerning the Bankruptcy Court's pretrial orders also moot.[41]

For these reasons, I confine my analysis to the first two issues raised by the Transeastern Lenders, namely (1) whether the Transeastern Lenders can be compelled to disgorge to the Conveying Subsidiaries funds paid by TOUSA to satisfy a legitimate, uncontested debt, where the Conveying Subsidiaries did not control the transferred funds, and (2) whether the Transeastern Lenders are liable for disgorgement as the entities "for whose benefit" the Conveying Subsidiaries transferred the Liens to the New Lenders, where the Transeastern Lenders received no direct and immediate benefit from the Lien Transfer. As discussed in more detail below, I answer both of these questions in the negative.

## IV. LEGAL STANDARD

In bankruptcy appeals, a district court conducts a *de novo* review of the bankruptcy court's legal determinations. *Trusted Net Media Holdings, LLC v. The Morrison Agency, Inc.* (*In re Trusted Net Media Holdings, LLC*), 550 F.3d 1035, 1038 n.2 (11th Cir. 2008); *Cohen v. United States*, 191 B.R. 482, 484 (Bankr. S.D. Fla. 1995). This includes "conclusions regarding the legal significance

---

[41] The Transeastern Lenders challenge the Bankruptcy Court's pretrial Order Granting the Committee's Motion for Summary Judgment on its Affirmative Defenses of Substantive Consolidation, Single Business Enterprise, and Alter Ego. [Bankr. ECF No. 513]. These affirmative defenses are moot now given my conclusion that the Bankruptcy Court erred in holding the Transeastern Lenders liable under all advanced theories of liability. The Transeastern Lenders also challenge the Bankruptcy Court's pretrial Order Striking their Counterclaim and Third-Party Complaint. [Bankr. ECF No. 508]. The Counterclaim and Third-Party Complaint at issue was raised by the Transeastern Lenders *in the alternative* to all of their substantive defenses, and it consisted of one count that the Transeastern Lenders would have a right of indemnification and recoupment against certain borrowers under the Transeastern Credit Agreements *in the event of any judgment against the Transeastern Lenders*. [Bankr. ECF Nos. 259, 260]. Again, because I hold that the Bankruptcy Court erred in entering judgment against the Transeastern Lenders, these issues are moot on appeal.

accorded to the facts." *Cohen*, 191 B.R. at 484.

In contrast, district courts apply the "clearly erroneous" standard of review on a bankruptcy court's findings of fact. FED. R. BANKR. P. 8013; *Trusted Net Media*, 550 F.3d at 1038 n.2. The "clearly erroneous" standard requires reversal "when the record lacks substantial evidence to support [the factual findings] such that an appellate court's review of the evidence results in a firm conviction that a mistake has been made." *Blohm v. Comm'r*, 994 F.2d 1542, 1548 (11th Cir. 1993). Whether a transfer was made for reasonably equivalent value is generally a question of fact to be reviewed under the "clearly erroneous" standard. *Nordberg v. Arab Banking Corp.* (*In re Chase & Sanborn Corp.*), 904 F.2d 588, 594 (11th Cir. 1990); 2 COLLIER BANKRUPTCY MANUAL ¶ 548.05[1][b], at 548-18 (Henry J. Sommer & Lawrence P. King, 3d ed. rev. 2002).

This case presents a distinct issue on appeal because the Bankruptcy Court's Order is practically a verbatim adoption of the Committee's Proposed Findings of Fact and Conclusions of Law submitted after the trial. As the Appellants have pointed out, "of the Committee's 448 proposed findings and conclusions, the Bankruptcy Court adopted 446 in whole or in part, while adopting *none* of the defendants' over 1,600 proposed findings. . . .  The Bankruptcy Court also added approximately 10 new paragraphs and removed a few of the Committee's footnotes." [First Lien Br., p. 23 & n.21 (emphasis in original)].

The Appellants have submitted "redline" comparisons between the Committee's Proposed Findings of Fact and Conclusions of Law and the

Bankruptcy Court's Order, which demonstrate that "[o]f the more than 53,000 words in the Decision, approximately 92% directly overlap with the Proposed Findings." [2d Lien Reply Br., p. 2 n.3]. Even though the Bankruptcy Court had a Joint Stipulation of Facts from the Parties that it could have relied on in its Order, it chose instead to adopt the facts submitted by the Committee. [Bankr. ECF No. 542; Op., pp. 1–128; *see also* Transeastern Lenders' Br., p. 53 ("The Defendants collectively submitted over 500 pages of post-trial submissions, yet *not a single* case, exhibit or other piece of evidence cited by them appears in the Opinion unless and to the extent it was also cited by the Committee." (emphasis in original)].

The "clearly erroneous" standard of review for factual findings is relaxed in circumstances where a lower court adopted one party's proposed order verbatim. *AmStar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 258 (5th Cir. 1980). This practice has been heavily criticized and discouraged by the U.S. Supreme Court and by the Eleventh Circuit. *See, e.g.*, *Anderson v. Bessemer City*, 470 U.S. 564, 572 (1985) ("We, too, have criticized courts for their verbatim adoption of findings of fact prepared by the prevailing parties . . . ."); *United States v. El Paso Nat'l Gas Co.*, 376 U.S. 651, 656 n.4 (1964) ("Many courts simply decide the case in favor of the plaintiff or the defendant, have him prepare the findings of fact and conclusions of law and sign them. This has been denounced by every court of appeals save one. This is an abandonment of the duty and the trust that has been placed in the judge by these rules. It is a noncompliance with Rule 52 specifically and it betrays the primary purpose of Rule 52—the primary purpose

being that the preparation of these findings by the judge shall assist in the adjudication of the lawsuit. I suggest to you strongly that you avoid as far as you possibly can simply signing what some lawyer puts under your nose. These lawyers, and properly so, in their zeal and advocacy and their enthusiasm are going to state the case for their side in these findings as strongly as they possibly can. When these findings get to the courts of appeals they won't be worth the paper they are written on as far as assisting the court of appeals in determining why the judge decided the case.") (citing J. SKELLY WRIGHT, SEMINARS FOR NEWLY APPOINTED UNITED STATES DISTRICT JUDGES 166 (1963)); *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1373 & n.46 (11th Cir. 1997) ("frowning upon" bankruptcy court for issuing order with verbatim adoption of one party's findings and ordering case to be re-assigned on remand because of "utter lack of an appearance of impartiality" that "belie[s] the appearance of justice to the average observer"); *Colony Square Co. v. Prudential Ins. Co. of Am.* (*In re Colony Square Co.*), 819 F.2d 272, 274–76 (11th Cir. 1987) ("The dangers inherent in litigants ghostwriting opinions are readily apparent. . . .   The quality of judicial decisionmaking suffers when a judge delegates the drafting of orders to a party; the writing process requires a judge to wrestle with the difficult issues before him and thereby leads to stronger, sounder judicial rulings."); *see also S. Pac. Commc'n Co. v. AT&T Co.*, 740 F.2d 980, 995 (D.C. Cir. 1984) (discussing the practice of "extensively copying the proposed findings of fact and conclusions of law prepared by counsel" and stating that "[c]onfidence in the integrity of the judicial process inevitably suffers when judges succumb wholesale to this

practice").

It is also well-established that when the factual record allows but one "resolution of the factual issue," remand is unnecessary. *Pullman-Standard v. Swint*, 456 U.S. 273, 292 (1982) ("[W]here findings are infirm because of an erroneous view of the law, a remand is the proper course unless the record permits only one resolution of the factual issue."); *Media Servs. Grp., Inc. v. Bay Cities Commc'n, Inc.*, 237 F.3d 1326, 1330 (11th Cir. 2001) (same); *Nix v. WLCY Radio/Rahall Commc'n*, 738 F.2d 1181, 1187 (11th Cir. 1984) (same); *see also Reynolds v. Giuliani*, 506 F.3d 183, 197 (2d Cir. 2007) (same); *S. Indus. of Clover, Ltd. v. Kattan*, 148 F. App'x 5, 7 (2d Cir. 2005) (same); *United States. v. Microsoft Corp.*, 253 F.3d 34, 94 (D.C. Cir. 2001) (same).

## V.    DISCUSSION

The Transeastern Lenders were paid an outstanding debt by the party that owed it. As acknowledged at oral argument, "there was no dispute in this litigation that the amounts paid by TOUSA to the Transeastern Lenders, were, in fact, owed," and "[n]obody has contended that the guarantees [on the Revolver debt] weren't valid obligations of TOUSA that arose to at least the level that was paid." [Appeal Hr'g Tr. 20:23–21:2]. Because TOUSA entered bankruptcy more than ninety days after that payment, the payment is not an "avoidable preference" under 11 U.S.C. § 547(b)(4)(A), and the Bankruptcy Court did not conclude that it was. Instead, the Bankruptcy Court concluded the payment was a "fraudulent transfer" under § 548.

Section 548 authorizes avoidance of "fraudulent transfers," defined to include—as relevant here—the transfer "of an interest of the debtor in property" if the debtor "received less than a reasonably equivalent value in exchange for such transfer," and "was insolvent on the date that such transfer was made." § 548(a)(1). In arguing to the Bankruptcy Court, the Committee lumped all Appellees together under the "fraudulent transfer" umbrella, although this case actually involved different transfers involving different parties with different legal implications. It is undisputed that TOUSA's repayment to the Transeastern Lenders was made in one of a series of multi-party transactions that took place on July 31, 2007. Those transactions involved three distinct asset transfers:

1.  TOUSA caused certain of the Conveying Subsidiaries to convey the liens on their real property assets and become obligated to a collection of financial entities referred here as the New Lenders.

2.  In exchange for the liens and the obligations, the New Lenders loaned funds and provided credit facilities, the New Loans, to TOUSA; and

3.  TOUSA used the funds from the New Lenders in part to satisfy its $421 million debt to the Transeastern Lenders.

The Bankruptcy Court found the Transeastern Lenders liable under Section 548 on *two* different bases of liability, *for two distinct fraudulent transfers*: (1) as direct transferees of the New Loan proceeds paid in satisfaction of a valid antecedent debt; and (2) as entities "for whose benefit" the Conveying Subsidiaries transferred the liens to the New Lenders. In essence, the Bankruptcy Court found that the Conveying Subsidiaries had a property interest in the New Loan proceeds that TOUSA transferred to the Transeastern Lenders, received only minimal value in exchange for relinquishing that property, and were

insolvent. Accordingly, the Bankruptcy Court voided the entire transfer and ordered the Transeastern Lenders to disgorge the funds received in satisfaction of the undisputed debt they were owed. [Op., p. 180–81]. The Bankruptcy Court's Opinion adopted both of the Committee's theories of liability in the same language used in the Committee's post-trial papers with only the barest of word changes, and without attempting to harmonize these two mutually exclusive theories.

### A.   The Bankruptcy Court's "Direct Transferee" Theory of the Transeastern Lender's Liability Is Legally Incorrect

Addressing the "direct transferee" theory of liability, the Transeastern Lenders argue that the Conveying Subsidiaries did not have a property interest in the New Lenders' loan proceeds because they had no control over those proceeds, and even if they did have a minimal interest—as the Bankruptcy Court concluded—the benefits they received from the debt repayment were reasonably equivalent in value to that minimal interest.

The Transeastern Lenders correctly point out that Section 548 applies only to a transfer "of an interest *of the debtor* in property." 11 U.S.C. § 548(a)(1). The threshold question under this provision is whether each transfer was in fact property of the debtor. *United States v. Kapila*, 402 B.R. 56, 60 (S.D. Fla. 2008) (discussing how § 548 requires the trustee to show a transfer of an interest *of the debtor* in property). For purposes of Section 548, the fraudulent conveyance claimed against the Transeastern Lenders applied only to "property" the Conveying Subsidiaries had in the New Loan proceeds which were transferred by TOUSA to the Transeastern Lenders in settlement of the antecedent debt.

The Transeastern Lenders contend on appeal that the Conveying Subsidiaries never had any property interest in the New Loan proceeds, and thus transferred nothing to the Transeastern Lenders. They are correct as a matter of law based on the undisputed record below. The Bankruptcy Court could not find that the Conveying Subsidiaries received the proceeds of the New Loans, or had power to distribute them, or designate who would receive the loan proceeds. The factual record establishes without contradiction that the power lay *exclusively* with TOUSA, as the New Loan Agreements expressly provided.

Without any factual dispute in the record, both the First and Second Lien Term Loan Agreements directed that the proceeds of the New Loans be used to satisfy the Transeastern Settlement. Specifically, Section 4.12 of the agreements required the proceeds of the loans to be used to fund the "Acquisition," defined as "the contribution by the 'Administrative Borrower' [TOUSA] to the Transeastern JV Entities of an amount necessary to discharge all amounts of outstanding indebtedness of the Transeasatern JV Entities." [Trial. Exh. 360 §§ 1.1, 4.12]. Under the totality of the circumstances, the Bankruptcy Court's findings and legal conclusions were neither "logical" nor "consistent with the equitable concepts underlying bankruptcy law." *Nordberg v. Societe Generale* (*In re Chase & Sanborn Corp.*), 848 F.2d 1196, 1199 (11th Cir. 1988).

The Eleventh Circuit has made clear that "our court adopted the control test to determine whether a debtor had possession of property allegedly recoverable under section 548." *Id.* Referring to its earlier ruling in *Nordberg v. Sanchez* (*In re Chase & Sanborn Corp.*), 813 F.2d 1177 (11th Cir. 1987), the

court stated: "We agree that *In re Chase & Sanborn Corp.*, establishes a general framework for analysis that can be utilized in this case." *In re Chase & Sanborn Corp.*, 848 F.2d at 1199. The court noted that the issue which troubled it was not whether the property in question went to the alleged transferee, but whether it came *from* the debtor, the alleged transferor. *Id.* It ruled "that the trustee could not recover the funds because, '[a]lthough the debtor corporation had possession of the funds in controversy by virtue of the transfer to the account, *the record demonstrates that the debtor corporation did not have sufficient control over the funds to warrant a finding that the funds were the debtor corporation's property*." *Id.* (emphasis added). The Eleventh Circuit explained that "the test articulated by our court is a very flexible, pragmatic one; in deciding whether debtors had controlled property subsequently sought by their trustees, courts must look beyond the particular transfers in questions to the entire circumstances of the transaction." *Id.* (citing *In re Chase & Sanborn Corp.*, 813 F.2d at 1181–82) (internal quotation marks omitted).

In the earlier *Chase* decision, the Eleventh Circuit held that a transfer is avoidable under Section 548 *only* if the debtor exercised *actual control* over the property transferred. *In re Chase & Sanborn Corp.*, 813 F.2d at 1181–82 ("For these reasons, we conclude that where a transfer to a noncreditor is challenged as fraudulent, more is necessary to establish the debtor's control over the funds than the simple fact that a third party placed the funds in an account of the debtor with no express restrictions on their use. In determining whether the debtor had control of funds transferred to a noncreditor, the court must look beyond the

particular transfers in question to the entire circumstance of the transactions."). The rationale was that, without the requisite control, the subject property could not have been used by the debtor to pay another creditor, and the transfer thus did not decrease the value of the debtor's estate.

The Eleventh Circuit's control test encompasses two elements: (1) the power to designate which party will receive the funds, and (2) the power to actually disburse the funds at issue to that party. In other words, control means control over identifying the payee, and control over whether the payee will actually be paid. *Tolz v. Barnett Bank of S. Fla.* (*In re Safe-T-Brake of S. Fla., Inc.*), 162 B.R. 359, 365 (Bankr. S.D. Fla. 1993). In determining the totality of the circumstances, control does not exist where the loan from the third party was conditioned on payment to a particular creditor. *Howdeshell of Ft. Myers v. Dunham-Bush, Inc.* (*In re Howdeshell of Fort Myers*), 55 B.R. 470, 474–75 (Bankr. M.D. Fla. 1985).

The Bankruptcy Court erred by failing to apply the Eleventh Circuit's control test to the totality of the circumstances as established by the actual documents governing the transactions. Rather, it dismissed the test, expressly rejecting as "clearly wrong" the proposition that 'control' is an essential element of any property interest under Section 548. [Op., p. 157]. The Bankruptcy Court expressed the view that a control test "would negate the paradigmatic example of a fraudulent transfer, in which the owner of an insolvent corporation transfers corporate funds to a personal account  for his personal use" because the owner's

*de facto* control over the funds cannot vitiate the corporation's control over, and property interest in, the funds. [*Id.* at 158].

The Bankruptcy Court compounded its error in not applying the "control test" by relying on the Bankruptcy Code's definition of "transfer" and fraudulent transfers as including "involuntary" and "indirect transfers." [*Id.* (citing 11 U.S.C. §§ 101(54)(D), 548(a)(1))]. According to the court, "[t]hese definitions leave no doubt that a debtor may own property even if the debtor has no power to prevent some other party from transferring the property." [*Id.*]. The Bankruptcy Court is legally incorrect in its interpretation, and further incorrect in concluding that the Conveying Subsidiaries had a property interest sufficient for the Code requirements because they were co-borrowers on the New Loans. [*Id.* at 156]. The Bankruptcy Court reasoned that "each of the co-borrowers has a property interest in the funds," because if that were not true, then the "property would belong to no one." *Id.* (quoting *United States v. Craft*, 535 U.S. 274, 285 (2002) (internal quotation marks omitted)).[42]

Here, the circumstances of the transactions clearly demonstrate that the Conveying Subsidiaries did not control the funds transferred to TOUSA. The record on appeal establishes without contradiction that the property involved did belong to someone, *i.e.*, TOUSA, who, as the primary borrower, was the only party with actual authority under the New Loan documents to control the loan proceeds' distribution. The New Loans made this clear in specifying that

---

[42] *Craft* is distinguishable because it dealt with whether tenants by the entirety each possess property within the meaning of the federal tax law and does not address or overrule the Eleventh Circuit's "control test." *United States v. Craft*, 535 U.S. 274, 285 (2002).

proceeds were to be used in satisfying the Transeastern Settlement. TOUSA's

Executive Vice President and Chief of Staff confirmed the same:

> Q   Now, is it your understanding that the conveying subsidiaries had
> any control over where the funds that were lent from Citibank
> actually went?
>
> A   No. I mean this was a corporate decision.
>
> Q   And is it also accurate to say that the funds could not have been
> used by the conveying subs for any purpose other than funding
> the settlement? Is that right?
>
> A   No, they had no control over them.
>
> [Bankr. Hr'g Tr. 1711:22–1712:7].

Without dispute, the Conveying Subsidiaries lacked any right to retain the New

Loans in their estates, and clearly the funds were not intended to pay off any

debt of the Conveying Subsidiaries.

The eventual use of the New Loan Proceeds was to repay the earlier

Transeastern Loans incurred by TOUSA and owed as a valid, antecedent debt to

the Transeastern Lenders. The transfer was part of a larger, complicated scheme

involving numerous entities. In this context, there was no payment of funds to the

Conveying Subsidiaries, and they could not use the funds for their own purposes.

The overwhelming evidence was that TOUSA, and not the Conveying

Subsidiaries, controlled the transfer at issue. *See In re Chase & Sanborn*, 813

F.2d at 1182 (finding no control by the debtor under similar circumstances).

Accordingly, I conclude that the funds were not the property of the debtor and the

transfer is not avoidable under a "direct transfer" theory. To conclude otherwise

would confer on the Committee a windfall at the expense of a valid antecedent

lender who was innocent of any intent to diminish the assets of the debtor. *See id.*

In its Appeal Brief, the Committee offered no substantive response to the Transeastern Lenders' position that the Conveying Subsidiaries never had any property interest in the New Loan proceeds, and thus transferred nothing to the Transeastern Lenders. Indeed, the Committee conceded in its brief:

> The Conveying Subsidiaries did not directly receive any of the borrowed funds, as the credit agreements expressly required that the funds be paid out to settle the Transeastern litigation against their parent. Rather than going to the Conveying Subsidiaries, the money was transferred by the lenders to Universal Land Title, Inc. (which is a TOUSA subsidiary, but not one of the Conveying Subsidiaries) which disbursed the funds to the various parties to the settlements.

> [Committee's Br., p. 94 (citing Op., p. 105)].

The Transeastern Lenders claim in their Reply Brief that the Committee has abandoned its first theory of liability. The Appellants state this "retreat" undermines the Bankruptcy Court's adoption of the Committee's position "as if the bankruptcy court's opinion—drafted by the Committee—did not even make such a ruling." [Transeastern Reply Br., p. 1]. At oral argument, the Committee stated that it had not abandoned its argument, although it conceded it did not spend "a lot of time trying to justify [this] alternative ground." [Appeal Hr'g Tr. 92:20–22]. Instead, the Committee urges consideration of its main argument in support of the Bankruptcy Court's ruling that the Transeastern Lenders are the entities "for whose benefit" the Conveying Subsidiaries transferred the Liens to the New Lenders. While I find merit in the Transeastern Lenders' position that the Committee has abandoned its first theory, I need not decide the issue on this basis alone. This is because I already have concluded that the Bankruptcy Court

committed clear error by incorrectly applying the Eleventh Circuit's "control test" to the totality of the circumstances and finding that the Conveying Subsidiaries lacked the requisite property interest in the New Loan proceeds.

However, before turning to the Committee's "for whose benefit" theory of liability, I still must consider the Transeastern Lenders' alternative position that even assuming the Conveying Subsidiaries had an interest in the New Loan proceeds, there is still no Section 548 liability because it is clearly erroneous that the Conveying Subsidiaries did not receive reasonably equivalent value in exchange for the transfer of that interest.   This issue raises substantial arguments which overlap with positions taken by the First and Second Term Lenders on appeal.

> **B.    The Bankruptcy Court Committed Clear Error, and Legally Erred, in Finding No Reasonably Equivalent Value for Any Direct Transfer of the Conveying Subsidiaries' Interest in the New Loan Proceeds to the Transeastern Lenders or in the Transfer of the Liens to the First and Second Lien Holders**

Section 548 of the Bankruptcy Code *excludes* avoidance of any transfers made of an interest of the debtor in property that was incurred on or within two years before the date of the filing of the petition, *if the debtor "received less than a reasonably equivalent value in exchange for such transfer or obligation."* 11 U.S.C. § 548(a)(1)(B)(i)–(ii) (emphasis added). Under Section 548(a)(1), the party alleging a fraudulent transfer bears the burden of proving that the debtor did not receive reasonably equivalent value in exchange for the property transferred and obligations incurred. *See In re Chase & Sanborn Corp.,* 904 F.2d at 593–94 ("The burden of proving lack of 'reasonably equivalent value' under 11

U.S.C.A. § 548(a)(2)(A) rests on the trustee challenging the transfer."). I conclude that the Bankruptcy Court erred in finding that the Committee had met its burden applying both a *de novo* and clear error standard of review.

> **i.** **The Bankruptcy Court Erred by Not Finding Reasonably Equivalent Value When It Found that the Conveying Subsidiaries Had a Property Interest in the Proceeds of the Term Loans, and, Alternatively, by Not Measuring "Reasonable Equivalent Value" Against the Conveying Subsidiaries' So-Called "Minimal Interest" in the Loan Proceeds**

The Bankruptcy Court held that "the Conveying Subsidiaries had a property interest in the loan proceeds . . . but the *value* of that property interest to the Conveying Subsidiaries was *minimal* because they had been forced to enter into a contractual commitment that the borrowed funds would be paid to others, principally the Senior Transeastern Lenders." [Op., p. 159 (emphasis added)]. The Bankruptcy Court further held that "the Conveying Subsidiaries did not receive reasonably equivalent value in exchange for the transfer [and] . . . did not receive either 'property' or the 'satisfaction of securing of a present or antecedent debt *of the debtor*.'" [*Id.* (citing 11 U.S.C. § 548(d)(2)(A)) (emphasis added)]. The Bankruptcy Court then stated:

> Because Plaintiff demonstrated the absence of any direct benefits to the Conveying Subsidiaries, the Senior Transeastern Lenders had the burden of producing evidence that the Conveying Subsidiaries received "indirect" benefits that were tangible and concrete, and to quantify their value with reasonable precision. The Senior Transeastern Lenders failed to produce such evidence. However, regardless of which party had the burden of producing evidence of indirect benefits, the evidence taken as a whole clearly established that there were no significant indirect benefits. . . . [T]he Conveying Subsidiaries did not receive reasonably equivalent value in exchange for the transfer to the Senior Transeasatern Lenders.

> [*Id.* at 159–60].

To begin with, it is difficult to reconcile the Bankruptcy Court's holding that the "Conveying Subsidiaries did not receive any *direct benefits* in exchange for the value they gave up in the July 31 Transaction because they received none of the proceeds of the loans they became obligated to repay," [*Id.* at 105], with the further parallel holding in connection with the Transeastern Claims that the Conveying Subsidiaries actually *did* receive the proceeds of the loans they became obligated to repay. [*Id.* at 155–56]. In particular, observing that the Conveying Subsidiaries were co-borrowers of the Term Loans, the Bankruptcy Court held, "[i]f the funds are lent to co-borrowers (rather than to a single borrower), each of the co-borrowers had a property interest in the funds." [*Id.*]. The Bankruptcy Court further observed that "[t]here can be no serious doubt that if the Conveying Subsidiaries had retained the borrowed funds . . . those funds would have been included within the debtors' estate when the petition was filed." [*Id.* at 155].

Given the Bankruptcy Court's express finding that the "Conveying Subsidiaries had a property interest in the loan proceeds," [*Id.* at 159], it was error to conclude that reasonably equivalent value did not exist as a matter of law. To avoid this result, the Bankruptcy Court reasoned that the "value of that property interest to the Conveying Subsidiaries was *minimal* because they had been *forced* to enter into a contractual commitment that the borrowed funds would be paid to others, principally to the Senior Transeastern Lenders." [*Id.* at 159 (emphasis added)]. But given the finding that there was a property interest, the *use* of the proceeds is irrelevant under the statute. *Beemer v. Heller & Co.* (*In*

*re Holly Hill Med. Ctr., Inc.*), 44 B.R. 253, 256 (Bankr. M.D. Fla. 1984) ("The criterion for whether a debtor received reasonably equivalent value cannot in any instance be whether the debtor used sound judgment in exploiting what it received to the best advantage . . . .  Whether borrowed money is used brilliantly or wasted by the recipient does not inflate or reduce its value from the lender's standpoint . . . .").

Furthermore, the record fails to establish that the Conveying Subsidiaries were "forced" to do anything, in that the Board of Directors of each Conveying Subsidiary—all of which had directors that were not on the TOUSA Parent board—approved the use of the loan proceeds to fund the Transeastern Settlement because they concluded that the settlement was in the best interests of the TOUSA enterprise. As TOUSA's Executive Vice President and Chief of Staff testified during the bench trial:

> Q    Now, in signing those resolutions—we are going to get back to the resolutions themselves—but in signing those resolutions, did you conclude that the transaction was in the best interest of each of those subsidiaries?
>
> A    Yes, I thought the transaction was in the best interest of the company as a whole and each of its subsidiaries.
>
> Q    And you believed that the financing that was associated with the transaction was in the best interest of each of the subsidiaries; is that right?
>
> A    Yes, sir.
>
> Q    And is it your belief that each of the TOUSA subsidiaries benefitted from the transaction?
>
> A    Yes, sir.
>
> [Bankr. Hr'g Tr. 1718:10–1719:22;  *see also  id.*  at 527:1–29:25, 1592:1–25; Trial Exhs. 374–76, 501–31, 2163 (resolutions or consents

approving the July 31 Transaction on behalf of the Conveying Subsidiaries as co-borrowers)].

If the Conveying Subsidiaries did receive a property interest, and a direct benefit from the transfer of the full New Loan proceeds as a result, the analysis need not go further. But assuming that the Bankruptcy Court was correct that the *use* of the proceeds was relevant, it is necessary to next consider whether, as claimed by the Senior Transeastern Lenders, the Bankruptcy Court erred by comparing *the total value of the loan proceeds*—rather than the Conveying Subsidiaries' "minimal" interest therein—to the benefits received by the Conveying Subsidiaries. Specifically, the Bankruptcy Court decided that to the extent the Conveying Subsidiaries received any value at all, it was *minimal* and did not come anywhere near the $403 million of obligations they incurred collectively. [Op., p. 105].

In essence, the Transeastern Lenders argue with merit that if the value of the property interest transferred from the Conveying Subsidiaries to the Transeastern Lenders was "minimal," then the measure of reasonably equivalent value must be whether the Conveying Subsidiaries received "minimal" value in return. This is because reasonably equivalent value must be measured in terms of the value of the *debtors' interest in the property conveyed*. *See Kittay v. Peter D. Leibowits Co., Inc.* (*In re Duke & Benedict, Inc.*), 265 B.R. 524, 531 (Bankr. S.D.N.Y. 2001) (noting that the relevant inquiry for analyzing reasonably equivalent value is not "the value of the property that was conveyed, but the value of the *debtor's interest in the property conveyed*" (emphasis added)). Accordingly, the Transeastern Lenders argue that *the bar, for purposes of*

*"reasonably equivalent value" is lower* as to them than as to the First and Second Lien Lenders because the Transeastern Lenders had received property from the Conveying Subsidiaries that was of "minimal" value. [Appeal Hr'g Tr. 107:19–21 ("You said it exactly right. Wherever their bar is, ours is much lower. That's what we're saying, and so we accept all of their arguments.")]. It follows that if the Transeastern Lenders received valuable property from the Conveying Subsidiaries, then the value of this very same property could not have been deemed "minimal" when it was previously transferred from the New Lenders to the Conveying Subsidiaries as part of the July 31 Transaction.

But even assuming the Bankruptcy Court further erred in not measuring "reasonably equivalent value" correctly as to the Transeastern Lenders (in terms of the transfer of the loan proceeds to the Transeastern Lenders), this does not end the inquiry. This is because the Bankruptcy Court further found the Transeastern Lenders liable for the transfer of the Liens to the New Lenders under Section 550 of the Bankruptcy Code as being the "entity for whose benefit such transfer was made." [Op., p. 151]. Thus, the Transeasatern Lenders still could be liable under Section 550 unless the Conveying Subsidiaries also received "reasonably equivalent value" *in exchange for the transfer of the Liens to the New Lenders*. At oral argument, the Transeastern Lenders acknowledged that, absent other circumstances, Section 550 could be triggered if the Lien Transfer was avoided as to the New Lenders, even if the Transeastern Lenders did not engage in a fraudulent transfer themselves. [Appeal Hr'g Tr. 109:21–23

(Mr. Leblanc: "Your Honor, there are circumstances, to be sure, where you are a direct recipient of a transfer where there still can be liability under 550.")].

Therefore, there is reason to examine the "reasonably equivalent value" issue in depth. Regardless if the bar is lower or is the same as between the Transeastern Lenders and the New Lenders, *if* the Conveying Subsidiaries received a reasonably equivalent value in exchange for each such transfer, there is *no* fraudulent transfer for Section 548 purposes. If there is no fraudulent transfer under Section 548, then the condition precedent to 11 U.S.C. § 550(a) is not met, and the Bankruptcy Court erred for this reason alone in finding the Transeastern Lenders liable for disgorgement under Section 550(a) as "the entity for whose benefit" such transfer (*i.e.*, the transfer of liens or New Loan proceeds) was made. [Appeal Hr'g Tr. 111:10–21 ("[I]f it's determined that the First and Second Lien Holders are not held to have committed a fraudulent transfer under 548 . . . [i]t is completely over for us . . . .")].

Section 550 spells out the condition precedent. It provides: "Except as otherwise provided in this section, *to the extent that a transfer is avoided under section . . . 548 . . . of this title*, the trustee may recover, for the benefit of the estate, the property transferred . . . ." This means that, if the transfer is *not* avoided, the trustee may not recover under Section 550. The Eleventh Circuit made this clear in *IBT International, Inc. v. Northern* (*In re International Administrative Services, Inc.*), 408 F.3d 689, 703 (11th Cir. 2005) when it held:

> *In fraudulent transfer actions, there is a distinction between avoiding the transaction and actually recovering the property or the value thereof.* By its language, 11 U.S.C. § 544(b) indicates that the transaction must first be avoided before a plaintiff can recover under 11 U.S.C. § 550. This demarcation between avoidance and recovery is underscored by § 550(f),

which places a separate statute of limitations on recovery actions; it provides that a suit for recovery must be commenced within one year of the time that a transaction is avoided or by the time the case is closed or dismissed, whichever occurs first.

*Id.* at 703 (internal citations omitted) (emphasis added).

As discussed in detail below, the Bankruptcy Court erred as a matter of law and fact in refusing to recognize as reasonably equivalent value the indirect benefits to the Conveying Subsidiaries from the July 31 Transaction. Thus, I conclude that Section 550 is not triggered as to the Transeastern Lenders.

     **C.**    **The Bankruptcy Court Erred as a Matter of Law and Fact in Refusing To Recognize as Reasonably Equivalent Value the Indirect Benefits to the Conveying Subsidiaries from the July 31 Transaction**

         **i.**    **The Bankruptcy Court's Ruling on Indirect Benefits**

Initially, the Bankruptcy Court found that "the Defendants failed to carry their burden of producing evidence of indirect benefits that were tangible and concrete, and of quantifying the value of those benefits with reasonable precision." [Op., p. 145]. In so ruling, the Bankruptcy Court improperly shifted the burden of proof to the Senior Transeastern Lenders and other Defendants. Under established case law, "the burden of proving lack of 'reasonably equivalent value' under [Section 548(a)(2)(A)] rests on the trustee challenging the transfer." *In re Chase & Sanborn Corp.*, 904 F.2d at 593–94 (citing *Gen. Elec. Credit Corp. v. Murphy* (*In re Duque Rodriguez*), 895 F.2d 725, 726 n.1 (11th Cir. 1990)).

Next, the Bankruptcy Court held that, under the language of Section 548(a)(1)(B)(1), an indirect benefit is cognizable only if three requirements are satisfied. First, the benefit must be received, even if indirectly, by "the debtor,"

*i.e.*, by an individual Conveying Subsidiary. Second, the "value" received must only encompass "property," which is limited to some kind of enforceable entitlement to some tangible or intangible article. Third, property must have been received "in exchange for" the transfer or obligation, such that any "property that a Conveying Subsidiary would have enjoyed regardless of the July 31 Transaction cannot be regarded as property 'in exchange for' the transfer or obligation." [Op., pp. 146–47].

While I conclude that the Bankruptcy Court erroneously disregarded the Appellants' factual and legal arguments concerning the "identity of interest doctrine" in analyzing reasonably equivalent value,[43] I need not reach that issue or resort to conflating all of the TOUSA entities for the purpose of assessing "value," because the record establishes beyond dispute that the Conveying Subsidiaries *themselves*, as compared to only the TOUSA Parent, received

---

[43] The "identity of interest rule" recognizes that "if the debtor and the third party are so related or situated that they share an 'identity of interests,'" then "what benefits one will, in such case, benefit the other to some degree." *Garrett v. Falkner* (*In re Royal Crown Bottlers, Inc.*), 23 B.R. 28, 30 (Bankr. N.D. Ala. 1982). The Bankruptcy Court failed to consider whether the "identity of interest doctrine" applied to this case, or whether such identity of interest existed sufficient to establish reasonably equivalent value. In fact, notwithstanding extensive trial testimony and briefing on the issue, the term "identity of interest" is nowhere to be seen in the Bankruptcy Court's 182-page Opinion. An analysis of whether a parent and subsidiary share an identity of interest is frequently undertaken in cases involving upstream guarantees or financing, which occur when a subsidiary corporation loans its parent money or guarantees its parent's obligations. The identity of interest doctrine recognizes that the facts may suggest that a corporate group has purposely availed itself of the benefits of an enterprise and should be treated as one borrowing unit even though each member of the enterprise is a separate entity. *See Leibowitz v. Parkway Bank & Trust Co.* (*In re Image Woldwide, Ltd.*), 139 F.3d 574, 578 (7th Cir. 1998) ("[C]ourts have loosened the old rule that transfers primarily for the benefit of a third party invariably give no consideration to the transferor. Thus, even when there has been no direct economic benefit to a guarantor, courts performing a fraudulent transfer analysis have been increasingly willing to look at whether a guarantor received indirect benefits from the guarantee if there has been an indirect benefit."); *Telefest, Inc. v. VU-TV, Inc.*, 591 F. Supp. 1368, 1378 (D.N.J. 1984) (holding that a subsidiary received reasonably equivalent value even though it did not receive the proceeds of a loan guaranteed for its parent); *Goveart v. Capital Bank* (*In re Miami Gen.Hosp., Inc.*), 124 B.R. 383, 393 (Bankr. S.D. Fla. 1991). Although this case does not involve "intercorporate guarantees," the July 31 Transaction raises the same kinds of issues because the Conveying Subsidiaries were co-borrowers with the TOUSA Parent on the Term Loans.

indirect economic benefits, constituting reasonably equivalent "value," in exchange for their lien transfers. Accordingly, for purposes of this analysis, I accept the Bankruptcy Court's conclusion that the indirect benefit must be received by *each debtor*. Nonetheless, I conclude that the Bankruptcy Court committed legal error in holding that the "avoidance of default and bankruptcy by the Conveying Subsidiaries" is as a matter of law "not property and therefore is not cognizable as 'value'" under Section 548 of the Bankruptcy Code. [Op., p. 148].[44] This holding—which raises pure questions of law regarding the interpretation of Section 548 of the Bankruptcy Code—is subject to *de novo* review. *See United States v. Andino*, 148 F. App'x 828, 829 (11th Cir. 2005) (reviewing a district court's interpretation of statutory definition contained in criminal statute under *de novo* standard); *Miami Police Relief & Pension Fund of Coral Gables, Ltd. v. Tabas* (*In re Fla. Fund of Coral Gables, Ltd.*), 144 F. App'x 72, 74 (11th Cir. 2005) (holding that the standard of review regarding the meaning of certain portions of the Bankruptcy Code "is properly characterized as a mixed question of law and fact") (citing *Matter of Holloway*, 955 F.2d 1008, 1014 (5th Cir. 1992) (calling the same "ultimately [a] question of law")); *Official Labor Creditors Comm. v. Jet Fla. Sys., Inc.* (*In re Jet Fla. Sys., Inc.*), 80 B.R. 544, 546 (S.D. Fla. 1987) (noting that definition of term under the Bankruptcy Code is subject to *de novo* review).[45]

---

[44] The Bankruptcy Court stated: "To the extent that the Defendants' claims of indirect benefits rest on the avoidance of default and bankruptcy by the Conveying Subsidiaries, those claims are equally flawed. 'Avoiding default' is not 'property' and therefore is not cognizable as "value" under the statute." [Op., p. 148].

[45] The Bankruptcy Court alternatively held that any indirect benefits received, "even if legally cognizable," were actually of little "value (if any)." [*Id.* at 149]. I address this issue separately later in this Opinion under the clear error standard of review.

ii.     **The Bankruptcy Court Erred in Narrowly Limiting the Meaning of "Value" Under the Bankruptcy Code**

The Bankruptcy Code does not define "reasonably equivalent value." Instead, it defines the term "value" for purposes of the fraudulent transfer provision as "property, or satisfaction or securing of a present or antecedent debt of the debtor." 11 U.S.C. § 548(d)(2)(A). In order to determine whether a debtor received "reasonably equivalent value," a court must look at what "value" the debtor received in return for the transfer. *See Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors of R.M.L., Inc.* (*In re R.M.L., Inc.*)*, 92 F.3d 139, 149 (3d Cir. 1996) ("[B]efore determining whether the value was 'reasonably equivalent' to what the debtor gave up, the court must make an express factual determination as to whether the debtor received any value at all."). A court must then determine whether the value received is reasonably equivalent; this will depend on the facts of each case. *See In re Chase & Sanborn Corp.*, 904 F.2d at 593 (addressing guarantee as reasonably equivalent value for loan and noting reasonably equivalent value is largely a question of fact).

The compelling legal error here is that the Bankruptcy Court, citing no case law,[46] relied (in a footnote) on the definition of property in WEBSTER'S DICTIONARY, to conclude that the Conveying Subsidiaries could not have received

---

[46] The Bankruptcy Court also generally cites to the definition of property under Section 541(a) of the Bankruptcy Code and an Eleventh Circuit case interpreting this definition. [*Id.* at 148 n.55]. Neither the general statutory reference nor the citation to Eleventh Circuit authority is helpful. The Eleventh Circuit's decision in *Bracewell v. Kelley* (*In re Bracewell*)*, 454 F.3d 1234 (11th Cir. 2006) addressed only the issue of whether payments that Congress had not yet authorized were "property." This issue has no bearing here. *See generally* 2 DAVID G. EPSTEIN, BANKRUPTCY § 9-49 (1992) ("The courts have made clear that *value* also includes other kinds of intangible consideration that economically benefits the debtor without returning a leviable assets to [its] estate. Common examples are services that the debtor buys and the consideration [it] gets in exchange for a transfer that settles a disputed claim or releases [it] from future obligations.") (emphasis added).

"property" unless they obtained some kind of enforceable entitlement to some tangible or intangible article. [Op., p. 148 n.55]. Based on this dictionary definition of property, the Bankruptcy Court concluded that "avoiding default" and "bankruptcy" does not constitute "property" and, therefore, cannot constitute "value." [Op., p. 148]. The Bankruptcy Court's interpretation and definition of a term in the Bankruptcy Code is subject to *de novo* review. *See Morgan v. United States* (*In re Morgan*), 182 F.3d 775, 777 (11th Cir. 1999) (per curiam) (noting that the interpretation, meaning, and application of Bankruptcy Code are questions of law subject to *de novo* review); *Affordable Bail Bonds, Inc. v. Sandoval* (*In re Sandoval*), 541 F.3d 997, 1000 (10th Cir. 2008) (same); *Gitto v. Worcester Tel. & Gazette Corp.* (*In re Gitto Global Corp.*), 422 F.3d 1, 8 (1st Cir. 2005) (same); *Travelers Prop. Cas. Corp. v. Birmingham-Nashville Express, Inc.* (*In re Birmingham-Nashville, Exp., Inc.*), 224 F.3d 511, 514 (6th Cir. 2000) (same); *In re Lewis*, 199 F.3d 249, 251 (5th Cir. 2000) (same); *Arnold & Baker Farms v. United States* (*In re Arnold & Baker Farms*), 85 F.3d 1415, 1421 (9th Cir. 1996) (same); *In re Jet Fla. Sys., Inc.*, 80 B.R. at 546 (same).

But it is not a dictionary definition that controls. Rather, Congress has left it to the courts to determine the scope and meaning of "reasonably equivalent value." This guidepost has been succinctly addressed in *In re R.M.L., Inc.,* 92 F.3d at 148, where the Third Circuit agreed that "[t]he mere 'opportunity' to receive an economic benefit in the future constitutes 'value' under the Code." The court further explained:

> Accordingly, we turn first to the appropriate method of determining reasonably equivalent value. The concept of reasonably equivalent value unfortunately has not been defined in the Code. As the Supreme Court

66

noted in *BFP v. Resolution Trust Corp.*, "[o]f the three critical terms 'reasonably equivalent value', only the last is defined: 'value' means, for purposes of § 548, 'property, or satisfaction or securing of a . . . debt of the debtor'. . . ." 511 U.S. 531(1994) (quoting 11 U.S.C. § 548(d)(2)(A)). **Thus, "Congress left to the courts the obligation of marking the scope and meaning of [reasonably equivalent value]."** *In re Morris Commc'n NC, Inc.*, 914 F.2d 458, 466 (4th Cir. 1990).

The lack of a more precise definition has led to considerable difficulty. This definitional problem is exacerbated in cases where, as here, the debtor exchanges cash for intangibles, such as services or the opportunity to obtain economic value in the future, the value of which is difficult, if not impossible, to ascertain. Because such intangibles are technically not within § 548(d)(2)(A)'s definition of "value," courts have struggled to develop a workable test for reasonably equivalent value. *See generally In re Young*, 82 F.3d 1407 (8th Cir.1996) (determining whether debtors obtained "value" in exchange for charitable contributions to church); *In re Chomakos*, 69 F.3d 769 (6th Cir.1995) (examining whether debtors obtained "value" in exchange for $7,710 in gambling losses), *cert. denied*, 517 U.S. 1168 (1996); *In re Morris Comm'n NC, Inc.*, 914 F.2d at 458 (attempting to determine "value" of shares in corporation whose only asset was a license application pending before the FCC that had a one in twenty-two chance of approval); *In re Fairchild Aircraft Corp.*, 6 F.3d 1119, 1125–26 (5th Cir.1993) (deciding whether money debtor spent in failed attempt to keep commuter airline afloat conferred "value" on the debtor).

*Id.* at 148 (emphasis added).

In addition, the Bankruptcy Court's narrow dictionary definition of property is contrary to the meaning of the term in the Bankruptcy Code. The legislative history for the Bankruptcy Reform Act of 1978 provides that "[a]lthough 'property' is not construed in [Section 102 of the Code], it is used consistently throughout the Code *in its broadest sense*, including cash, all interests in property, such as liens, *and every kind of consideration* including promises to act or forbear to act as in section 548(d)." Statements by Legislative Leaders, 124 CONG. REC. 11,089 (1978), *reprinted in* 1978 U.S.C.C.A.N. 6439, 6508.[47] The Bankruptcy Court's

---

[47] Under Eleventh Circuit case law, I am prohibited from looking to legislative history unless the statutory language is ambiguous or inconclusive. *See United States v. Mount Sinai Med. Ctr. of Fla., Inc.*, 486 F.3d 1248, 1251–52 (11th Cir. 2007). Here, the section 102 of the statute is inconclusive as to the meaning of the word *property*, but the legislative history sheds light on the use of this term.

narrow definition of "property" is also contrary to Supreme Court precedent holding that "property" is broadly defined to include "all legal or equitable interests of the debtor," and that "[t]he term 'property' has been construed most generously and an interest is not outside its reach because it is *novel or contingent* or because enjoyment must be postponed." *Segal v. Rochelle*, 382 U.S. 375, 379 (1966) (emphasis added); *see also Kokoszka v. Belford*, 417 U.S. 642, 646 (1974) (same); *Perry v. Sindermann*, 408 U.S. 593, 601 (1972) ("'[P]roperty' denotes a broad range of interests that are secured by 'existing rules or understandings.'"); *Lines v. Frederick*, 400 U.S. 18, 19 (1970) (same); *Kapila v. United States* (*In re Taylor*), 386 B.R. 361, 368 (Bankr. S.D. Fla. 2008) (citing *Segal* and noting that "[s]ubsequent Court of Appeals decisions have confirmed the continuing vitality of *Segal* under the Bankruptcy Code").

The Bankruptcy Court's Order is contrary to well-established case law which holds that indirect benefits may take many forms, both tangible and intangible. *See Ministries v. Hayes* (*In re Hannover Corp.*), 310 F.3d 796, 801 (5th Cir. 2002) (holding that the "arc of § 548 easily encompasses as 'value'" an exchange of cash for a right to buy or sell property at a future point in time); *United States v. Crystal Evangelical Free Church* (*In re Young*), 82 F.3d 1407, 1415 (8th Cir. 1996) (holding that district court correctly "did not define 'value' only in terms of tangible property or marketable financial value"), *vacated on other grounds*, 521 U.S. 1114 (1997); *Cordes & Co., LLC v. Mitchell Co., LLC*, 605 F. Supp. 2d 1015, 1022 (N.D. Ill. 2009) ("Indirect benefits can include a wide range of intangibles."); *Creditors' Comm. of Jumer's, Castle Lodge, Inc. v. Jumer*

Therefore, I consider the legislative history to supplement the inconclusive statutory text.

(*In re Jumer's Castle Lodge, Inc.*), 338 B.R. 344, 354 (C.D. Ill. 2006) ("[I]ndirect benefits constitute 'value' and can include a wide range of intangibles such as: corporation's goodwill or increased ability to borrow working capital; the general relationship between affiliates or 'synergy' within a corporate group as a whole; and a corporation's ability to retain an important source of supply or an important customer."); *see also* 5 COLLIER ON BANKRUPTCY ¶ 548.05, at 548-67 (Alan N. Resnick & Henry J. Sommer eds, 16th ed. 2006) ("The nature of the value that is received need not be a tangible, direct economic benefit. An indirect economic benefit can suffice, so long as it is 'fairly concrete.'"); 4 COLLIER ON BANKRUPTCY ¶ 548.09, at 548-111 (Lawrence P. King ed., 15th ed. rev. 1996) ("Whether value has been given for a transfer depends on all the circumstances of the case.").

The Bankruptcy Court's narrow definition of "value" also purports to exclude "economic benefits" from being considered. It stated that "section 548 does not refer to 'benefits,' whether direct or indirect." [Op., p. 147]. While Section 548 does not use the word "benefits," that does not mean that "economic benefits" may not be considered in determining whether the debtor received "value" in a complicated, multiple-party transaction. This conclusion is directly supported by the Eleventh Circuit's clear pronouncement, in *In re Duque Rodriguez*, that Section 548(a)(2) "does not authorize voiding a transfer which confers an *economic benefit upon the debtor, either directly or indirectly*." *In re Duque Rodriguez*, 895 F.2d at 727 (emphasis added) (citing *Rubin v. Mfr. Hanover Trust Co.,* 661 F.2d 979, 991 (2d Cir. 1981)). Quoting from *Rubin,* the Eleventh Circuit recognized that in such a situation, "the debtor's net worth has

been preserved, and the interests of the creditors will not have been injured by the transfer." *Id.* at 726.

Of importance, and contrary to the Bankruptcy Court's legal conclusion, *Rodriguez* recognized, in a three-party transaction, that, among other things, a debtor's reprieve from foreclosure, with the accompanying right to continue its operations, *could* confer an indirect "economic benefit." *Id.* at 728 ("Only if Domino [the debtor] shared in the enjoyment of either of these benefits can the payments have conferred an 'economic benefit' upon Domino such that its net worth was preserved by the payment.") (citing *Rubin*, 661 F.2d at 987).[48]

As recognized in *Rubin*, and addressed on a limited basis in *Rodriguez,* "three-sided transactions such as those at issue here present special difficulties." *Rubin,* 661 F.2d at 991. The standard laid down by the Second Circuit in *Rubin* when dealing with such indirect benefit cases is that the consideration given to the third person must ultimately land in the debtor's hands or otherwise confer an economic benefit upon the debtor—provided that the value of the benefit received by the debtor approximates the value of the property transferred by the debtor. *Id.* at 991–92.

---

[48]  Under the facts of *Rodriguez*, the Eleventh Circuit concluded that, absent the piercing of the corporate veil, the debtor was not liable for the Parent's corporate debt and, therefore, did not benefit from the reducing of that debt. While *Rodriguez* considered the "reasonably equivalent value" standard under Section 548(a)(2), the Eleventh Circuit concluded that decisions applying the relevant section of the Bankruptcy Act of 1898, using the term "fair consideration," have been adopted as applicable to the 1978 Bankruptcy Reform Act. *Rodriguez*, 895 F.2d at 727 n.2. In creating the "indirect benefit rule," the Second Circuit in *Rubin* specifically noted that an indirect benefit constitutes "fair consideration." *Rubin*, 661 F.2d at 991–92; *see also* 4 Collier on Bankruptcy ¶ 548.09, at 548-112, 548-113, 548-117 & n.16 (Lawrence P. King ed., 15th ed. 1996) ("When the consideration is difficult to measure precisely, the courts have not been too exacting in applying the criterion of 'fair consideration.' . . . Settlement of a suit can be fair consideration. . . . Cancellation of future indebtedness . . . has been held correctly to be a good and valuable consideration for a transfer.").

In *Rubin*, the bankruptcy trustee of two debtor corporations sought to recover as a fraudulent transfer under § 67d of the Bankruptcy Act certain funds and securities pledged to secure loans made to affiliates of the debtor corporations. *Id.* at 980–81. The general rule regarding transfers by a bankrupt for the benefit of a third party was stated by the Second Circuit in that case as follows:

> Accordingly, courts have long recognized that "[t]ransfers made to benefit third parties are clearly not made for a 'fair' consideration," and, similarly, that "a conveyance by a corporation for the benefit of an affiliate [should not] be regarded as given for fair consideration as to the creditors of the conveying corporations." 4 COLLIER ON BANKRUPTCY ¶ 67.33, at 514.1-514.2 (14th ed. 1978) (citing cases).
>
> *Rubin*, 661 F.2d at 991.

Yet, there is a well-recognized exception to the general rule:

> The cases recognize, however, that a debtor may sometimes receive "fair" consideration even though the consideration given for his property or obligation goes initially to a third person. As we have recently stated, although "transfers solely for the benefit of third parties do not furnish fair consideration" under § 67(d)(1)(e), the transaction's benefit to the debtor "need not be direct; it may come indirectly through benefit to a third person."
>
> *Id.* (citing *Klein v. Tabatchnick*, 610 F.2d 1043, 1047 (2d Cir.1979); *accord Williams v. Twin City Co.*, 251 F.2d 678, 681 (9th Cir.1958); *McNellis v. Raymond*, 287 F. Supp. 232, 238–39 (N.D.N.Y.1968), *aff'd in relevant part*, 420 F.2d 51 (2d Cir.1970)).

The Eleventh Circuit has not yet had the opportunity to consider the application of the "reasonably equivalent value" test to the intricacies and complexities of the factual circumstances like the July 31 Transaction at issue. Nonetheless, other circuits, such as the Third Circuit, have rejected the notion that a debtor must receive a direct, tangible economic benefit in order to receive "value" for purposes of Section 548(a)(2). In two opinions, the Third Circuit

reconfirmed that indirect potential, *intangible* benefits, although incapable of precise measurement and quantification, can confer "value" for purposes of Section 548(a)(2) of the Code. *See Mellon Bank, N.A. v. Metro Commc'n, Inc.,* 945 F.2d 635 (3d Cir. 1991), *cert. denied,* 503 U.S. 937 (1992); *see also In re R.M.L., Inc.*, 92 F.3d at 151 ("Significantly, the court in *Metro Communications, Inc.,* went on to discover several potential, intangible benefits, that, although incapable of precise measurement, conferred value on Metro despite their failure to materialize.").

Likewise, the Seventh Circuit, in *Leibowitz v. Parkway Bank & Trust Co.* (*In Re Image Worldwide, Ltd.*)*,* 239 F.3d 574 (7th Cir. 1998), applied a similar analysis in a comparable case involving an "upstream" guarantee, where a subsidiary guarantees the debt of its parent. The Seventh Circuit recognized that requiring a direct flow of capital to a cross-guarantor subsidiary (or, such as in this case, Conveying Subsidiary co-borrowers) to avoid a finding of a fraudulent transfer, may well be inhibitory of contemporary financing practices, and that often such guarantees (or co-borrowing practices) are legitimate business transactions, and are not made to frustrate creditors. *See id.* at 578. Under such circumstances, courts performing a fraudulent transfer analysis have been increasingly willing to look at whether a guarantor, or co-borrower transferor, received indirect benefits from the transfer or obligation. As noted by the Seventh Circuit:

> However, requiring a direct flow of capital to a cross-guarantor to avoid a finding of a fraudulent transfer is inhibitory of contemporary financing practices, which recognize that cross-guarantees are often needed because of the unequal abilities of interrelated corporate entities to collateralize loans. Often, these guarantees are legitimate business

transactions, and not made to frustrate creditors. In recognition of this economic reality, courts have loosened the old rule that transfers primarily for the benefit of a third party invariably give no consideration to the transferor. Thus, even when there has been no direct economic benefit to a guarantor, courts performing a fraudulent transfer analysis have been increasingly willing to look at whether a guarantor received indirect benefits from the guarantee if there has been an indirect benefit. [O]ne theme permeates the authorities upholding guaranty obligations: that the guaranty at issue was the result of arm's length negotiations at a time when the common enterprise was commercially viable.

Generally, a court will not recognize an indirect benefit unless it is fairly concrete. The most straightforward indirect benefit is when the guarantor receives from the debtor some of the consideration paid to it. But courts have found other economic benefits to qualify as indirect benefits. For example, in *Mellon Bank, N.A. v. Metro Communications, Inc.*, the court found reasonably equivalent value for a debtor corporation's guarantee of an affiliate's debt when the loan strengthened the corporate group as a whole, so that the guarantor corporation would benefit from synergy within the corporate group. The Mellon court stated that indirect benefits included intangibles such as goodwill and an increased ability to borrow working capital. *Telefest* indicated that indirect benefits to a guarantor exist when the transaction of which the guaranty is a part may safeguard an important source of supply, or an important customer for the guarantor. Or substantial indirect benefits may result from the general relationship between affiliates. In *Xonics*, we recognized the ability of a smaller company to use the distribution system of a larger affiliate as an indirect benefit as well.

*Id*. at 578–79 (internal citations and quotation marks omitted).

Contrary to the Bankruptcy Court's legal conclusion, the weight of authority supports the view that indirect, intangible, economic benefits, including the opportunity to avoid default, to facilitate the enterprise's rehabilitation, and to avoid bankruptcy, even if it provided to be short lived, may be considered in determining reasonable equivalent value. An expectation, such as in this case, that a settlement which would avoid default and produce a strong synergy for the enterprise, would suffice to confer "value" so long as that expectation was legitimate and reasonable. The touchstone is whether the transaction conferred

*reasonable* commercial value on the debtor. Again, resort to *In re R.M.L., Inc.*, is

helpful in formulating the correct legal analysis:

> The question, then, is how to determine whether an investment that failed to generate a positive return nevertheless conferred value on the debtor. We think our decision in *Metro Communications, Inc.* answers this question implicitly. *We held there that the mere expectation that the fusion of two companies would produce a strong synergy (an expectation that turned out to be inaccurate in hindsight) would suffice to confer "value" so long as the expectation was "legitimate and reasonable." Thus, so long as there is some chance that a contemplated investment will generate a positive return at the time of the disputed transfer, we will find that value has been conferred.*
>
> * * *
>
> *We think our analysis appropriately balances a creditor's interest in estate preservation against a debtor's legitimate, pre-bankruptcy efforts to take risks that, if successful, could generate significant value and, possibly, avoid the need for protection under the Code altogether.* As we noted above, requiring that all investments yield a positive return in order to find that they conferred value on the debtor would be unduly restrictive. But so, too, would a rule insulating from § 548's coverage investments that, when made, have zero probability of success. *The best solution, therefore, is to determine, based on the circumstances that existed at the time the investment was contemplated, whether there was any chance that the investment would generate a positive return. In this way creditors will be protected when an irresponsible debtor invests in a venture that is obviously doomed from the outset.*
>
> *In re R.M.L., Inc.*, 92 F.3d at 152 (emphasis added) (internal citations omitted).

What is key in determining reasonable equivalency then is whether, in

exchange for the transfer, the debtor received in return the continued opportunity

to financially survive, where, without the transfer, its financial demise would been

all but certain. Where such indirect economic benefits are provided, *"the debtors'*

*net worth has been preserved, and the interests of the creditors will not have*

*been injured by the transfer." Kipperman v. Onex Corp.*, 411 B.R. 805, 837 (N.D.

Ga. 2009) (citing *In re Rodriguez*, 895 F.2d at 727) (emphasis added). Significant

other authority supports such an analysis. *See Rubin*, 661 F.2d at 993 (collateral benefits of debtor's guarantees of loans to affiliated corporation might support finding of fair consideration); *Williams v. Twin City Co.,* 251 F.2d 678, 681 (9th Cir. 1958) ("Consideration can run to a third party, so long as it is given in exchange for the promise sought to be enforced. This was done here. There was indirect benefit to Elliff by giving him a further chance to avoid bankruptcy—further time."); *see also Gereon v. Palladin Overseas Fund, Ltd.* (*In re AppliedTheory Corp.*), 330 B.R. 362, 364 (S.D.N.Y. 2005) (holding that financing that provided debtor the ability to avoid bankruptcy, even if it "proved to be short-lived," provides reasonable equivalent value); *Whitaker v. Mortg. Miracles, Inc.* (*In re Summit Place, LLC*)*,* 298 B.R. 62, 73 (Bankr. W.D.N.C. 2002) ("Summit Place received 'reasonably equivalent value' because part of the 'value' it received was the avoidance of foreclosure and the chance to survive until it had an opportunity to refinance its project. As noted above, that chance had substantial value to the debtor and creditors because it represented the difference between immediately losing nearly a half-million dollars in equity through foreclosure and in having a chance to refinance and complete the project. The court finds that based on all the circumstances surrounding the transaction, the transfer was not in exchange for less than reasonably equivalent value."); *Jones v. Williams* (*In re McDonald*), 265 B.R. 632, 637 (Bankr. M.D. Fla. 2001) (finding economic benefit where transaction "secur[ed] a future opportunity for Debtor to enhance his net worth and *possibly* escape from insolvency" (emphasis added)) (citing *Official Comm. of Unsecured Creditors v. Florida* (*In re*

*Tower Envtl., Inc.*)*, 260 B.R. 213, 226–27 (Bankr. M.D. Fla. 1998)); *Pembroke Dev. Corp. v. Commonwealth Sav. & Loan Ass'n* (*In re Pembroke Dev. Corp.*)*, 124 B.R. 398, 400–01 (Bankr. S.D. Fla. 1991) ("This Court recognizes that an indirect benefit to the transferor may be sufficient to establish reasonably equivalent value where the debtor and third party 'are so related or situated that they share an identity of interests because what benefits one will, in such case benefit the other to some degree.' Therefore, the creditor's forebearing of foreclosure on its loan with Pembroke Charter Corporation indirectly benefitted the debtor since it was liable as a guarantor on the loan.") (citations omitted); *Holly Hill*, 44 B.R. at 254–55 (interest payments made by debtor on loan to affiliated corporation were supported by a reasonably equivalent value when affiliate voluntarily used the loan to advance the debtor's operations); *In re Jones*, 37 B.R. 969, 975 (Bankr. N.D. Tex. 1984) (trickle-down benefits to debtor-guarantor from loan made to affiliated corporation constituted a reasonably equivalent value).

Having concluded that the Bankruptcy Court erred in its legal definition of value, and in its determination that the Conveying Subsidiaries did not receive value in the transaction, the Bankruptcy Court further legally erred by not considering the "totality of the circumstances" in measuring reasonable equivalency. This test, as adopted by the Third Circuit in *In re R.M.L., Inc.*, has been applied in this Circuit by U.S. District Courts and U.S. Bankruptcy Courts in Florida. *See Wiand v. Waxenberg*, 611 F. Supp. 2d 1299, (M.D. Fla. 2009) ("In assessing whether value was given, the totality of the circumstances are

examined . . . ."); *Goldberg v. Chong*, Case No. 07-20931, 2007 WL 2028792 (S.D. Fla. July 11, 2007);[49] *Cuthill v. Kime* (*In re Evergreen Sec., Ltd.*), 319 B.R. 245, 253 (Bankr. M.D. Fla. 2003) (citing *In re R.M.L.* as establishing the test for determining if reasonably equivalent value was provided); *In re Tower Envtl. Inc.*, 260 B.R. at 226 ("As set forth by the Third Circuit Court of Appeals, this second step of the two-step analysis [for measuring reasonably equivalency] requires application of the 'totality of circumstances' test.").

The totality of the circumstances test is not strictly a mathematical formula. Courts have generally considered three factors: (1) whether the transaction was at arm's length, (2) whether the transferee acted in good faith, and (3) the degree

---

[49]

As relevant here, the District Judge in *Goldberg* concluded as follows:

> The Court engages in a two-part inquiry to determine whether reasonably equivalent value was provided in a transfer. *Tower Envtl., Inc.*, 260 B.R. at 225 (citing *In re R.M.L.*, Inc., 92 F.3d 139, 148 (3d Cir.1996)). "First, was any value received by the debtor in exchange for the transfer. . . . Second, if value was given, was the value given reasonably equivalent of the funds transferred." *In re Evergreen Sec., Ltd.*, 319 B.R. 245, 253 (Bankr. M.D. Fla. 2003) (citing *Tower Envtl., Inc.*, 260 B.R. at 225). "[V]alue must be assessed on a 'case by case basis' by looking at the surrounding circumstances and by focusing on the precise nature of the transfer." *Id.* Finally, the Eleventh Circuit has counseled that "a determination of whether value was given under Section 548 should focus on the value of the goods and services provided rather than on the impact the goods and services had on the bankrupt enterprise." *In re Fin. Federated Title & Trust, Inc.*, 309 F.3d 1325, 1332 (11th Cir. 2002).
>
> With respect to the first prong, the inquiry is whether the debtor obtained "any benefit" without regard to the cost of services, the nature of the transaction or the good faith of the transferee. *Tower Envtl., Inc.*, 260 B.R. at 225. This determination involves whether the debtor received any "realizable commercial value" as a result of the transaction. *Id.* (citing *R.M.L., Inc.*, 92 F.3d at 149). If it is determined that value was in fact conferred, the Court must undertake the second prong by determining whether the value was reasonably equivalent to the transferred funds. In making this determination, the Court applies a "totality of the circumstances" test. *Id.* That test includes a consideration of factors including "the fair market value of the item or service received compared to the price paid, the arms-length nature of the transaction, and the good faith of the transferee.

*Goldberg v. Chong,* Case No. 07-20931, 2007 WL 2028792, at * 5 (S.D. Fla. July 11, 2007).

of difference between the fair market value of the assets transferred and the price paid. *In re R.M.L.*, 92 F.3d at 145. Certainly, the fact that a transaction occurred at arm's length is one considerable factor in the determination. But a court "must examine all aspects of the transaction to measure carefully the value of the benefits received by the plaintiff." *BCPM Liquidating LLC v. PricewaterhouseCoopers LLP* (*In re BCP Mgmt.*), 320 B.R. 265, 280 (Bankr. D. Del. 2005) (citing *Mellon Bank*, 92 F.3d at 154).

Admittedly, this can be a difficult task. But, to paraphrase the Eleventh Circuit's inquiry in *Rodriguez,* the decisive inquiry can be simplified to whether, based on the totality of the circumstances at the time of the transfer, the result was to preserve the debtor's net worth by conferring realizable commercial value on the debtor. Otherwise stated, *but for the transfer,* was there a realistic risk that the Conveying Subsidiaries and the enterprise would not financially continue to survive?

While such an analysis is often fact intensive, and significant deference is to be accorded on appeal to the Bankruptcy Court's findings, no such deference is warranted here given the undisputed record as supported by the underlying legal documents. Here, the Conveying Subsidiaries themselves, unlike the debtor in *Rodriguez*, had a vital stake in the Transeastern Settlement as a result of their own guarantees on the Revolver and bond debt. The Conveying Subsidiaries' very existence was contractually tied through their pre-existing guarantees to the outcome of the claims in the Transeastern Litigation against the TOUSA parent which had guaranteed the debt. Without dispute in the record, an adverse

judgment in excess of $10 million against the TOUSA parent would have caused it to be in default under both the Bond Debt and the Revolver. At least $421 million in hard money was owed to the Transeastern Lenders, which had to be paid back, and which was subject to adverse judgment,[50] while the remaining litigation fight was over the Transeastern Lenders' additional damage claims of over $2 billion under the Carve Out and Completion Guarantees. [Appeal Hr'g Tr. 19:11–15].[51] Not only had the Transeastern Lenders' New York action survived a motion to dismiss, but the record overwhelmingly established, and it was acknowledged at oral argument, that an adverse judgment in the Transeastern Litigation was virtually certain for the monies actually borrowed—being far in excess of $10 million. [Trial Exhs. 3094–98].[52]

Such default by virtue of an adverse judgement, and any filing of bankruptcy by the TOUSA parent, would have triggered the Conveying Subsidiaries' guarantees to both the bond creditors and the Revolver lenders.

---

[50] As noted at oral argument: "Mr. Leblanc: In addition to that, there was no dispute in this litigation [meaning before the bankruptcy court] that the amount paid by TOUSA to the Transeastern lenders were, in fact, owed. That is not a subject of dispute here. Nobody has contended that the guarantees weren't valid obligations of TOUSA that arose to at least the level that was paid . . . ." [Appeal Hr'g Tr. 20:22–21:2].

[51] As noted at oral argument: "Mr. Leblanc: And just to be clear, the fear of the parent was that the judgment against it would be far in excess of what it paid ultimately to resolve the Transeastern litigation." [*Id.* at 21:11–21:14].

[52] The Committee argues without merit that the July 31 Transaction did not have material value to the Conveying Subsidiaries because an adverse judgement in the Transeastern Litigation (and the defaults that such a judgment would trigger) was not "imminent." [Committee's Br., pp. 119–20]. The record establishes without contradiction that a judgment in excess of $10 million dollars was virtually assured because much more than that amount was actually owed on a valid antecedent debt. The record establishes without contradiction that the TOUSA parent, through its management, was advised by its expert advisers and attorneys that there was a substantial risk of an adverse judgment, that a more favorable settlement of the Transeastern Litigation was not possible, and that "time was of the essence." *See supra*, Section II.C.

Thus, eliminating the threat of these claims against the Conveying Subsidiaries' parent, and indirectly against each of them, constituted an enormous economic benefit to these subsidiaries in terms of their viability as going concerns and their continued access to financing through the TOUSA parent, which, in turn, allowed them, for a period of time, to continue to pay interest to the bondholders, the very creditors at issue. The fact that TOUSA was in distress or that the July 31 Transaction did not negate all significant risks to the enterprise, and assure long-term viability for either the TOUSA parent or the Conveying Subsidiaries, is not controlling. As the case law supports, it is enough that the July 31 Transaction left the Conveying Subsidiaries in a better position to remain as going concerns than they would have been without the settlement.

Reduced to its essence, besides the evidence of the integrated nature of TOUSA's business, and the reliance of the various TOUSA affiliates on each other, the underlying documents in evidence and the testimony presented at trial overwhelming established, and the Bankruptcy Court clearly and erroneously ignored, that an adverse judgment in the Transeasatern Litigation would have resulted in: (1) TOUSA and the Conveying Subsidiaries having to file for bankruptcy which, in turn, raised major concerns about the whole enterprise's ability to continue operating as a going concern and reorganize under Chapter 11 protection; (2) the consequent disappearance of the Conveying Subsidiaries' existing source of financing, the Revolver; and (3) under the terms of the bond debt and the Revolver loan agreements, which the Conveying Subsidiaries guaranteed, the Conveying Subsidiaries becoming liable for more than $1 billion

in obligations enforceable against them directly by the Revolver Lenders and the holders of the TOUSA bond debt. [*See* Background, Sections on Bonds, Revolver, and Transeastern Litigation].

The totality of these circumstances, as patently ignored by the Bankruptcy Court in its virtually *verbatim* adoption of the Committee's proposed findings of fact, established a direct link between the financial net worth of the Conveying Subsidiaries and the fate of the TOUSA parent. A review of the documents regarding TOUSA's funding practices establishes this direct link. In particular, under the legally binding default and guarantee provisions in the TOUSA bond debt and the Revolver agreements and amendments, the Conveying Subsidiaries were both guarantors and co-borrowers of over a billion dollars worth of corporate debt. The Conveying Subsidiaries' dependence on the viability of the TOUSA enterprise as a whole is especially evidenced by the Conveying Subsidiaries' reliance on the Revolver as their primary source of liquidity. As is clear from the structure and language of the Revolver agreements and their amendments, the credit facility was in place for the benefit of and at the expense of *the entire TOUSA network*. Not only were the Conveying Subsidiaries dependent on TOUSA, the parent, to request funding for each "borrowing procedure," but their global borrowing "cap" was also expressly determined by the "Borrowing Base," which was calculated using *all assets of the TOUSA enterprise*.

This "Borrowing Base" was also increased by the acquisition of assets from the Transeastern JV as part of the Transeastern Settlement. As described

in Section II.D of the background facts above, the liquidated Transeastern assets resulted in proceeds that went into a centralized cash management system available for all subsidiaries. TOUSA's former Executive Vice President and CFO believed that these acquisitions increased the Revolver "Borrowing Base" by $150 million, which was especially valuable to the Conveying Subsidiaries at that time because they relied so heavily on the Revolver and could not have obtained independent financing. [Bankr. Hr'g Tr. 545:9–547:1; Trial Exh. 362, p. 7]. Similarly, the Transeastern Settlement provided TOUSA and the Conveying Subsidiaries with the right to future tax benefits totaling approximately $74.8 million. [Trial Exh. 5404 ¶ 40; Trial Exh. 3000, p. 147]. As with all TOUSA receipts, those funds were expected to be placed into the TOUSA centralized cash management system, on which all TOUSA subsidiaries could draw. [Bankr. Hr'g Tr. 1675:17–21].

In addition, and as established by the bond Prospectuses that were not even considered by the Bankruptcy Court, the same unsecured creditors that make up the Committee in this proceeding were given notice when they decided to invest in TOUSA as far back as 2002 that the corporate structure consisted of a *highly integrated and consolidated enterprise*. Based on the information provided in the Prospectuses, these bondholders directly relied on the integrated nature of the company to repay interest on the bond debt owed to them by TOUSA and guaranteed by the Conveying Subsidiaries. The Prospectuses directly told the Committee's unsecured creditors that TOUSA's ability to service the debt was dependent upon the cash flow of the Conveying Subsidiaries,

which, in turn, depended upon the continued funding from the Revolver loans disbursed to the Conveying Subsidiaries by the TOUSA parent. [Appeal Hr'g Tr. 13:24–16:25; Trial Exh. 3296, p. 18].

Because such legally binding obligations directly tied the fate of the Conveying Subsidiaries to the outcome of the Transeastern Litigation, the resolution of the Transeastern Litigation as part of the July 31 Transaction conferred reasonably equivalent economic benefits on the Conveying Subsidiaries that fit squarely within the case law (a) recognizing that cross-stream guarantees may provide reasonably equivalent value "when the transaction strengthens the viability of the corporate group," *In re Image Worldwide,* 139 F.3d at 581, and (b) recognizing that the "opportunity" to facilitate its rehabilitation, and to avoid default and bankruptcy, including even if "this 'breathing room' may have ultimately proved to be short-lived," *In re AppliedTheory Corp.,* 330 B.R. at 364.

By virtue of the Transeastern Settlement, the Conveying Subsidiaries' "net worth" was preserved and imminent default was avoided, thereby preserving, at that point of time, the interests of the Committee's unsecured creditors by allowing the enterprise to continue to meet its bond interest obligations and Revolver loan payments. As such, additional Revolver payments were paid out in excess of $65 million following the Transeastern Settlement, that allowed the enterprise's business to continue until the real estate industry totally collapsed later that year in a manner that was not foreseen at the time of the settlement.

Under such circumstances, no further proof of "quantification" was required to establish reasonably equivalent value, and the Bankruptcy Court further erred as a matter of law in requiring the same.[53] Even the Committee concedes in its brief that "courts *sometimes can,* without precise mathematical quantification, decide that particular facts and circumstances show that a debtor received reasonably equivalent value." [Committee's Br., p. 109 (emphasis in original)]. Thus, a *per se* rule, as applied by the Bankruptcy Court, that indirect benefits must be mathematically quantified is error. [Op., p. 144 ("The burden on Defendants includes a requirement to show that the 'indirect benefits' were tangible and concrete, and to *quantify their value with reasonable precision*.") (emphasis added)]. As noted above, this is exactly the kind of case, as supported by applicable case law, that shows that a debtor's opportunity to avoid default, to facilitate its rehabilitation, and to improve its prospects of avoiding bankruptcy are precisely the kind of benefits that, by definition, are not susceptible to exact quantification but are nonetheless legally cognizable under Section 548.

---

[53] The Bankruptcy Court further committed clear and prejudicial error by repeatedly sustaining the Committee's hearsay objections to testimony elicited by the Transeastern Lenders and other Appellants to the testimony elicited by them from Paul Berkowitz, Executive Vice President and Chief of Staff of TOUSA, and an officer of many of the Conveying Subsidiaries, regarding the negative effects of the Transeastern Litigation on the Conveying Subsidiaries and the benefits received by the Conveying Subsidiaries in the Transeastern Settlement. [*E.g.*, Bankr. Hr'g Tr. 1588:19–22; 1590:23–1591:10; 1633:24–1637:11 (Mr. Berkowitz's testimony as to his position in TOUSA and his signatory authority for the Conveying Subsidiaries and the Bankruptcy Court's decision to sustain objections regarding his testimony)]. Mr. Berkowitz was uniquely qualified to offer such testimony. His testimony was directly supported by relevant resolutions or consents of the Conveying Subsidiaries approving the July 31 Transaction as co-borrowers and concluding that the Transaction was in the best interest of, and benefitted, each Subsidiary. [Trial. Exhs. 374–76, 501–31, 2163]. As such, his testimony was admissible under FED. R. EVID. 801(d)(2)(D) as statements by an agent or officer of the Conveying Subsidiaries who were the real parties to the avoidance action. The Committee merely acted on their behalf in prosecuting the action. [Bankr. ECF No. 243, p. 4 (Third Amended Complaint)]. If allowed, Mr. Berkowitz's testimony would have directly corroborated and strongly supported that the Conveying Subsidiaries did, in fact, receive substantial indirect benefits from TOUSA's payment of the New Loan proceeds to the Transeastern Lenders.

Inherently, these benefits have immense economic value that ensure the debtor's net worth has been preserved, and, based on the entirety of this record, were not disproportionate between what was given up and what was received. While scenarios of "massive disparities" can be envisioned, this is not what happened here.

In fact, much of what the Bankruptcy Court did was to review the transactions at issue through the lens of retrospection to point out that bankruptcy ultimately was not avoided. But whether a debtor received reasonable equivalent value must be evaluated as of the date of the transaction. *Corporation Liquidation Trust v. Chang* (*In re Joy Recovery Tech. Corp.*), 286 B.R. 54, 75 (Bankr. N.D. Ill. 2002) ("Courts will not look with hindsight at a transaction because such an approach could transform fraudulent conveyance law into an insurance policy for creditors."); *see also Cooper v. Ashley Commc'n, Inc.* (*In re Morris Commc'n, NC, Inc.*), 914 F.2d 458, 466 (4th Cir. 1990) ("Neither subsequent depreciation in nor appreciation in value of the consideration affects the value question whether reasonable equivalent value was given."). This point is well-articulated in *In re R.M.L., Inc.,* 92 F.3d at 152, which rejected a "hindsight" test. In doing so, the Court stated:

> Furthermore, were we literally to apply the highlighted statement from *Metro Communications, Inc.* as the categorical test for value under § 548(a)(2), we would announce a rule for this Circuit that only successful investments can confer value on a debtor. This would permit a court viewing the events with the benefit of hindsight to conclude that any transfer that did not bring in the actual, economic equivalent of what was given up fails to confer reasonably equivalent value as a matter of law. Such an unduly restrictive approach to reasonably equivalent value has been soundly rejected by other courts, and with good reason. Presumably the creditors whom § 548 was designed to protect want a debtor to take

> some risks that could generate value and, thus, allow it to meet its obligations without resort to protection under the Bankruptcy Code . . . .
>
> *Id.* at 151 (citing *Chomakos*, 69 F.3d at 771 (gambling losses conferred value on debtor); *Fairchild Aircraft Corp.*, 6 F.3d at 1119 (money spent in failed attempt to keep commuter airline afloat conferred value on debtor)).

In sum, the Bankruptcy Court's holding that the Conveying Subsidiaries did not receive reasonably equivalent value in the July 31 Transaction is a clearly erroneous holding that must be reversed. Further, due to the overwhelming evidence of indirect benefits to the Conveying Subsidiaries that directly linked their own survival as a going concern to that of TOUSA, reversal without remand is appropriate. *Media Servs. Grp., Inc.,* 237 F.3d at 1330 (reversing judgment without remand because "the record permit[ted] only one resolution of the factual issue") (quoting *Pullman-Standard*, 456 U.S. at 292).

In addition, reversal is further supported by additional and significant factual errors made by the Bankruptcy Court, as included in the Committee's virtual *verbatim* adopted findings, which undermine the Bankruptcy Court's factual and legal conclusions. [*See* Transeastern Reply Br., p. 65 ("This was not a routine adoption of a two-page order on a motion after a hearing. What the bankruptcy court did here was to adopt, uncritically and near verbatim, a 182-page Proposed Opinion that was simultaneously submitted with the proposed conclusions of law and findings of fact of three separate groups of defendants, without any apparent regard for the submissions of any party other than the Committee.")]. These errors are discussed below.

**D.    The Bankruptcy Court Committed Clear Error in Finding that the Indirect Benefits to the Conveying Subsidiaries Had Little or No Value**

The most valuable indirect benefit received by the Conveying Subsidiaries is that their participation in the July 31 Transaction, which financed the settlement of the Transeastern Litigation, prevented a default by the Conveying Subsidiaries on $1.06 billion dollars of bond debt (plus the triggering of their Revolver guarantees) for which a vast majority of the Conveying Subsidiaries were jointly and severally liable. The overwhelming evidence at trial showed that the viability of the entire TOUSA enterprise, including the Conveying Subsidiaries, was threatened by the Transeastern Litigation. The evidence established that a judgment of just $10 million, which no one disputed was imminent in that litigation, would have triggered default on more than $1 billion of TOUSA bond debt (from six different bond offerings) and on hundreds of millions of dollars of secured Revolver debt. The Conveying Subsidiaries were jointly and severally liable to pay the entirety of this debt upon a default. Moreover, the Revolver was a critical liquidity source for the Conveying Subsidiaries, who relied on the Revolver to meet working capital needs and to finance home construction. In the face of such defaults, the Conveying Subsidiaries would have needed to line up hundreds of millions of dollars in alternative financing and negotiated forebearance and subordination agreements with the six different groups of bond lenders as well as the secured Revolver lenders.

Given these circumstances, and anticipating that its definition of "value," may well be legally at issue, the Bankruptcy Court's holding on "reasonably

equivalent value" turned on its alternative holding that these indirect benefits, "even if legally cognizable" were actually of little "value (if any)." [Op., p. 149]. The Bankruptcy Court reasoned that,

> even assuming the Transaction did prevent (or postpone) a TOUSA Parent bankruptcy, it still conferred no substantial benefits on the Conveying Subsidiaries because . . . Tousa, Inc.[']s bankruptcy would not *necessarily have caused* the Conveying Subsidiaries to declare bankruptcy, [and even if an adverse result in the Transeastern Litigation resulted in a default on the Bond Debt triggering the Conveying Subsidiaries guarantees, the] Conveying Subsidiaries *could have* come to an accord with the bondholders *possibly* obtaining their own financing to refinance the bonds, which would have allowed them to continue as going concerns despite the default.

> [*Id.* at 109 (emphasis added)].

In short, the Bankruptcy Court took the view that because disastrous harm to the Conveying Subsidiaries was "not necessarily" inevitable but "could" at least "possibly" be averted, the Conveying Subsidiaries received no material benefit at all.

The Bankruptcy Court's conclusions about the Conveying Subsidiaries' ability to survive as standalone entities is reversible clear error. These findings were contrary to the overwhelming weight of the evidence at trial to the contrary,[54] and were in direct conflict with its parallel finding that the Conveying Subsidiaries were *insolvent as of July 31, 2007*. [*Id.* at 130]. If, as found by the Bankruptcy Court, the Conveying Subsidiaries were insolvent, there is nothing of record which in any way could support that the same entities could have

---

[54]

 *See, e.g.*, Bankr. Hr'g Tr. 1877:5–18 (confirming that the Conveying Subsidiaries "absolutely [could] not" obtain their own financing). This followed from the fact that: (a) the Conveying Subsidiaries' assets were already pledged to secure up to $800 million of existing Revolver debt; (b) none of the Conveying Subsidiaries had its own audited financial statements as a predicate to obtain independent financing, and © the TOUSA intercompany accounts were an irreconcilable "pile of tangled spaghetti." [*Id.* at 1401:7–8 (Committee's expert admitting that TOUSA's intercompany accounts were "a huge pile of tangled spaghetti")].

convinced lenders to provide them with hundreds of millions of dollars of new financing or allow renegotiation of bond debt.

Of note, the Bankruptcy Court hedged on the issue, as suggested by the Committee's *verbatim* adopted findings, by never directly concluding that the Conveying Subsidiaries could survive if the TOUSA Parent was forced into bankruptcy in absence of the July 31 Transaction. Rather, the Opinion simply concluded that disastrous harm to the Conveying Subsidiaries was "not necessarily" inevitable absent the July 31 Transaction but "could" at least "possibly" be averted. [*Id.* at 109]. This speculative conclusion is tied to the Bankruptcy Court's further erroneous resort to "hindsight" reasoning that because the July 31 Transaction did not prevent TOUSA, Inc.'s bankruptcy—at most it delayed the inevitable—and it could not have given rise to any purported benefits to the Conveying Subsidiaries predicated on the avoidance of such a bankruptcy. [*Id.* at 108–09].

Equally fundamental, and directly contrary to the undisputed documents of record, is the Bankruptcy Court's incorrect but critical finding that the Conveying Subsidiaries' assets would have been *unencumbered* but for the July 31 Transaction. [*Id.* at 113]. In point of fact, given the existing security interests on the Revolver debt, the Conveying Subsidiaries assets *were already pledged*. [Stip., p. 9; Trial Exh. 3062 § 2; Bankr. Hr'g Tr. 3615:17–25 ("[The] revolvers had taken collateral in the fall, so we [the New Lenders] needed their approval in order to share that collateral with any other lenders.")]. They just were not pledged to the Transeastern deal. But, the fact that the Conveying Subsidiaries

assets were pledged to the Revolver debt implicated the Bankruptcy Court's finding on alternative "standalone" financing.

The only evidence referenced by the Bankruptcy Court in support of the finding that the Conveying Subsidiaries could have obtained alternative standalone financing was the conclusory testimony of two of the Committee's experts, William Derrough and Charles Hewlett. [Op., p. 109]. Their testimony can only be characterized on appellate review as "rank speculation." Their opinions were predicated on their claim to have seen other subsidiaries survive bankruptcies of their parents, or negotiate around bond defaults, or obtain independent financing. None of these opinions were tied to, or addressed, the specific circumstances of this case.[55] The Bankruptcy Court erred in not conducting an analysis of these opinions, as required by FED. R. EVID. 702, to determine if either were qualified to render such opinions, and, alternatively, to determine their factual sufficiency or reliability, particularly given the overwhelming contrary evidence that these entities did not have, and could not have reasonably obtained independent financial statements; needed consents

---

[55] Mr. Derrough concluded the following without further analysis: "I believe these companies could have been able to get financing on their own, and there's plenty of examples of companies in bankruptcy with meaningful, major subsidiaries that are not in bankruptcy continuing to operate, cash management systems with cash flowing back and forth between debtor and non-debtor subsidiaries, *so I don't think it is a given at all that a bankruptcy of the parent would necessarily be the death knell for these subsidiaries.*" [Bankr. Hr'g Tr. 1302:11–20. (emphasis added)]. Likewise, Mr. Hewlett opined that "[b]ased on the evidence and my knowledge of the home building industry, there's no reason to think that TOUSA's home building subsidiaries, namely TOUSA Homes, Inc. and Newmark Homes, LP, would have been unable to secure financing on their own." [Bankr. Hr'g Tr. 854:7–855:2]. Mr. Hewlett admitted that although he arrived at this conclusion, he did not "specifically recall going into a subsidiary-level analysis relative to them obtaining individual financing." [*Id.* at 575:16–18]. He further conceded during cross examination that when he arrived at this conclusion, he never considered the actual circumstances of the Conveying Subsidiaries. Specifically, he did not take into account any of the Conveying Subsidiaries' obligations under the Revolver or the bond debt. [*Id.* at 855:25–856:14]. When asked whether those obligations of the Conveying Subsidiaries would have prevented them from obtaining separate financing, he replied: "That's not my area of expertise, no." [*Id.* at 856:10–20].

from the Revolver lenders to take on new debt and encumber assets on which the Revolver lenders already had security interests; and needed waivers by the holders of the TOUSA bond debt of the new liability to repay immediately the $1 billion in obligations triggered by an adverse judgment in the Transeastern Litigation. *See Gorelik v. Holder*, 339 F. App'x 70, 73 (2d Cir. 2009) (noting that "little weight" should be given to an expert's testimony where the expert's reasoning is "speculative"); *Jenkins v. Astrue*, 250 F. App'x 645, 647 (5th Cir. 2007) (holding that "hypothetical testimony" by a vocational expert, which is unsupported by the evidence, may be properly disregarded); *Velander v. Garner*, 348 F.3d 1359, 1371 (Fed. Cir. 2003) (according little weight to broad conclusory statements in expert testimony). In fact, counsel for the Committee even conceded at oral argument on this appeal that the risks and implications of obtaining credit as a stand-alone entity are entirely different than those of a subsidiary in a large enterprise.[56]

For all of these reasons, I conclude that the Bankruptcy Court erred in concluding that the Conveying Subsidiaries did not receive "reasonably equivalent value" as a result of the July 31 Transaction.

---

[56] Appeal Hr'g Tr. 42:4–15 ("Judge Jordan: I mean, if you're a standalone company and you have only your own debt and the company decides—a bank decides to lend you money because it thinks you're a good credit risk and you're a good bet on a going forward basis, it analyzes what you owe, what your prospects are, et cetera. But then you're bought by someone else and because of intercorporate transactions, you now guarantee the other side's debt. Your balance sheet doesn't look that good anymore. So now a bank who's looking at you is saying, 'Hummm. If they were a standalone company, I'd lend them money again,' but you're not a standalone company anymore. Mr. Robbins: *That's true, Judge Jordan.*") (emphasis added).

**E.     The Bankruptcy Court Erroneously Compelled The Senior Transeastern Lenders To Disgorge Under Section 550 the Value of the Liens as the Parties "For Whose Benefit" the New Loans Were Made**

I turn now back to the second theory of liability adopted by the Bankruptcy Court, that is, that the Transeastern Lenders were liable as the entities "for whose benefit" the Conveying Subsidiaries transferred the liens to the New Lenders because the liens were used by the New Lenders to satisfy TOUSA's debt to the Transeastern Lenders. Because I have concluded that the Conveying Subsidiaries received reasonably equivalent value for the July 31 Transaction under § 548, I could simply decline to address any arguments concerning the Conveying Subsidiaries' right to recovery under § 550. The Parties do not dispute this point. *See* Appeal Hr'g Tr. 97:7–9 (counsel for the Committee agreeing that "[Section] 548 is the prerequisite that has to be met before you get to [Section] 550"); *id.* at 111:10–21 (counsel for the Transeastern Lenders stating that if the Court determines that the First and Second Lien Holders are not held to have committed a fraudulent transfer under § 548, then "it is completely over for us").

But, for purposes of full analysis, and given the complexity of issues that will be further reviewed by the Eleventh Circuit, I elect to address the Section 550 issues directly. Thus, even if the Bankruptcy Court's finding on reasonably equivalent value was ultimately sustained, reversal is nonetheless required because, as a matter of law, the Conveying Subsidiaries cannot recover from the Transeastern Lenders pursuant to § 550. The linchpin of the Committee's argument under this provision of the Bankruptcy Code was not that the

Conveying Subsidiaries ever held a property interest in the New Loans, but rather that they could recover because the transfer of the liens to the New Lenders was avoidable and was for the "ultimate benefit" of the Transeastern Lenders. The Bankruptcy Court erroneously adopted the argument and stated:

> The Senior Transeastern Lenders were "entities for whose benefit" the transfer of liens to the First and Second Lien Lenders was made. The plain meaning of the statutory language encompasses the Senior Transeastern Lenders. The new loans, and the liens securing those loans, were undertaken for the express purpose of resolving the claims of the Transeastern Lenders against TOUSA, Inc. and Holmes L.P. Execution of the settlement with the Transeastern Lenders was expressly required by the loan agreements, and all parties to the July 31 Transaction understood that the Senior Transeastern Lenders would immediately receive more than $421 million of the loan proceeds. The Senior Transeastern Lenders directly received the benefit of the Transaction and the Transaction was undertaken with the unambiguous intent that they would do so.
>
> [Op., p. 151].

The Bankruptcy Court's overly broad interpretation of Section 550(a) erroneously neglects to analyze the specific text of that provision. There are three types of entities from whom or from which a trustee may recover an avoidable transfer: (1) an initial transferee, (2) an entity for whose benefit the initial transfer was made, or (3) a subsequent transferee. *See* 11 U.S.C. § 550(a);[57] *In re Int'l Admin. Servs., Inc.,* 408 F.3d at 703; *Christy v. Alexander & Alexander (In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson &*

---

[57]

It is only to the extent the "transfer" is avoided under section 548, may the trustee recover the value of "such property" from "(1) the initial transferee of *such transfer* or the entity for whose benefit *such transfer* was made [Section 550(a)(1)]; or (2) any immediate or mediate transferee of such *initial* transferee [Section 550(a)(2)]." 11 U.S.C. § 550(a)(1)–(2). Section 550(b) goes on to say that the trustee may *not* recover under Section 550(a)(2) from "(1) a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided; or (2) any immediate or mediate good faith transferee of such transferee." *Id.* § 550(b).

*Casey*), 130 F.3d 52, 56 (2d Cir.1997); *Bowers v. Atlanta Motor Speedway, Inc.* (*In re SE Hotel Prop. Ltd. P'ship*), 99 F.3d 151, 154 (4th Cir. 1996). The statute clearly separates "(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made" from "(2) any immediate or mediate transferee of such initial transferee," otherwise known as the subsequent transferee, see 11 U.S.C. §§ 550(a)(1)–(2); *In re Finley, Kumble*, 130 F.3d at 57; *Danning v. Miller* (*In re Bullion Reserve*), 922 F.2d 544, 547 (9th Cir. 1991); *Bonded Fin. Servs., Inc. v. European Am. Bank*, 838 F.2d 890, 895 (7th Cir. 1988), because the liability to the estate of the initial transferee or the entity for whose benefit the initial transfer was made is absolute, see *In re Finley, Kumble*, 130 F.3d at 57; *SE Hotel*, 99 F.3d at 154; *Bullion*, 922 F.2d at 547, whereas the liability of the subsequent transferee to the estate is not strict but subject to the "good faith purchaser for value" defense contained in § 550(b). *See* 11 U.S.C. § 550(b); *In re Int'l Admin Servs., Inc.,* 408 F.3d at 703 ("If there is not an affirmative good faith defense, then [section] 550(a) allows recovery from subsequent transferees as well."); *SE Hotel*, 99 F.3d at 154; *Bullion*, 922 F.2d at 548; John E. Theuman, *What Constitutes 'Initial Transferee' Under § 550(a) of the Bankruptcy Code*, 92 A.L.R. Fed. 631 § 2 (1989) ("The characterization of a potential defendant as an initial, immediate, or mediate transferee may make a substantial difference in a trustee's ability to make a case under § 550 . . . .").

With regard to Section 550(a), the Eleventh Circuit has recognized that the paradigm case of a benefit under that provision is the benefit to a guarantor by the payment of the underlying debt of the debtor. *Reily v. Kapila* (*In re Int'l Mgmt.*

*Assoc.*), 399 F.3d 1288, 1292 (11th Cir. 2005) (stating that the phrase "entity for whose benefit such transfer was made" usually has been "employed when the trustee attempts to recover from a guarantor of an underlying debt") (citing *In re Coggin*, 30 F.3d 1443, 1453 (11th Cir. 1994)); 5 COLLIER ON BANKRUPTCY ¶ 550.02[4], at 550-17 (Lawrence P. King ed., 15th ed. 1996)); *see also In re Finley, Kumble,* 130 F.3d at 57 (stating that the phrase "entity for whose benefit such transfer was made" usually "references entities that benefit as guarantors of the debtor, or otherwise, without ever holding the funds"); *Bonded Fin. Servs., Inc.*, 838 F.2d at 895 (stating that "the paradigm 'entity for whose benefit such transfer was made' is a guarantor or debtor"). In this case, the Transeastern Lenders clearly do not fit the "paradigm" classification as an entity for whose benefit a transfer was made because they were not guarantors of the debtor Conveying Subsidiaries. Rather, they were the holders of a valid antecedent debt from TOUSA that was incurred substantially prior to the preference period.

To properly analyze Section 550 and determine if the Transeastern Lenders qualify in any category of entities exposed to liability under Section 550, it is first necessary to ask which "transfer" was at issue. Under the plain statutory language of Section 550(a)(1), the phrase "*such transfer,*" with reference to the *initial transferee,* is the *same* transfer for purposes of the "entity for whose benefit *such transfer* was made." In essence, this is the "transfer [that] is avoided." § 550(a). The Bankruptcy Court's Order makes it clear that "*such transfer,*" that is, the transfer at issue for Section 550(a) purposes, *was the transfer of the liens to*

*the New Lenders*. Counsel for the Committee also confirmed that this was the relevant transfer during oral argument:

> Judge Gold:   And you're talking about—let me ask this—in your "for whose benefit theory is," you're talking about the fraudulent transfer being the *conveyance of the lien interest* in this respect.
>
> Mr. Robbins:   *Precisely*.
>
> Judge Gold:   Okay. So if you look at the language, "Any transfer of an interest of the debtor in property," *the transfer of the interest of the debtor is solely the liens*.
>
> Mr. Robbins:   *That's true*.
>
> [Appeal Hr'g Tr. 96:3–7 (emphasis added)].

The Bankruptcy Court did not (and could not) find that the Transeastern Lenders were liable for this transfer of liens as either "initial" or "subsequent" transferees. As the Eleventh Circuit has noted, the "term 'initial transferee' is a term of art whose meaning in any given transaction is not always straightforward." *Andreini & Co. v. Pony Express Delivery Serv., Inc.* (*In re Pony Express Delivery Serv., Inc.*), 440 F.3d 1296, 1300 (11th Cir. 2006). The court went on to establish a "control" test to determine if a person or entity is an "initial transferee" under § 550(a): "[A] recipient of an avoidable transfer is an initial transferee only if they exercise legal control over the assets received, such that they have the right to use the assets for their own purposes, and not if they merely served as a conduit for assets that were under the actual control of the debtor–transferor or the real initial transferee." *Id.* Here, it is undisputed that the initial transfer for statutory purposes, was the transfer of liens from TOUSA and the Conveying Subsidiaries to the New Lenders *who exercised full legal control over the liens*. Therefore, only the New Lenders, and not the Transeastern

Lenders, could qualify as "initial transferees" under the Eleventh Circuit's "control test." It is further undisputed that the liens remained at all times *with the New Lenders* and were never transferred to the Transeastern Lenders. Therefore, the Transeastern Lenders could not qualify as "subsequent transferees."[58]

The Bankruptcy Court appears to acknowledge that the Transeastern Lenders could not be categorized as "subsequent transferees." Instead, it held that the Transeastern Lenders were both initial transferees and entities "for whose benefit" the transfer was made. [Op., p. 176 ("Because both the First and Second Lien Lenders and the Senior Transeastern Lenders are initial transferees (and the Senior Transeastern lenders are beneficiaries) of an avoidable transfer, Section 550 would permit recover from either set of Defendants.")]. Essentially, the Bankruptcy Court's theory is that the Transeastern Lenders received a benefit *flowing from the use to which the initial lien transfer was put; namely, the further transfer of proceeds to TOUSA which, in turn, transferred the proceeds to the Transeastern Lenders in settlement and payment of a valid, antecedent debt.*

The Committee attempts to avoid the direct implication of applicable case law by contending that the Transeastern Lenders benefitted from the lien transfer because although there were in fact multiple transactions that occurred, they were all part of a "single integrated transaction" that took place of July 31, 2007. [Committee's Br., p. 94, 96, 131, 146, 152; *see also* Op., p. 8 (referring to the "single integrated transaction")]. This attempt to lump all transactions into a

---

[58]  The Committee also provided an additional ground to reject the theory that the Transeastern Lenders could have been "subsequent transferees" because it abandoned its claims under this theory in the proceedings below. [*See* Bankr. ECF No. 243].

"single integrated transaction" for purposes of the analysis under § 550 is problematic for several reasons. It is contrary to the Bankruptcy Court's own analysis where the court broke down the transfers into separate transactions for Section 548 purposes. [Op., p. 105 ("The Conveying Subsidiaries received none of the proceeds of the loans they became obligated to repay.  The money was transferred by the lenders to Universal Land Title, Inc. . . . which disbursed the funds to the various parties to the settlement."); *see also id.* at 147 ("The statute entirely refutes Defendants' attempt to lump all of the TOUSA entities together for purposes of determining reasonably equivalent value.")]. Having split the transactions for Section 548 purposes, it is now error to then "lump" them together for Section 550(a) purposes, when the overwhelming record of evidence on appeal establishes that the lien and proceeds transactions had different transferors and transferees and, in recognition of this, the Committee had brought multiple claims alleging that both transfers were fraudulent for completely different reasons.

In addition, the Parties' stipulation concerning the phrase "single integrated transaction" is not controlling for the analysis under Section 550. The actual stipulation between the Parties was that the "July 2007 Credit Agreements"—which are made up of (1) the Amended Revolver Agreement dated July 31, 2007; (2) the First Lien Term Credit Agreement; and (3) the Second Lien Term Credit Agreement—were "executed as part of a single integrated transaction."[59] As the Transeastern Lenders correctly argue in their

---

[59] The July 2007 Credit Agreements can be found in Trial Exhibits 360–62.

Reply Brief, this phrase taken from the Joint Stipulated Facts is not "talismanic" in terms of legal significance for the Bankruptcy Court's application of § 550 to the facts of this case. [Transeastern Reply Br., p. 12]. More importantly, this stipulation refers only to the *credit agreements* governing the Parties on July 31, 2007, and it *does not* refer to the separate payment of proceeds made from Universal Land Title, Inc. to the Transeastern Lenders. At most, the transactions concerning the credit arrangements *going forward in the future* with the New Lenders and the Revolver Lenders could possibly be viewed as part of a "single integrated transaction," but the payment to the Transeastern Lenders in order to effectuate settlement for a separate, previous debt could not be viewed as part of that same transaction.

Because Section 550(a) explicitly links the initial transferee with the entity "for whose benefit" the initial transfer was made, "only a person (or entity) who receives a benefit from the initial transfer" can be an entity "for whose benefit the initial transfer was made. *Bonded Fin. Serv., Inc.*, 838 F.2d at 896 (cited with approval by the Eleventh Circuit in *In re Int'l Mgmt Assoc.,* 399 F.3d at 1293). Therefore, "a subsequent transferee cannot be the 'entity for whose benefit' the initial transfer was made." *Id.* at 897. This is because "the structure of the statute separates the initial transferees and beneficiaries, on the one hand, from 'immediate or mediate transferee[s]' on the other." *Id.* at 895. According to the Seventh Circuit in *Bonded Financial*, "[T]he implication is that the 'entity for whose benefit' is different from a transferee, 'immediate' or otherwise." *Id.* As the court explained: *"Someone who receives the money later on is not an 'entity for*

*whose benefit such transfer was made*.' " *Id.* at 896 (emphasis added); *see also SE Hotel*, 99 F.3d at 155 (citing *Bonded* for the point that an entity "for whose benefit" a transfer was made cannot be a subsequent transferee); *Bullion*, 922 F.2d at 548 (noting that a subsequent transferee cannot be an entity for whose benefit the initial transfer was made, even if the subsequent transferee actually receives a benefit from the initial transfer); *Lippi v. City Bank*, 955 F.2d 599, 611 (9th Cir. 1992) (same); *Lowry v. Sec. Pac. Bus. Credit, Inc.* (*In re Columbia Data Prod., Inc.*), 892 F.2d 26, 28 (4th Cir. 1989) (same)*; Merrill v. Dietz* (*In re Universal Clearing House*), 62 B.R. 118, 128 n.12 (D. Utah 1986) ("A reading of subsection (a)(1) in conjunction with the remainder of section 550 leads to the conclusion that the phrase 'or the entity for whose benefit such transfer was made' refers to those who receive a benefit as a result of the initial transfer from the debtor—not as the result of a subsequent transfer.").

Simply put, the "for whose benefit" language does not apply where the "benefit" is not the immediate and necessary consequence of the initial transfer, but flows from the manner in which the initial transfer is *used* by its recipient—the "benefit must derive directly from the [initial] transfer, not from the use to which it is put by the transferee." *Turner v. Phoenix Fin., LLC.* (*In re Imageset, Inc.*)*,* 299 B.R. 709, 718 (Bankr. D. Me. 2003) ("As explained in *Bonded Financial*, the paradigmatic 'entity for whose benefit the transfer was made' is the debtor or guarantor, whose own liability is reduced or extinguished by the payment made, as a result of the payment itself. The benefit must derive directly from the transfer, *not from the use to which it is put by the transferee*." (emphasis added));

*Peterson v. Hoffmann* (*In re Delta Phones, Inc.*), Adversary Case No. 05 A 1205, 2005 WL 3542667, at *5 (Bankr. N.D. Ill., Dec. 23, 2005) (same). Thus, because the Transeastern Lenders were "subsequent transferees" of the proceeds backed by the liens, the Senior Transeastern Lenders do not qualify as "entities for whose benefit" the transfers were made within § 550(a)(1)'s meaning.

The Bankruptcy Court further erred by imposing strict liability on the Transeastern Lenders under the "whose benefit" language without considering whether the Transeastern Lenders were subsequent "transferees" under the statute, and, therefore, whether the Trustee was precluded from recovering under Section 550(a) by virtue of the language of Section 550(b)(1) which, in turn, precludes recovery from "a transferee that takes for value, including satisfaction . . . of a . . . antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided," *or* by virtue of Section 550(b)(2) which precludes recovery from "any immediate or mediate good faith transferee of such transferee."

I nonetheless conclude that remand to consider the status of the Transeastern Lenders as a "transferee," and the application of the Section 550(b) two exceptions, is unnecessary on this appellate record. Even assuming under some theory[60] that the Transeastern Lenders could be considered the "immediate transferee of the proceeds," they nevertheless were a transferee that took "for value," that is, the payment of a valid antecedent debt. As made clear in *Bonded*

---

[60]

The Bankruptcy Code does not define "transferee" and "there is no legislative history on that term." *Martinez v. Hutton* (*In re Harwell*), — F.3d —, Case No. 09-14997, 2010 U.S. App. LEXIS 26367, at *10–29 (11th Cir. Dec. 29, 2010) (discussing at length the "control" or "conduit tests" under § 550 and reaffirming that the statute should not be construed in a rigid manner).

*Financial,* "the statute does not say 'value to the debtor. It says 'value.' . . . [A] natural reading looks to what the transferee gave up rather than what the debtor received." *Bonded Fin. Serv., Inc.*, 838 F.2d at 897. Thus, it is sufficient if the "value," as was the case here, was the satisfaction of TOUSA's valid antecedent debt.

Furthermore, the Committee offered no evidence that sufficiently established that the Transeastern Lenders acted in bad faith to obtain repayment of their antecedent debt, or to settle the Transeastern Litigation, and that the Transeastern Lenders accepted payment of the valid debt with knowledge of the voidability (if any) of the lien transfer to the New Lenders.  Notwithstanding, the Bankruptcy Court determined that the Transeastern Lenders acted in bad faith and were grossly negligent because they knew of or should have known on the basis of publically available information that TOUSA and the Conveying Subsidiaries were insolvent on July 31, 2007, or were precariously close to insolvency. [Op., pp. 116, 124]. In other words, the Bankruptcy Court held that it is "bad faith" for a creditor of someone *other than the debtor* to accept payment of a valid, tendered debt repayment outside of any preference period, through settlement or otherwise, if the creditor does not first investigate the debtor's internal re-financing structure and ensure that the debtor's subsidiaries had received fair value as part of the repayment, or that the debtor and its subsidiaries, in an enterprise, were not insolvent or precariously close to being insolvent.

This standard is patently unreasonable and unworkable. The 182-page Opinion contains no analysis or discussion of any duty of care under New York law (which governed the transaction) or under established bankruptcy law, that suggests that the Transeastern Lenders owed a duty of care to the Conveying Subsidiaries. Furthermore, the Bankruptcy Court provided no basis why a court could consider such a duty—if it even existed—as a factor for determining "good faith" under Section 550(b). Case law generally cautions against imposing exhaustive duties to investigate upon banks and other creditors. *See, e.g.*, *McCarty v. Richard James Enter., Inc.* (*In re Presidential Corp.*), 180 B.R. 233, 239 (B.A.P. 9th Cir. 1995) ("A party who receives a subsequent transfer from the buyer's escrow account should not be required to investigate the source of the deposits, any more than a party receiving payment from someone's personal checking account should be required to investigate the source of the funds."); *N.Y. Assets Realization Co. v. McKinnon*, 209 F. 791, 793 (2d Cir. 1913) ("It would be an exceeding great hardship on the debtor if the creditor had the right to refuse to accept payment of the debt after it was due, and at the same time retain the debtor's property or a lien upon it for the debt.").

The net result of the Bankruptcy Court's improper finding is to impose extraordinary duties of due diligence on the part of creditors accepting repayment—duties that equal or exceed those imposed on lenders extending credit in the first place. To the contrary, the Transeastern Lenders, as recipients of a debt payment, had no reason or legal duty to conduct such extraordinary

due diligence with respect to the provenance of the funds with which they were being repaid.

A wide range of authority suggests that Congress did *not* intend to use Section 550 as a means to expand liability in such a drastic manner as the Bankruptcy Court has done. The legislative history[61] of the Bankruptcy Code makes it clear that Congress did *not* intend to expand liability in Section 550 beyond that which is available under Section 548. In particular, the legislative history of Section 550 provides that "[t]he words 'to the extent that' in the lead in to this subsection [550] are designed to incorporate *the protection of transferees* found in proposed 11 U.S.C. 549(b) and 548©." S. REP. No. 95-989, at 90 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5876 (emphasis added). Early legislative materials also indicate that Congress was least concerned with imposing liability on entities "for whose benefit" a transfer was made because initial versions of the Bankruptcy Reform Bill contained no reference at all to recovery from such entities. *See* Larry Chek & Vernan O. Teofan, *The Identity and Liability of the Entity for Whose Benefit a Transfer Is Made Under Section 550(a): An Alternative to the Rorschach Test*, 4 J. BANKR. L. & PRAC. 145, 149 (1995) ("It was not until the bill emerged from the conference committee in its final form that the 'entity for whose benefit' language [first] appeared."); *see also* Lara R. Sheikh, *Sections 548 and 550—Developments in the Law of Fraudulent Transfers and Recoveries*, 2010 NORTON ANN. SURV. BANKR. L. § 2.B ("Initially, section 550(a)(1) did not

---

[61]

As noted above, I am required under Eleventh Circuit case law to first determine if the text of a statute is ambiguous or inconclusive before considering its legislative history. *Mount Sinai*, 486 F.3d at 1251–52. In this instance, the text of § 550 does not shed light on whether Congress intended to expand liability through this recovery provision. Therefore, I look to legislative history.

contain the ability to recover from the 'entity for whose benefit such transfer was made.'").

Expanding liability under § 550 in the manner set forth by the Bankruptcy Court's Order would lead to unintended consequences because the traditional "theory of recovery" under fraudulent transfer law was "cancellation, not civil damages for any act of wrongdoing." *See* Chek & Teofan, *supra*, at 147–48, 151–52 (arguing that there is no precedent or indication that Congress contemplated "sweeping liability" under § 550); *see also id.* at 159 ("[U]nless courts are prepared to extend liability under Section 550(a)(1) to the remotest frontiers of benefit-in-fact, there must be some principle to confine liability to an immediate class of beneficiaries.").

Because the Bankruptcy Court's Opinion greatly expanded liability under § 548 and § 550, numerous scholarly articles have already been published criticizing the Opinion since it was issued. *See, e.g.*, Patricia A. Redmond, *et al.*, *Clutching a Home-Run Recovery from a Shortstop Transferree and the Single-Satisfaction Umpire*, 28 AM. BANKR. INST. J. 18, 18 (2010) ("The lesson learned from cases involving multiple transferees and the entities for whose benefit the transfer was made is simple: Be wary of, and careful with, prebankruptcy transfers."); Marc Anthony Angelone, *The TOUSA Decision: A Lender's Nightmare?*, 127 BANKR. L. J. 863, 863 (2010) ("Th[e] laundry list of woes was the painful reality for the lenders in *In re TOUSA, Inc.*"); Douglas E. Deutsch, *et al.*, *Top Business Bankruptcy Cases of 2009*, 29 AM. BANKR. INST. J. 40, 41 (2010) ("The outcome is greatly troubling to secured lenders."); Jo Ann J. Brighton,

*TOUSA: Do Lenders Have the Responsibility To Protect Borrowers from Their Own Bad Judgment?*, 29 AM. BANKR. INST. J. 18, 20 (2010) ("TOUSA provides a classic example of how bad facts make bad law. . . . [W]here was Citi's fiduciary obligation to protect the bondholders? . . . The increased work that lenders will be forced to do [after the Bankruptcy Court's Order] to review a potential transaction will inevitably result in higher fees to borrowers.").

The limited legislative history specifically concerning the phrase "good faith" in § 550(b) also does not indicate that Congress ever intended courts to use that phrase as a "gateway" to more expansive liability.[62] The phrase was "intended to prevent a transferee from whom the trustee could recover from transferring the recoverable property to an innocent transferee, and receiving a retransfer from him, that is, 'washing' the transaction through an innocent third party." S. REP. NO. 95-989, at 90 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5876; *see also Friedman v. Vinas* (*In re Trauger*), 109 B.R. 502, 505 (Bankr. S.D. Fla. 1989) ("[T]he good faith exception of 550(b)(1) was intended for those situations in which a bad faith transferee materially assists in, or in fact enables, the transferring of funds which can not then be recovered, and who derives some demonstrable benefit thereby."). Here, there is no evidence that the Transeastern Lenders ever "washed" any part of the July 31 Transaction or "materially assisted" any kind of improper scheme, but rather they accepted payment for a valid antecedent debt.

---

[62] Again, I look to legislative history on this point because the text of the statute provides no indication of congressional intent concerning the phrase *good faith*. The legislative history is helpful in supplementing the inconclusive statutory text because it provides an example where a party could not rely on this defense.

In a recent Eleventh Circuit decision regarding 550(a), the court surveyed the law on the issue of "initial transferees" for purposes of Section 550(a)(1) and discussed the application of a conduit or control test to initial transferees. *Martinez v. Hutton* (*In re Harwell*), — F.3d  —, Case No. 09-14997, 2010 U.S. App. LEXIS 26367, at *10–29 (11th Cir. Dec. 29, 2010). The Eleventh Circuit stated that "in effect, we have tempered literal application of Section 550(a)(1), examining all the facts and circumstances surrounding a transaction to prevent recovery from a transferee innocent of wrongdoing and deserving of protection." *Id.* at *27–28. Among other reasons to adhere to a "tempered" application of § 550, the court took note of important public policy concerns.  For example, if a court "were to require banks to examine the source of a wire transfer and determine its solvency, then it would pose an unfair burden on the banks and would severely impair the wire transfer system." *Id.* at *19–20 (citing *In re Chase & Sanborn*, 848 F.2d at 1202).

Drawing upon this analogy, if the Bankruptcy Court's ruling were to stand, it would pose an unfair burden on creditors to investigate all aspects of their debtors and the affiliates of those debtors before agreeing to accept payments for valid debts owed. The Bankruptcy Court's legal definition of what constitutes "good faith" is contrary to any "tempered" application of Section 550(a)(1)–(2). To adopt the Bankruptcy's Court's position would have a profoundly chilling effect on acceptance of payment  by lenders of valid antecedent debts—a result not contemplated by the Bankruptcy Code or supported by any direct legal authority. It would place an impossible burden on holders of antecedent debt that would

undermine their ability to settle valid debts outside any preference period, and, instead, would encourage the proliferation of wasteful debt-resolution litigation.

> **F.     The Bankruptcy Court Erroneously Relied on the Eleventh Circuit's Decision in *In re Air Conditioning, Inc.* To Establish Liability Under Section 550(a)**

In determining that the Transeastern Lenders were liable under § 550, the Bankruptcy Court also relied on the Eleventh Circuit's decision in *American Bank of Martin County v. Leasing Service Corp.* (*In re Air Conditioning, Inc.*), 845 F.2d 293 (11th Cir. 1988).[63] The facts in that case involved a debtor who provided security to an undersecured creditor through a bank letter of credit, which the debtor then secured through a certificate of deposit at the bank. *Id.* at 295. When the creditor filed for bankruptcy within one month of this transaction, the Eleventh Circuit held that the transfer of the collateral to the bank was an avoidable preference under Section 547(b) and that although the transfer went directly to the bank, it was "for the benefit of" the creditor because it "secured payment of an undersecured antecedent debt owed by [the debtor]." *Id.* at 295–96.

The Bankruptcy Court below held that the facts of this case "fall squarely" within the Eleventh Circuit's holding in *Air Conditioning.* [Op., p. 151]. A closer analysis of that case demonstrates otherwise. Most importantly, *Air Conditioning* was a case about an avoidable preference governed under 11 U.S.C. § 547,

---

[63] In fact, although the Parties devote considerable attention in their briefs to *In re Air Conditioning*, the Bankruptcy Court addressed the case in only three sentences in its Order. [Op., p. 151 ("The facts of this case also fall squarely within the Eleventh Circuit's holding in *American Bank of Marin County v. Leasing Service Corp.* (*In re Air Conditioning, Inc. of Stuart*), 845 F.2d 293 (11th Cir. 1988). In *Air Conditioning*, a creditor was paid with funds provided by a bank in exchange for a security interest in the debtor's property. The Eleventh Circuit held that the creditor was an entity for whose benefit the transfer of the security interest to the bank was made.").

which has no application to the Transeastern Lenders in this dispute. Because the focus of the Eleventh Circuit in *Air Conditioning* was on Section 547—not Section 550—of the Bankruptcy Code, that case does not control the outcome in the instant matter. *See Air Conditioning*, 845 F.2d at 296–97 ("We hold therefore that LSC did receive a benefit *under section 547(b)(1)*.") (emphasis added).

The Committee argues that the distinction between Code provisions is irrelevant because § 547 permits avoidance of preferential transfers that are undertaken "to or for the benefit of the creditor." I find this argument unpersuasive. As the Committee recognized at oral argument, it is obligated under the facts of this case to establish liability pursuant to § 548 before reaching the question of recovery under § 550. [Appeal Hr'g Tr. 97:7–8]. The Committee further conceded that the phrase "for the benefit of" as used in § 548 of the Code only applies to employment contracts. *See id.* at 95:10–16; 11 U.S.C. § 548(a)(1)(B)(iv) (prohibiting certain transfers "to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business"). As is clear from the text of these two provisions, the "for the benefit of" *substantive liability provision* of § 547(b) differs from that of § 548, and both of those provisions differ from the "for whose benefit" *recovery provision* contained in § 550. The Seventh Circuit has recognized that *Air Conditioning* did not "consider" the relation between § 547 and § 550. *See Levitt v. Ingersoll Rand Fin. Corp.*, 874 F.2d 1186, 1196 n.6 (7th Cir. 1989).

In addition, the holdings in both *Air Conditioning* and *Kellogg v. Blue Quail Energy, Inc.* (*In re Compton Corp.*), 831 F.2d 586 (5th Cir. 1988), which the Eleventh Circuit relied on in *Air Conditioning*, were limited to banking disputes concerning letters of credit or certificates of deposit. *See Air Conditioning*, 845 F.2d at 299 (affirming the district court specifically because of its decision "to uphold the sanctity of letters of credit as vital instruments of commerce"); *In re Compton*, 831 F.2d at 594 ("The precise holding in this case needs to be emphasized. . . . The holding of this case fully allows the letter of credit to function. We preserve its sanctity and the underlying independence doctrine. We do not, however, allow an unsecured creditor to avoid a preference attack by utilizing a letter of credit to secure payment of an antecedent debt.").[64] The *Air Conditioning* court even explicitly noted that "it has been clear from the outset what this dispute is about: The $20,000 certificate of deposit." *Air Conditioning*, 845 F.2d at 299. Here, there is no letter of credit or certificate of deposit that precludes claims against the recipient of the debtor's property, namely the liens. Therefore, *Air Conditioning* is not controlling.

For all of these reasons, I find that the Bankruptcy Court erred in ordering recovery against the Transeastern Lenders under 11 U.S.C. § 550.

### G.   Remedies

Having determined that the Bankruptcy Court's Order must be reversed on all grounds concerning the liability of the Transeastern Lenders, I must next

---

[64] The Transeastern Lenders also correctly note that the Fifth Circuit has retreated from *Compton*, and the decision has been the subject of criticism. [*See* Transeastern Lenders' Br., p. 29 n.17; Transeastern Reply Br., p. 18 n.17].

consider the remedies imposed by the Bankruptcy Court. The Parties have spent considerable time briefing their arguments regarding these remedies. Because all of their arguments—including the arguments put forth by the Intervenors—concern the remedies scheme that the Bankruptcy Court adopted *based on its holdings as to liability*, I need not address these arguments. My decision to reverse the Bankruptcy Court on liability renders all of these arguments moot. [*See* Transeastern Reply Br., p. 23 n.29 ("If this Court reverses the bankruptcy court's findings of liability against the Transeastern Lenders, it need not consider the issues relating to remedies.")].

Traditionally, I would remand this case back to the Bankruptcy Court for further proceedings consistent with this opinion, but this case presents unique circumstances, which warrant additional consideration. In particular, the Transeastern Lenders have raised compelling arguments concerning the near-*verbatim* opinion issued by the Bankruptcy Court and its ability to conduct further proceedings in this matter.[65] I also consider the binding case law set forth in Section IV above regarding the standard of review. The U.S. Supreme Court and

---

[65] As noted above, the Transeastern Lenders have requested that this case be reassigned to another bankruptcy judge if remand is warranted on the basis that they have "serious doubts about [Judge Olson's] ability to approach the Defendant's evidence and arguments fairly." [Transeastern Lenders' Br., p. 53–55; Transeastern Reply Br., pp. 64–68]. Among other things, the Transeastern Lenders note that the Bankruptcy Court did the following below: it granted summary judgment to the Committee on one issue even after the Committee acknowledged that it withdrew its motion requesting summary judgment on that same issue; it questioned witnesses for the Defendants in a "belligerent and dismissive" manner; it allowed rebuttal testimony by two of the Committee's expert witnesses in order to "know what the truth is" even though it "refused to allow any testimony from a single fact witness identified by the Defendants as rebuttal to the new testimony"; and it directed that "each of the two Transeastern Lender defendant groups [] make a $10,000 'voluntary contribution' to a pro bono organization or be sanctioned in exchange for his agreement to vacate a fundamentally flawed dismissal of this very same appeal." [Transeastern Lenders' Br., pp. 53–55; Transeastern Reply Br., pp. 64–68]. Although I consider these arguments persuasive, I must not address these issues because I quash the Bankruptcy Court's Order. The Eleventh Circuit may consider these arguments as it deems necessary.

the Eleventh Circuit have strongly criticized trial courts for adopting proposed findings of fact and conclusions of law from litigants without conducting an independent analysis, and these two courts have also established that remand to a trial court is unnecessary where the record allows only one resolution of the factual issues at stake. Given the unique circumstances of this case and this binding case law, I conclude that remand of this case is unnecessary.[66]

Accordingly, it is **ORDERED AND ADJUDGED** that

1. The Bankruptcy Court's Order [Bankr. ECF No. 722] is **QUASHED** as it relates to the liability of the Transeastern Lenders.

2. The Bankruptcy Court's imposition of remedies as to the Transeastern Lenders is **NULL AND VOID**.

3. All bonds deposited by the Transeastern Lenders[67] in response to the Bankruptcy Court's Order on Motion for Stay Pending Appeal [Bankr. ECF No. 723] are **DISCHARGED**. However, such funds shall not be discharged if any Party files an appeal of this decision

---

[66] To avoid confusion for the Parties, I note that my decision not to remand this case will in no way affect the parallel appeal proceedings currently pending before the Honorable Adalberto J. Jordan. Specifically, the First and Second Lien Term Lenders in those proceedings also argue, as the Transeastern Lenders did here, that the Bankruptcy Court erred in holding that the July 31 Transaction did not confer reasonably equivalent value upon the Conveying Subsidiaries. Whether or not Judge Jordan affirms or reverses the Bankruptcy Court on this point under § 548 is irrelevant to the ultimate liability of the Transeastern Lenders because I hold that the Bankruptcy Court *independently erred* in concluding that the Conveying Subsidiaries could recover from the Transeastern Lenders under § 550 *even if the Bankruptcy Court had not erred in its § 548 analysis*.

[67] The Parties have noted that certain of the Transeastern Lenders also served as New Lenders for the July 31 Transaction. [*See* Plaintiffs' Proposed Findings, p. 21; Transeastern Proposed Findings p. 46; Second Lien Proposed Findings, p. 16; First Lien Proposed Findings, pp. 19, 21; Committee's Br., p. 27; Transeastern Reply Br., pp. 40–41 & nn.41–42; Second Lien Reply Br., p. 12 n.10]. To the extent that any of the lenders that have served in both capacities have deposited bonds, this Order only relates to those funds deposited by lenders acting in their capacity as Transeastern Lenders.

in which case the bonds shall remain in effect pending resolution of any appeals.

4.     The additional appeal proceedings before me filed by the Transeastern Lenders, all of which were contingent upon my decision concerning liability, are **DISMISSED AS MOOT**.

5.     All appeal proceedings before me concerning the Transeastern Lenders [Case Nos. 10-60017, 10-61478, 10-62032, 10-62035, and 10-62037] are **CLOSED**.

**DONE AND ORDERED** in Chambers in Miami, Florida, this 11th day of February, 2011.


_____
THE HONORABLE ALAN S. GOLD
UNITED STATES DISTRICT JUDGE


cc:
U.S. Bankruptcy Judge John K. Olson
All counsel of record